# EXHIBIT 1

```
                U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                         MEMPHIS DISTRICT OFFICE

ALEX J. HIXSON,                     )
                                    )
        Complainant,                )
                                    )
        vs.                         ) EEOC NO. 490-2015-00094X
                                    ) AGENCY NO. TVA-2014-0037
WILLIAM JOHNSON, President          )
and CEO, TENNESSEE VALLEY           )
AUTHORITY,                          )
                                    )           ORIGINAL
        Agency.                     )
                                    )
```

June 16, 2015

DEPOSITION OF TIMOTHY COFER

APPEARING FOR THE COMPLAINANT:

DOUG HAMILL, ESQUIRE
Burnette, Dobson & Pinchak
711 Cherry Street
Chattanooga, TN 37402


APPEARING FOR THE AGENCY:

PHILIP J. PFEIFER, ESQUIRE
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902


EMILY S. WEISS, LCR 592
HALL AND ASSOCIATES
1010 MARKET STREET, SUITE 402
CHATTANOOGA, TENNESSEE 37402
423/267-4328

| | | |
|---|---|---|
| 1 | Q | Is that a yes? |
| 2 | A | Yes. |
| 3 | Q | And so from August of 2008 through Mr. Hixson's termination date, were you Mr. Hixson's immediate supervisor? |
| 6 | A | Yes. |
| 7 | Q | And during this period of time, what was Mr. Hixson's position at Central Labs? |
| 9 | A | Technician. |
| 10 | Q | You said he was an junior grade? |
| 11 | A | Junior grade, A-level technician. |
| 12 | Q | Did you ever have an occasion to observe Mr. Hixson doing his job? |
| 14 | A | Yes. |
| 15 | Q | And how many occasions or how often were you able to observe him doing his job? |
| 17 | A | Over seven years or six years, at least once/twice a week, a month. It would vary. |
| 19 | Q | But at least on a weekly basis you had an opportunity to observe him doing his work? |
| 21 | A | Yes. |
| 22 | Q | How would you describe Mr. Hixson's overall quality of his work performance here at Central Labs? |
| 24 | A | For the most part, it was good. |
| 25 | Q | Before January of 2014, did you ever have to |

1  discipline Mr. Hixson?
2      A    No.
3      Q    Before January of 2014, did you ever tell
4  Mr. Hixson that you were unsatisfied with his work
5  performance?
6      A    We had discussed lack of training before. He
7  had goals that he was supposed to meet on training goals.
8  That was the biggest issue.
9      Q    When did you have this discussion with
10 Mr. Hixson about lack of training?
11     A    That would have been during the review period
12 during -- we do annual goals. They're goals set out every
13 year. So it would have been sometime during that period.
14     Q    What year?
15     A    I couldn't tell you. I'd have to look at the
16 goal, the review period, the personnel history report.
17     Q    Okay. Was it -- I assume that you last gave him
18 a performance review -- well, do you remember when you
19 last gave him a performance review?
20     A    No.
21     Q    Can you remember talking to him about this
22 training issue within six months of his termination?
23     A    I couldn't recall having that conversation, no.
24          MR. PFEIFER: We provided you with all of his
25 performance appraisals if you --

```
 1      Q    Do you remember when this performance review was
 2   done?
 3      A    It would most likely have been October of 2013.
 4   It's usually in October.  Sometimes they run into early
 5   November, but I would say it was October.
 6      Q    What overall rating did you give for Mr. Hixson?
 7      A    Satisfactory, I believe.
 8      Q    Did you give Mr. Hixson any exceeds expectations
 9   on this performance review?
10      A    He received one exceeds for having no violations
11   of the Quality Control Plan.
12      Q    Is that what QPP stands for?
13      A    That is correct.  That would be Quality
14   Programming Procedures or Quality Procedures Program.
15   That's our quality program for Central Laboratory
16   Services.
17      Q    Turn to Page 4, please.  There is a section for
18   rating Mr. Hixson on the topic of safety and health; do
19   you see that?
20      A    I do.
21      Q    And how did you rate Mr. Hixson?
22      A    Satisfactory.
23      Q    And what were your comments?
24      A    I said that Mr. Hixson always works in a safe
25   and conscientious manner.
```

BY MR. HAMILL:

Q    There's a section where you graded Mr. Hixson on communication; do you see that?

A    Yes.

Q    And you gave him a satisfactory rating; is that correct?

A    That is correct.

Q    Did you ever have any -- well, let me -- for the year 2013, did you have any complaints from any of Mr. Hixson's coworkers about his work?

A    Is this calendar year 2013 or fiscal year 2013 or fiscal --

Q    Calendar year.

A    I'm sorry. I bring that up because we're talking about performance reviews that run end of -- or October through end of September.

Q    Right.

A    So calendar year 2013. None that I can recall.

Q    Before January of 2014, were you aware that Mr. Hixson had depression?

A    I had never seen an official diagnosis or anything like that, but it had been inferred.

Q    And when you said it had been inferred, what do you mean by that?

A    Mr. Hixson had told me that he had issues. He'd

```
 1  had to have extended leave on more than one occasion, and
 2  that was -- we knew it was psychological, but I did not
 3  know that it was specifically depression or I had never
 4  seen a doctor's diagnosis.
 5      Q    Okay.  But you understood before January of 2014
 6  that Mr. Hixson had psychological issues; is that correct?
 7      A    That is correct.
 8      Q    Before January of 2014, were you aware that
 9  Mr. Hixson had insomnia?
10      A    No, at least not clinically diagnosed or
11  anything.  I've never seen a diagnosis.
12      Q    Were you aware that he had issues with sleep?
13      A    In general, no.  He may have told me he
14  had issues for a certain period, but that's not something
15  I associated with all the time.
16      Q    Okay.  When you say issues in a certain period,
17  do you remember when -- was there a time when Mr. Hixson
18  told you that he was having trouble with sleep?
19      A    I don't recall a specific time.
20      Q    Were you aware that Mr. Hixson was hospitalized
21  for psychiatric issues in the fall of 2012?
22      A    Hospitalized?
23      Q    Yes.
24      A    No.  I knew he had a procedure going on, but I
25  did not know that it was hospitalized.
```

Q   Based upon information I've been provided in this case, I can tell you with relative comfortableness that it does appear that he returned to work in January of 2013. Does that sound accurate to you?

A   I really don't know.

Q   As I understand, he -- whenever he was returned to work following this leave, he continued to work for you throughout the calendar year 2013; is that correct?

A   That's correct.

Q   During the calendar year of 2013, did Mr. Hixson ever have any kind of accident at work?

A   I don't recall any now.

Q   Are you aware if Mr. Hixson has ever had any kind of accident while working for TVA?

A   The only accident that I can remember -- and I can't remember when it happened -- he put a high pressure oxygen cylinder on a low pressure line, and it blew the line. It was a copper line. But I don't remember what year that was.

Q   Was it closer in time to his termination or farther back in time?

A   I really don't remember. I don't believe it was close to his termination, no. I think it was farther back, but I don't remember the time.

Q   At any point in the calendar year 2013, did you

```
 1   observe Mr. Hixson working in a manner that was unsafe?
 2        A    No.
 3        Q    At any point in 2013, did you observe Mr. Hixson
 4   working in a manner that was careless?
 5        A    No.
 6        Q    Did anyone ever report to you that Mr. Hixson
 7   was working in an unsafe manner in 2013?
 8        A    Calendar year 2013?
 9        Q    Yes, sir.
10        A    No one reported to me other than a customer
11   questioning results that we then figured out what went on
12   in early 2014.
13        Q    Okay.  And that wasn't really an unsafe manner,
14   that was he failed to miss a step?
15        A    That was an uncareful.
16        Q    Okay.
17        A    You said careful, I believe.
18        Q    Okay.  So that wouldn't be unsafe.  You would
19   just categorize that as not being careful, not following
20   the particular steps he was supposed to follow?
21        A    Not focused.
22        Q    At any point in 2013, did you observe Mr. Hixson
23   acting in an abnormal or strange manner?
24        A    No.
25        Q    At any point in 2013, did anyone ever report to
```

1  you that they had observed Mr. Hixson working in an
2  abnormal or strange manner?
3      A    Not that I recall.
4      Q    At any point in 2013, were you concerned that
5  Mr. Hixson could not safely perform his job?
6      A    No.
7      Q    At any point in 2013, did you believe Mr. Hixson
8  to be a threat to himself?
9      A    No.
10     Q    At any point in 2013, did you believe Mr. Hixson
11 to be a threat to coworkers?
12     A    No.
13     Q    Did you ever schedule Mr. Hixson to work on
14 Sundays?
15     A    That was his schedule when I arrived, and it
16 continued to be his schedule throughout his employment.
17     Q    Were there ever times where you were aware that
18 Mr. Hixson was working alone in the department?
19     A    There was always a laborer on-site. Though they
20 typically spend part of their day in another building,
21 they do come up from time to time.
22     Q    So there were times that you were aware that
23 Mr. Hixson was working in the building by himself;
24 correct?
25     A    For small periods of time but not for a whole

day. He would have seen other employees throughout the day.

Q   Would that -- what -- were those typical days where he would work for extended periods of time alone? For example, was that more on the weekend versus a weekday or --

A   Just Sunday would be the only day he would go for more than an hour without seeing somebody.

Q   Did you ever have any concerns about him working alone in the lab for an hour or two hours or however long he had to?

A   No.

Q   Now, as I understand, Mr. Hixson was selected for a random drug test on December 23rd, 2013; correct?

A   That is correct.

Q   And you notified Mr. Hixson that he had been randomly selected for the test; correct?

A   That is correct.

Q   At that point, did Mr. Hixson tell you that he had been prescribed a medicine that would result in a false positive or could result in a false positive?

A   That's correct.

Q   And what did you say to him in response?

A   I told him that he needed to go for the test. You still have to go for the random test. I said you

```
 1  meant --
 2       A    On the phone.
 3       Q    -- live -- you talked to him live?
 4       A    Yes.
 5       Q    Okay.  When you found out TVA wanted Mr. Hixson
 6  to submit to a medical evaluation, did anybody from TVA at
 7  that point ask you about Mr. Hixson's work performance?
 8       A    No.
 9       Q    At that point, did anyone from TVA ask you about
10  Mr. Hixson's behavior at work?
11       A    I don't believe so.
12       Q    At the time that you had learned that Mr. Hixson
13  was going to have to submit to a medical exam, had anybody
14  either from HR or Fitness for Duty talked to you about
15  Mr. Hixson's specific job duties?
16       A    Yes.  I had someone spell out for me why the
17  chemistry technician position was a safety-sensitive
18  position.
19       Q    Was that a conversation that happened around the
20  time that Mr. Hixson was first being taken off work, or
21  was that a conversation that took place after a month or
22  two?
23       A    I believe this was after the confirmation had
24  come back.
25       Q    Okay.  So that would have been roughly how long?
```

```
 1       Q    Okay.  You had indicated to me earlier in this
 2  deposition that you recall somebody from Fitness for Duty
 3  asking you about the safety-sensitive nature of
 4  Mr. Hixson's job, but you couldn't recall exactly when
 5  that happened.  Does this e-mail and --
 6       A    Yes.
 7       Q    Read it to yourself.  But does that refresh your
 8  recollection?
 9       A    This is what I was referring to.
10       Q    Okay.  And this first e-mail is from Ms. Clepper
11  to you dated March 25, 2014.  She says, Hi Tim, we have
12  Alex Hixson's job description, but it'd be helpful to our
13  psychologist if you could write a bit more narrative on
14  the hazardous elements of his job.  When would you be able
15  to do that and send it back to me?  Thanks.
16            Before this e-mail, had Ms. Clepper ever talked to
17  you about the specific job duties of Mr. Hixson?
18       A    I don't recall.
19       Q    Before this e-mail, had anybody at Fitness for
20  Duty or human resources ever talked to you about the
21  specific nature of Mr. Hixson's job duties?
22       A    I don't believe so, at least not in relation to
23  Mr. Hixson anyway.  It would have just been for general
24  job description purposes when posting the position.
25       Q    So as best as you can recall today, March 25th,
```

```
 1   2014 this was a new topic being raised to you; is that
 2   correct?
 3        A    Yeah.  I believe that these positions had been
 4   declared safety sensitive 15 years or more ago, and
 5   this -- I took it to be a refresher of exactly why it
 6   needed to be a safety-sensitive position.
 7        Q    But was this the first time --
 8        A    This is the first time I had ever been asked.
 9        Q    Okay.  Yes, that's what I wanted to know.  Now,
10   you responded to Ms. Clepper's e-mail roughly two and a
11   half hours later with, I assume, the attachment that's
12   Exhibit 1; is that right?
13        A    That's correct.  Wait.  Attachment that's
14   Exhibit 1?
15        Q    Oh, I'm sorry.  I didn't mean to say Exhibit 1.
16   The attachment.
17        A    Yes.
18        Q    It's the second page of this exhibit.  And
19   looking at this second page, did you type this document?
20        A    I did.
21        Q    And so this was your response to Ms. Clepper's
22   request; correct?
23        A    That is correct.
24        Q    Around this time frame, did you have any type of
25   follow-up conversations with Ms. Clepper regarding what
```

    1    A    I believe the end of May I was notified that he
    2    had not turned in the medication list by the 15th of May.
    3    And I remember I asked him if that was true. He said he
    4    hadn't. I reminded him that was part of his return to
    5    work agreement and suggested that he contact Non-nuclear
    6    Fitness for Duty. I believe that was at the end of his
    7    workweek, and I didn't see him again until Monday of the
    8    following week. And I was notified Monday morning that he
    9    had still not submitted his medication list.
    10   Q    Okay. Let me backtrack a little bit. So we
    11   talked about Mr. Hixson's workweek. Did his workweek
    12   begin on Sunday and run through Wednesday?
    13   A    That is correct.
    14   Q    Okay. So this conversation that you had with
    15   Mr. Hixson about hey, you better report your medications,
    16   could that have taken place on Wednesday, May 28th, 2014?
    17   A    That was my -- I believe that's when it
    18   happened. I think I was notified on that day.
    19   Q    Okay. So you're -- who was it that notified
    20   you?
    21   A    It was either Fitness for Duty or human
    22   resources through Fitness for Duty. One of the two called
    23   me and said, hey, he hasn't submitted these.
    24   Q    Okay. And then you turned immediately around
    25   and asked Mr. Hixson; correct?

```
 1      Q    At this month-and-a-half period of time, had he
 2  done anything that would give an indication that he was
 3  working in an unsafe manner?
 4      A    No.
 5      Q    Now, were you involved in the decision to fire
 6  Mr. Hixson?
 7      A    Yes.
 8      Q    And what was your involvement in that
 9  decision-making process?
10      A    Human resources contacted me Monday morning,
11  June 2nd, and said he still has not submitted his
12  paperwork and said he's in violation.  This is what you
13  can do.  Is this what you want to do as far as
14  termination?  They asked me if that was what I wanted to
15  do.  At that point, he had signed a return to work
16  agreement, had already had a false positive on a drug
17  test, and not been completely forthcoming to Fitness for
18  Duty.  So it was time for termination.
19      Q    Okay.  So are you the person who was responsible
20  for making the decision to fire Alex Hixson?
21      A    That's correct.
22      Q    And the reason for his termination was what?
23      A    Failure to meet the stipulations in the return
24  to work agreement and also giving misleading or false
25  information to Non-nuclear Fitness for Duty.
```

```
 1     A     Uh-huh.
 2     Q     Is that correct?
 3     A     That is correct.
 4     Q     Okay.  But you weren't going to discuss with
 5  Mr. Hixson why you were coming to the terms of terminating
 6  him; is that correct?
 7     A     The discussion is in the attachment that he was
 8  presented with.  We sat down and went through what was in
 9  this letter.
10     Q     Okay.  But you had already made the decision to
11  fire him at that point; had you not?
12     A     That's correct.
13     Q     Okay.  Did you ever talk to him about why you
14  wanted to fire him before you made the decision to fire
15  him?
16     A     No.
17     Q     Why not?
18     A     Because I hadn't really determined that I wanted
19  to fire him until I found out that he had not fully
20  disclosed information and until he did not fulfill the
21  requirements of the return to work agreement.  Both of
22  those I found out the morning of June 2nd.
23     Q     So you found out this information the morning of
24  June 2nd, and you immediately called him in and fired him?
25     A     We sat down -- I sat down with human resources
```

```
 1   May 29th?
 2        A    That's all --
 3        Q    That's water under the bridge; is it not?
 4        A    No.  It's all the same person, all
 5   similar issues, lack of trust.
 6        Q    So you didn't trust him so much you put him to
 7   work on June 1st at the lab all by himself?
 8        A    I didn't find out about this or make the
 9   decision to terminate him until June 2nd when I received
10   this attachment.
11        Q    All right.  When HR told you all the
12   information; correct?
13        A    That is correct.
14        Q    Okay.  Because you didn't have any information
15   to fire him before June 2nd; is that correct?
16        A    That is correct.
17        Q    So all the information you had to fire
18   Mr. Hixson was supplied to you by someone in human
19   resources?
20        A    That's correct.
21        Q    And you signed your name to the termination
22   letter?
23        A    Yes.
24        Q    Had you even thought about firing Mr. Hixson
25   before June 2nd, 2014?
```

# REPORTER'S CERTIFICATE

STATE OF TENNESSEE:
                    :
COUNTY OF HAMILTON:

I, Emily S. Weiss, the officer before whom the foregoing deposition was taken do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me;

That the testimony of said witness was taken by me in machine shorthand and thereafter reduced to typewriting; that the said deposition is a true record of testimony given by said witness;

That I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

That the said deposition has in no manner been changed or altered since same was given by said witness, but that the same has remained in my possession up to the time of delivery.

In witness whereof, I have hereunto set my hand this 21 day of July, 2015.

Emily S. Weiss, TN licensed Court Reporter and Notary Public in and for the State of Tennessee at Large.
My commission expires: 6/17/14
Tennessee LCR Number: 592