# EXHIBIT
2

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

MEMPHIS DISTRICT OFFICE

---------------------------------------------------------
ALEX J. HIXON,                    *
                                  *
            Complainant,          *
                                  *
-vs-                              *    EEOC NO. 490-2015-00094X
                                  *    AGENCY NO. TVA-2014-0037
WILLIAM JOHNSON,                  *
President and CEO,                *
TENNESSEE VALLEY                  *
AUTHORITY,                        *        COPY
                                  *
            Agency.               *
---------------------------------------------------------

JUNE 12, 2015

DEPOSITION OF STEPHEN ADAMS, M.D.


APPEARING FOR THE COMPLAINANT:

DOUGLAS S. HAMILL, ESQUIRE
BURNETTE, DOBSON & PINCHAK
711 CHERRY STREET
CHATTANOOGA, TENNESSEE 37402
(423)266-2121


APPEARING FOR THE AGENCY:

PHILIP J. PFEIFER, ESQUIRE
TENNESSEE VALLEY AUTHORITY
400 WEST SUMMIT HILL DRIVE
KNOXVILLE, TENNESSEE 37902
(865)632-7876




Janet P. Tilley, LCR, CCR
Hall & Associates
1010 Market Street, Suite 402
Chattanooga, Tennessee 37402
(423)267-4328

1 everything that we send to TVA.
2          There is an electronic medical record that
3 I used for two things: One, to generate the two
4 letters -- I looked this morning to verify that I
5 had included everything related to TVA. I noticed
6 that there were -- I guess he had seen another
7 Erlanger physician, and there were some
8 non-TVA-related items there that I did not feel
9 comfortable in reviewing. But this is all the TVA
10 stuff we have.
11 Q          So what you're telling me, this is the
12 information that you submit to TVA; is that correct?
13 A          These are copies of what we submit to TVA.
14 They have the originals.
15 Q          And then were there other documents that
16 were internal to UT Family Practice that you did not
17 retain?
18 A          No. This is everything.
19 Q          Are you currently employed, Dr. Adams?
20 A          Yes.
21 Q          And who is your employer?
22 A          University of Tennessee.
23 Q          And what is your current position?
24 A          I have two positions. I'm a professor of
25 family medicine with the College of Medicine. It's

1 a faculty appointment. And then in addition to
2 that, I'm the chief medical informatics officer for
3 Erlanger Medical Center.
4 Q          So do you have two employers? Erlanger
5 and University of Tennessee?
6 A          No. I'm an employee of the University of
7 Tennessee, but they have subcontracted out
8 80 percent of my time to Erlanger. So Erlanger
9 funds my position -- the portion of my position that
10 I work for them through the university.
11 Q          Do you have an affiliation or a
12 relationship with Tennessee Valley Authority?
13 A          Erlanger has a relationship with TVA. We
14 do occupational medical exams for them.
15 Q          And do you perform work for TVA? You
16 personally?
17 A          I perform work for the -- Erlanger and the
18 university, and some of that includes seeing TVA
19 patients, if that's what you're asking.
20 Q          Yes. Yes. In a general sense. And what
21 type of work do you perform for TVA?
22 A          Physical examinations, fitness-for-duty
23 examinations, special-clearance examinations,
24 occasionally chart reviews.
25 Q          With respect to your medical practice, how

1 much of your practice is devoted to work for TVA?
2 A          That's changed in the last 12 months. It
3 used to be a significant amount of the patients that
4 I saw were TVA. Since I took on the CMIO position,
5 I'm not seeing very many TVA patients.
6 Q          And when you say -- so as of last year --
7 going back 12 months or 13 months, when you said
8 that back then you had a significant amount of --
9 A          It would be a couple of patients a week,
10 typically.
11 Q          Okay. How long have you done work for
12 TVA?
13 A          Since 1998.
14 Q          I want to talk about your medical
15 qualifications for a minute. Are you licensed to
16 practice medicine in the state of Tennessee?
17 A          Yes.
18 Q          And how long have you been licensed to
19 practice in Tennessee?
20 A          Since 1997.
21 Q          Are you licensed to practice medicine in
22 any other state?
23 A          No, not currently.
24 Q          Have you ever been?
25 A          Alabama.

1 Q          And what year or years were you licensed
2 to practice medicine in the state of Alabama?
3 A          1995 through '7, I think.
4 Q          And what caused you to be licensed to
5 practice in Alabama?
6 A          I moved to Tennessee. I didn't want to
7 continue paying a license fee for a state I would
8 never practice in.
9 Q          Was that during -- I don't know if they
10 call it internship or residency.
11 A          It was during residency.
12 Q          Was that through the University of
13 Alabama?
14 A          Yes.
15 Q          When did you first become licensed to
16 practice medicine?
17 A          1995.
18 Q          Where did you attend medical school?
19 A          University of Tennessee - Memphis.
20 Q          And what year did you graduate medical
21 school?
22 A          1994.
23 Q          Do you have any medical board
24 certifications?
25 A          American Board of Family Medicine.

1 Q   Do you have any other certifications? Any
2 other medical board certifications?
3 A   No.
4 Q   So I take it you're not -- you don't have
5 a certification from the American Board of Physical
6 Medicine and Rehabilitation; is that correct?
7 A   I do not.
8 Q   Do you have a certification in the field
9 of psychiatry?
10 A   No.
11 Q   Any special training in the field of
12 psychiatry?
13 A   None beyond what is contained within a
14 family medicine residency.
15 Q   Do you have a certification in the field
16 of occupational medicine?
17 A   No.
18 Q   Do you have a certification in the field
19 of toxicology?
20 A   No.
21 Q   Do you have any special training in
22 addiction medicine?
23 A   No.
24 Q   Are you familiar with a person named Alex
25 Hixon?

1 A   Yes.
2 Q   And how do you know Alex Hixon?
3 A   I saw him on behalf of TVA.
4 MR. HAMILL:  Make that Exhibit 1.
5 (Thereupon, the document was marked
6 and subsequently attached hereto as
  Exhibit Number 1.)
7 BY MR. HAMILL:
8 Q   Dr. Adams, what's been marked Exhibit 1 to
9 your deposition is a one-page document dated
10 January 3, 2014.  Have you seen this document before
11 today?
12 A   Yes.
13 Q   How did you -- did you receive this
14 document on or around January 3, 2014?
15 A   I wouldn't personally receive it.  It
16 would come to our office.  So I would -- yeah.  Our
17 office received it.
18 Q   Do you know how it was sent?  Whether by
19 e-mail? U.S. Mail?
20 A   I do not.
21 Q   Other than this letter and the
22 accompanying job description and TVA Form 1444, did
23 anyone communicate with you the purpose of your
24 examination of Mr. Hixon?
25 A   Let me look in the record.  (Peruses

1 document.)  I didn't make a notation of --
2 specifically of how I was notified.
3 Typically, there is a phone call either --
4 from someone in Fitness for Duty to explain what
5 they're -- who they're sending and why.  So I can't
6 recall if it was from one of them or from Dr. Leigh.
7 Q   And the phone call that you typically
8 would receive from Fitness for Duty, would that be
9 from either Candace Clepper or her assistant Hannah
10 Lowery?
11 A   Yes.  I mean --
12 Q   Do those names ring a bell?
13 A   Or sometimes it's Dr. Leigh.
14 Q   In this case with Alex Hixon, do you
15 recall having any communication from someone from
16 Fitness for Duty before examining Mr. Hixon?
17 MR. PFEIFER:  Now, objection.  Are
18 you -- or just one point to make sure we avoid
19 getting vague and confusing.  We're talking
20 before this particular examination of
21 Mr. Hixon, 2014, or communications that might
22 go back to 2005, those examinations?
23 MR. HAMILL:  No, no, no.
24 BY MR. HAMILL:
25 Q   Did you understand my question?

1 A   Yes.  The problem is, there were multiple
2 phone calls back and forth.  And this far away from
3 the event, I can't recall who I talked to or whether
4 it was immediately preceding or immediately after.
5 I don't recall.
6 Q   Okay.  But do you think you did have --
7 let me back up just to clarify.  You're telling me
8 that you cannot recall one way or the other if you
9 had a phone conversation with someone from Fitness
10 for Duty before you examined Mr. Alex Hixon in
11 January of --
12 A   No, I don't recall.
13 Q   And let me -- I didn't give you any
14 deposition instructions.  One thing that we want to
15 make sure -- just so the record is clear, try not to
16 talk over one another.  So, for example, if you will
17 wait to answer my question until I've fully gotten
18 the question out, before you start your answer.
19 And, likewise, I'm not going to -- I'll try my very
20 best not to talk over you as you're giving your
21 answer.  Will you agree to do that for us today?
22 A   Yes.
23 Q   Okay.  What did you understand the purpose
24 of this January 2014 examination of Mr. Hixon to be?
25 A   Mr. Hixon had a positive urine drug test

1  Fitness for Duty staff and Dr. Leigh.  And then I
2  make a decision.
3  Q        With respect to the January 2014
4  examination of Alex Hixon, what was the scope of
5  that examination?
6  A        Do you mean the physical examination or
7  the questioning or -- help me with that.
8  Q        The entire examination.
9  A        Okay.  Well, if you look at the note, I
10 start out by telling why he's there.  I indicate
11 that I have gone through his psychiatric history,
12 his medication history, who his current treating
13 physician is, and why he's seeing them.
14          He also indicated to me that he was under
15 treatment from a psychiatrist in Atlanta and
16 detailed the history of that treatment and multiple
17 other treatments.
18          We talked about his current symptoms.  And
19 then we talked about why he was taking the Marinol
20 and symptoms that he was having from it.
21          We went back through his past medical
22 history, his social history.  He had volunteered
23 some financial history.
24          I did a physical examination.  The nurse
25 obtained vital signs.  And then beyond that is my

1  assessment and plan.
2  Q        Now, as I understand it, the reason that
3  you were examining Mr. Hixon was to determine
4  whether he could safely do his chem-lab-tech job
5  while taking Marinol; is that correct?
6  A        Well, it's more than that.  It's an
7  overall assessment.  When there's a concern at TVA
8  about an employee, they do, generally, a
9  comprehensive assessment of whether that person is
10 globally able to function in that job currently or
11 not.
12 Q        Okay.  And what specifically was TVA
13 concerned about that they wanted to do a global or a
14 comprehensive physical examination of Mr. Hixon?
15 A        The chief complaint was "Here is an
16 unexpected medication.  Is this reasonable for him
17 to take this and be at work?"
18 Q        So the only thing that you knew of that
19 caused TVA any concern was him taking Marinol --
20 this drug Marinol; is that correct?
21 A        I wouldn't say that's correct.  He has an
22 ongoing, long-term history of psychiatric illness.
23 So TVA is aware of that, and I was aware of that.
24 Q        Okay.  So going into this examination, you
25 were already concerned about Mr. Hixon's prior

1  psychiatric condition?
2  A        I like Mr. Hixon.  Even though we're in an
3  adversarial situation now, I still find him to be a
4  likable person.  So from a -- from the perspective
5  of a physician who wants to see people do well,
6  yeah, when I heard about it, I was concerned.
7  Q        And so were you -- you were concerned that
8  somehow Mr. Hixon's psychiatric or mental health
9  condition was adversely impacting his ability to
10 perform his job safely?
11 A        When I heard about it, I was concerned,
12 wanted to know what's going on, what's happening
13 with him, and why is he taking this.
14 Q        Did anybody from Fitness for Duty tell you
15 that they were concerned about his mental health
16 condition prior to this examination in January of
17 2014?
18 A        I don't have a recollection of that.
19 Q        So other than you, no one else from TVA
20 had told you, "Hey, we're worried about Alex Hixon's
21 mental state" in January of 2014?
22 A        Dr. Leigh was after his evaluation.  But
23 you'll have to depose the TVA employees to get their
24 recollection of who told who, what, and when.
25 Q        Right.  I'm only concerned with what you

1  know.  I'll take care of the rest later.
2          What do you know, as of the date of this
3  examination in January of 2014, of Alex Hixon, at
4  that point in time?  Had anybody from TVA recently
5  told you that they were concerned about Alex Hixon's
6  mental health condition?
7  A        I don't recall any conversation prior to
8  the visit along those lines.
9  Q        Okay.  So you're telling me that at this
10 point in January of 2014, you were going to do --
11 you understood that you were going to do a
12 comprehensive physical evaluation of Mr. Hixon; is
13 that correct?
14 A        As with any fitness-for-duty evaluation,
15 we're expected to do an overall comprehensive
16 evaluation of that person.
17 Q        And how did you arrive at that
18 expectation?
19 A        That was an expectation that was made
20 clear to me when we started doing the contract.
21 Q        And how long ago was that?
22 A        1998.
23 Q        Did anyone tell you in January of 2014
24 that they wanted an all-inclusive, wide-scoped
25 physical examination of Alex Hixon?

1  A        A fitness-for-duty examination is an
2  overall, full examination.  Is this person capable
3  of performing their job duties in a safe manner?
4  And it's not possible to -- for me to say yes or no
5  without doing a comprehensive look at them.
6             (Thereupon, a document was marked
7             and subsequently attached hereto as
             Exhibit Number 2.)
8  BY MR. HAMILL:
9  Q        Dr. Adams, what's been marked Exhibit 2 to
10 your deposition is a three-page document dated
11 January 6, 2014.  Can you tell me what that document
12 is?
13 A        This is my visit note from his
14 fitness-for-duty examination.
15 Q        And does this document summarize all the
16 important things that took place during your
17 examination with Mr. Hixon on January 6, 2014?
18 A        I believe so.
19 Q        The first section has the heading "History
20 of Present Illness."  Do you see that?
21 A        Yes.
22 Q        Who provided the information that's within
23 that section?
24 A        I did.
25 Q        And from what source or sources did you

1  Q        What did he say?
2  A        He said because his drug test was positive
3  for THC and that he was -- launched us
4  into a discussion of why he was taking it and what
5  symptoms he was having, what side effects he was
6  having.
7  Q        Did he tell you he was taking the drug
8  Marinol for insomnia?
9  A        He did.  Although I -- at the time, I
10 understood it also to be an experiment to see if it
11 would help his mood overall.
12 Q        Did you learn that by asking follow-up
13 questions?
14 A        I suppose so.  I don't recall if he
15 volunteered it or if I asked it.  That's a bit more
16 detail than what I can recall.
17 Q        As part of the examination, was Mr. Hixon
18 required to fill out a questionnaire or some type of
19 intake sheet?
20 A        Not for this visit.  Well, before I say
21 that, let me look.  Sometimes there -- there is a
22 TVA standard questionnaire for -- that may not have
23 applied.  (Peruses documents.)  So I don't see one
24 for this visit.
25 Q        Did Mr. Hixon bring any documents to the

1  obtain that information?
2  A        Mr. Hixon.
3  Q        Just Mr. Hixon or from any other source?
4  A        Well, I came into the visit understanding
5  the reason for the evaluation, but the rest of it is
6  Mr. Hixon.
7  Q        Did you also obtain some of that
8  information from Mr. Hixon's chart that has prior
9  medical information in it?
10 A        You mean did I review our previous visits
11 with him?  Is that what you're asking?
12 Q        Well, partially.  But that's a different
13 question.  But, yes, did you review it before
14 Mr. Hixon came in?
15 A        Yes.
16 Q        Okay.  So at the time you examined
17 Mr. Hixon on January 6, 2014, you understood that
18 Mr. Hixon had a history of chronic depression,
19 anxiety, and insomnia; is that correct?
20 A        Yes.
21 Q        And how did the subject of Mr. Hixon's
22 depression and anxiety come up?
23 A        I asked him.
24 Q        So you point-blank asked him?
25 A        I asked him why he was sent.

1  examination?
2  A        He filled out a list of medications on a
3  blank sheet of paper.
4  Q        And was that something that he brought
5  with him, or was that something he filled out in
6  your presence?
7  A        I believe he brought it with him, but I
8  don't recall.  I don't recall asking him to sit down
9  and write it out.
10 Q        Did Mr. Hixon tell you that he was seeing
11 his primary care physician, a therapist, and a
12 psychiatrist for his depression and anxiety?
13 A        Yes.
14 Q        So you understood that Mr. Hixon was
15 seeing three healthcare professionals for the
16 treatment of his depression and anxiety, correct?
17 A        That's what he led me to believe.
18 Q        Did you have any reason to doubt that?
19 A        My sense at the time was that he was
20 primarily seeing Dr. Adams.
21 Q        And what led you to that sense?
22 A        My discussion with him.  I see in my note
23 I did -- he did indicate that he was seeing a
24 therapist and had a psychiatrist in Atlanta.
25 Q        And you said you did or you didn't believe

1  that he was seeing three healthcare professionals
2  for the treatment of his depression and anxiety?
3  A       At the time, I didn't have an objective
4  way to know whether he was seeing them regularly or
5  not.
6  Q       Did you want to verify and did you have
7  the desire to verify that information to see if it
8  was accurate and correct?
9  A       Yes. But, generally, Dr. Leigh will do
10 that portion of the evaluation. So I didn't pick up
11 the phone and call his psychiatrist and ask him,
12 "Has he been there recently?" or his therapist.
13 Q       Did you assume that Mr. Hixon was also
14 going to be evaluated by Dr. Leigh?
15 A       No.
16 Q       So why did you -- I guess I don't
17 understand your answer to my last question, why you
18 didn't have a desire to pick up the phone or verify
19 whether he was being currently seen by three health
20 care professionals.
21 A       Because I learned enough in the evaluation
22 that -- got a man who is taking what I consider to
23 be an inappropriate and potentially dangerous
24 medication that there's no evidence for using it in
25 his particular condition. His depression is not

1  well controlled. He has a history -- a significant
2  psychiatric history. He needed a psychological
3  evaluation. And many times that is an avenue for
4  somebody who's in trouble getting help.
5  Q       You say that you thought that his
6  depression was not being well controlled; is that
7  correct?
8  A       Yes.
9  Q       Based upon what facts did you conclude
10 that?
11 A       Based upon what your client told me.
12 Q       And what is that?
13 A       That his depression was not well
14 controlled.
15 Q       Did Mr. Hixon say, "My depression is not
16 well controlled"? I do not see that written
17 anywhere in your chart.
18 A       He states his symptoms are under fair
19 control but are always there.
20 Q       Well, when someone -- do you know anything
21 about depression, Doctor?
22 A       I do.
23 Q       Okay. Do you know depression is a chronic
24 condition? Is it not?
25 A       For some people it is.

1  Q       Okay. So it's a condition -- its symptoms
2  are going to flare up from time to time; is that
3  correct?
4  A       For some people.
5  Q       Yeah. And then sometimes they'll go for
6  periods where there's not really very many symptoms;
7  is that correct?
8  A       Yes.
9  Q       Okay. So Mr. Hixon told you that his
10 symptoms -- or his condition was under fair control,
11 but his symptoms are always there -- or the
12 condition was always there; is that correct?
13 A       There are other ways a patient can tell
14 you their depression is not controlled.
15 Q       What does that have to do with Mr. Hixon?
16 A       It has everything to do with Mr. Hixon.
17 Q       Let me ask you this: Did Mr. Hixon appear
18 abnormal or his behavior appear abnormal in your
19 examination?
20 A       His affect appeared sad.
21 Q       And did you document that in your clinical
22 notes?
23 A       It's what led to my assessment at the end.
24 Q       My question was: Did you document that in
25 your clinical notes?

1  A       If you look at the general part of the
2  physical exam, "Alert male. Softly spoken."
3  Q       Yes. And are you telling me that
4  somewhere in there, the words "affect, sad" is in
5  there?
6  A       So to paint you a picture, imagine someone
7  who was somewhat disheveled and is not making good
8  eye contact and who is speaking very softly -- which
9  is not fair to her, because she's going to have to
10 put this on paper. That is a way of somebody
11 telling you that their depression is not controlled,
12 even if they say, "Well, my symptoms aren't so bad."
13 Q       Doctor, you didn't put anything in your
14 clinical notes stating that Mr. Hixon had a sad
15 affect, did you?
16 A       I think I implied it in the fact that he
17 was softly spoken, which was different than what I
18 recalled him to be in previous visits.
19 Q       Did you put anything in your clinical
20 notes that indicated or expressed that Mr. Hixon was
21 exhibiting depressed symptoms during your evaluation
22 on January 6, 2014?
23 A       Yes.
24 Q       What?
25 A       I wrote, "His depression is not very well

```
1   controlled and has not been for a long time.  He
2   will need evaluation by Dr. Leigh."
3   Q        Okay.  And that's a conclusion, correct?
4   A        That's a conclusion.
5   Q        Okay.  What facts did you -- what facts or
6   observations did you note in your clinical notes
7   that expressly stated that he was exhibiting
8   depressive symptoms in your presence?
9   A        Are you asking me if I detailed all of the
10  questions I asked him that led me to that?
11  Q        No.  I'm not asking you that, Doctor.
12  It's a simple question.  I'll ask it again.
13          The question is this:  Did you expressly
14  state anywhere in your clinical notes that Mr. Hixon
15  was exhibiting depressive symptoms?
16  A        I implied it in my conclusion.  In the
17  sections above, no, I did not document every
18  finding.
19  Q        Is it important to document findings and
20  observations during a physical examination?
21  A        Only if you find that you're going to be
22  deposed later.  It is common in clinical practice to
23  summarize your findings and not detail every word of
24  the conversation.  It's not practical to detail
25  every question I ask.  It is reasonable to put a
```

```
1   general summary of what occurred.
2   Q        Right.  And was there any summary that you
3   wrote down about describing depressive symptoms that
4   you observed in Mr. Hixon other than "softly
5   spoken"?
6   A        Not within the Physical Exam section of
7   the note.
8   Q        Do you consider yourself an expert in
9   treating depression and anxiety?
10  A        I have a great deal of experience in
11  treating depression and anxiety.
12  Q        Do you consider yourself an expert in
13  treatment of depression and anxiety?
14  A        It depends on how you define "expert."
15  Q        What's your definition of "expert," then?
16  A        Someone who has the appropriate training
17  and extensive experience in the disorder.
18  Q        And do you feel that you meet your own
19  definition of expert in the treatment of --
20  A        I do.
21  Q        -- of patients with depression and
22  anxiety?
23  A        I do.
24  Q        You indicate that Dr. Adams -- and this
25  is -- this would be Dr. Charles Adams, correct?
```

```
1   A        Yes.
2   Q        And Dr. Charles Adams is Mr. Hixon's
3   primary care physician, correct?
4   A        I assume he is.  He was at the time.
5   Q        You indicate that Dr. Charles Adams had
6   recommended a trial of Marinol for insomnia; is that
7   correct?
8   A        Yes.
9   Q        Before your examination of Mr. Hixon in
10  January of 2014, had you ever heard of the drug
11  Marinol?
12  A        Yes.
13  Q        When had you first heard about that drug?
14  A        I don't recall.
15  Q        Had it been years before, or was this
16  something recent, that you had first heard about
17  Marinol?
18  A        I don't remember when it came on the
19  market.  It was not new to me at the time.
20  Q        It's a medication that's been around for a
21  while, correct?
22  A        Yes.
23  Q        Had you done any type of independent
24  research about Marinol before examining Mr. Hixon on
25  January 6, 2014?
```

```
1   A        I reviewed what I guess you would call
2   standard medical references as a part of my
3   evaluation.  And I did more looking after I talked
4   with Mr. Hixon than I did before.
5   Q        When you said you did more after talking
6   with Mr. Hixon, how much time elapsed after this
7   examination did you do more research about Marinol?
8   A        A couple of days.
9   Q        Is your research documented anywhere in
10  the clinical notes or in your chart of Alex Hixon?
11  A        Yes.
12  Q        And where is that documented?
13  A        (Peruses documents.)  I reference it in
14  the letter that I sent in March to Dr. Charles
15  Adams.
16          Okay.  So there's nothing before -- and
17  what's the date of that letter, by the way?
18  A        March 14, 2014.
19  Q        So there's nothing in your chart of Alex
20  Hixon that's documented about your medical research
21  prior to March of 2014; is that correct?
22  A        There are no -- I'm not aware of any
23  notations that I made at the time.
24  Q        Now, looking again at your clinic notes
25  here.  There's a section titled Past Medical
```

1  History.  Do you see that?  That's still on the
2  first page.
3  A      Yes.
4  Q      From what source did you obtain the
5  information contained in that section?
6  A      Mr. Hixon.
7  Q      Was there anything significant to you
8  about Mr. Hixon's past medical history that related
9  to whether he could return to work in January of
10 2014?
11 A      Well, his psychiatric illness plays a role
12 in the global evaluation.  I don't recall
13 that things like having a stomach ulcer would have
14 any relevance.
15 Q      And what's that -- what about his right
16 shoulder dislocation?  Was that at all significant
17 to your evaluation?
18 A      I don't believe so.
19 Q      What's that third word?  I can't even
20 pronounce that.
21 A      Pyelonephritis?
22 Q      Yes.  What does that mean?
23 A      A kidney infection.
24 Q      Was that all -- was that relevant
25 whatsoever to your evaluation of Mr. Hixon?

1  A      I don't think so.
2  Q      UTI is the next one that's listed.  That's
3  a urinary tract infection?
4  A      Yes.
5  Q      And was that relevant to your examination?
6  A      I don't think so.
7  Q      Bilateral leg pain with numbness, was that
8  relevant to your examination?
9  A      I don't think so.
10 Q      So the only thing that you said that was
11 relevant to your examination as to whether Mr. Hixon
12 could return to work safely was depression and
13 anxiety; is that correct?
14 A      And a history of prolonged psychiatric
15 hospitalization.
16 Q      And there's also a section called Social
17 History.  And from what source did you obtain the
18 information contained in that section?
19 A      Mr. Hixon.
20 Q      Was there anything significant to you
21 about Mr. Hixon's social history that related to
22 whether he could return to work in January of 2014?
23 A      His alcohol use.
24 Q      Anything else?
25 A      His denial of drug use.

1  Q      How was his alcohol use relevant to your
2  evaluation as to whether he could return to work in
3  January of 2014?
4  A      He has a history of misuse and at one time
5  had been recommended to have treatment, which he
6  terminated prematurely.
7  Q      When was that?
8  A      I'd have to look through the chart to find
9  it.  I believe it was several years prior.
10 Q      And that was information that you had
11 obtained by looking at his medical chart prior to
12 this January 2014 evaluation?
13 A      I'm not sure.  That would be one where I'd
14 have -- would you like me to read through all of
15 this and find out the dates?
16 Q      If that will help answer the question.
17 A      All right.  (Peruses documents.)
18        Okay.  So on January 7, 2005, I saw him
19 for a fitness-for-duty examination.  And at the
20 time, he -- his mental illness was quite
21 uncontrolled, to the point that I was concerned,
22 based on the history he was giving me, that he might
23 have bipolar disorder.  He also told me -- at the
24 time, he denied illicit drug use, but said there
25 were a couple of weeks of the year where he drank

1  too much.
2  Q      This is all from 2005, correct?
3  A      Yes.
4  Q      Do you have anything more recent than
5  2005?
6  A      Well, I'm not finished.  That same visit,
7  there was a note from Iva Mahan, from TVA,
8  indicating that he was prone to addiction -- or
9  indicating that Mr. Hixon had told them he was prone
10 to addiction.
11 Q      So that was secondhand information or
12 thirdhand information by the time you got it?
13 A      (No response.)
14 Q      Is that correct, Doctor?
15 A      I suppose so.  I saw him in March of 2005
16 after a psychiatric hospitalization.
17 Q      But do you have any information past 2005
18 related to alcohol use?
19 A      In January of 2013, he was seen by
20 Dr. Worthington for a fitness-for-duty examination
21 because of worsening mental illness.  And at the
22 time, it includes case notes from Dr. Leigh which
23 indicated that in 2005 he tried to return to work
24 after he prematurely left the recommended substance
25 abuse treatment by his psychiatrist, Dr. Lily

1  (phonetic). He was drinking 15 -- only 15 beers per
2  week and didn't feel like he was abusing alcohol.
3  Q      And that's all 2005, correct?
4  A      This note is 2013.
5  Q      It's referencing 2005, is it not?
6  A      (Peruses documents.)
7  Q      It's representing 2005, is it not, Doctor?
8  A      I think so. I'm looking to see if there
9  was something more recent than that.
10 Q      I don't think you're going to find it,
11 Doctor. I've looked through everything you're
12 looking through.
13 A      All right. I'll take your word for it.
14 Q      So is it your testimony that on January 6,
15 2014, you were concerned that Mr. Hixon might not be
16 able to return to work because he abused alcohol in
17 2005? Is that your testimony?
18 A      No.
19 Q      Okay. Were you concerned at all that
20 Mr. Hixon could not return to work because he drank
21 wine?
22 A      No. But I have -- as a part of a global
23 concern, when somebody has a history of substance
24 abuse, and specifically alcohol, and they're using
25 that substance and they have uncontrolled

1  psychiatric illness, that there may be more of a
2  problem there than I'm seeing.
3  Q      Flip to the second page of your clinical
4  notes. It looks like somebody took vital signs of
5  Mr. Hixon; is that correct?
6  A      Yes.
7  Q      Why was that done?
8  A      Because every fitness-for-duty examination
9  is a global physical examination, and not doing
10 vital signs is not a good practice.
11 Q      Were the results of this physical
12 examination normal?
13 A      (No response.)
14 Q      I'm sorry. Back up. I misspoke. Were
15 the results of -- were his vital signs normal?
16 A      Yes.
17 Q      And then it looks like also a physical
18 examination was performed; is that correct?
19 A      Yes.
20 Q      Now, who performed the physical
21 examination of Mr. Hixon?
22 A      I did.
23 Q      Were the results of the physical
24 examination normal?
25 A      With the exception to the concerns about

1  his psychiatric state, they were.
2  Q      Okay. Now, at the bottom of page 2,
3  there's a section called Impression and
4  Recommendations. Do you see that section?
5  A      Yes.
6  Q      What's the purpose of that section?
7  A      It's to give an overall summary of my
8  impression of the patient's situation.
9  Q      Were you diagnosing physical or mental
10 problems of Mr. Hixon?
11 A      In this case, I don't know that I was
12 diagnosing anything new. I was listing things that
13 he told me he had.
14 Q      Well, let me ask you this: Do you think
15 as -- after this evaluation of Mr. Hixon, do you
16 believe that he had chronic depression?
17 A      Yes.
18 Q      And you even gave an ICD code. That's a
19 diagnostic code, is it not?
20 A      Those are given automatically when you
21 select that problem in the electronic medical
22 record.
23 Q      So did you agree that he had a diagnosis
24 of chronic depression on January 6, 2014?
25 A      Yes.

1  Q      You list insomnia; is that correct?
2  A      Yes.
3  Q      And then you also list lumbar disc
4  disease; is that correct?
5  A      Yes.
6  Q      Did you believe that these three mental or
7  physical conditions related to Mr. Hixon's ability
8  to perform his job?
9  A      I don't believe lumbar disc disease had a
10 significant impact, with the exception that he
11 related that he had a history of prescriptions for
12 hydrocodone.
13 Q      And you reviewed some
14 controlled-substances database on that, correct?
15 A      Yes.
16 Q      Okay. Based on your review of that
17 database, it showed what?
18 A      Within the state of Tennessee, he -- what
19 he had filled was fairly consistent with what he
20 told me, with the exception that he had neglected to
21 tell me about a prescription for amphetamines, which
22 is related in -- in the -- under Problem Number 1.
23 Q      Oh. Under "insomnia"?
24 A      Yes.
25 Q      How old was that amphetamine prescription?

```
1  A       I don't know.  At the time, it was illegal
2  to include the database report in the medical
3  record, which was a mistake made by our legislature.
4  So you could only summarize it, and then you had to
5  shred it.
6  Q       But was it a current prescription, or was
7  it a prescription from the past?
8  A       I'd have to ask Mr. Hixon about that,
9  because I don't recall.  I seem to think it was
10 within the previous months, but it was not a
11 current -- it was not long, long ago, but it wasn't
12 current either.
13 Q       Take a look at the insomnia, Problem
14 Number 1, that you list.  Does that medical
15 condition in any way relate to Mr. Hixon's ability
16 to do his job?
17 A       Insomnia is often a symptom of
18 uncontrolled depression.
19 Q       And how does that relate to whether or not
20 Mr. Hixon can do his job?
21 A       So people who are not getting adequate
22 sleep may have delayed reaction times or problems
23 with cognition.  And it also can be a canary in the
24 coal mine, that the underlying, primary disorder,
25 which is depression, is not well controlled.
```

```
1  Q       How long did you talk with Mr. Hixon
2  during this examination?
3  A       I did not record a time.  So . . .
4  Q       I mean, there's -- did you meet with or
5  did you talk with him for about 30 minutes?
6  A       That might be a reasonable guess.
7  Q       Okay.  Well, could it have been longer?
8  A       It could have.
9  Q       Do you think it would have been any
10 shorter than 30 minutes?
11 A       Not typically.
12 Q       Okay.  So during this at-least-30-minute
13 conversation that you had with Mr. Hixon, did he
14 answer your questions?
15 A       He did.
16 Q       Okay.  Did he appear not to be able to
17 understand your questions?
18 A       I don't recall him to be -- to have
19 problems with that.
20 Q       Okay.  So based on your observations, his
21 concentration was okay with you, correct?
22 A       I don't recall specifically.  I didn't
23 note any issues with concentration.
24 Q       Under this "Insomnia," you indicate, "I
25 explained to him that THC has a very long half-life,
```

```
1  and it's problematic for him to use this drug at
2  night and to work at TVA with safety-sensitive
3  duties."
4  When you're referencing "THC," are you
5  talking about Mr. Hixon taking the drug Marinol?  Is
6  that the reference?
7  A       Yes.
8  Q       How did you know that Mr. Hixon's job
9  involved safety-sensitive duties?
10 A       From information from TVA.
11 Q       Okay.  So that's information you received
12 from somebody at TVA?
13 A       Uh-huh.
14 Q       Is that a "Yes"?
15 A       Yes.
16 Q       Okay.  Do you remember who?
17 A       No.
18 Q       Do you remember from what department at
19 TVA?  Was this an HR person?
20 A       All the communications for fitness for
21 duty come from that department.
22 Q       So this was not information that you
23 obtained through Mr. Hixon; is that correct?
24 A       We discussed his job duties.
25 Q       Did he tell you he had safety-sensitive
```

```
1  job duties?
2  A       I don't recall him using those words.  And
3  that's not typically what someone would say.  My
4  understanding, after speaking with him and after
5  communication with TVA, is that he did work with
6  potentially dangerous equipment and chemicals.
7  Q       So the words "safety-sensitive duties" are
8  your words, correct?
9  A       No.  They're TVA's words.
10 Q       Oh.  You used TVA's words; is that
11 correct?
12 A       If you look back in the 2013 document,
13 Dr. Leigh goes into detail describing his job duties
14 and the safety-sensitive nature of them.
15 Q       So "safety-sensitive duties" were words --
16 those words were from TVA; is that correct?
17 A       Those are TVA words, but I feel free in
18 using them as well.
19 Q       Did you understand that Mr. Hixon took
20 Marinol only at nighttime?
21 A       That's an interesting question.  He told
22 me that it was prescribed during the daytime
23 initially and that he had side effects from it and
24 that he had stopped taking in the daytime and was
25 taking it at night.
```

1 Q        Did you believe him?

2 A        You always have to have some element of

3 suspicion when dealing with a patient's description

4 of how they take controlled substances.  So I did

5 not have a firm conclusion in my mind as to whether

6 that was true or not.

7 Q        So you didn't 100 percent believe

8 Mr. Hixon when he told you that he was taking

9 Marinol only at nighttime?

10 A        I don't 100 percent believe anyone when it

11 comes to controlled substances.  I leave room in my

12 mind for doubt.

13 Q        Well, is there any way to verify it?

14 A        The best way to verify it is to look and

15 see how it was actually prescribed by the

16 prescribing physician.

17 Q        And did you do that in this case?

18 A        Well, ultimately, we did find that it was

19 prescribed three times a day.

20 Q        And you say "ultimately."  When did you

21 learn that?

22 A        I didn't know it on this date.

23 Q        January 6, 2014?

24 A        That's correct.  Other than Mr. Hixon

25 telling me that that was the initial plan with his

1 treating psychiatrist -- I'm sorry -- with his

2 treating primary care physician.

3 Q        Did Mr. Hixon ever tell you that when he

4 took Marinol at nighttime, he was groggy or sleepy

5 during the next workday?

6 A        He did not.

7 Q        You've already testified that you reviewed

8 Mr. Hixon's controlled-substance-database report,

9 correct?

10 A        Yes.

11 Q        And based upon your review, you indicated

12 that he appeared to take controlled medications

13 appropriately; is that correct?

14 A        There's a flaw in the database, and that

15 is it only included Tennessee.  And his treating

16 physician is in Georgia; so I had no way to

17 independently verify what was occurring in Georgia.

18 Q        But based upon what you saw in Tennessee,

19 did that tell you that he was the type of person

20 that abused controlled substances?

21 A        I didn't see anything in his Tennessee

22 record that was particularly concerning beyond he

23 didn't tell me about use of amphetamines.

24 Q        You also diagnosed chronic depression.

25 Does that disease relate in any way to Mr. Hixon's

1 ability to perform his job in January of 2014?

2 A        Yes.

3 Q        How so?

4 A        Mr. Hixon has a -- has had an ongoing

5 history of decompensation of his mental illness to

6 the point that he has had to be off work and has had

7 to be hospitalized for psychiatric illness.  And in

8 my opinion, at the time, he was not doing well.

9 Q        Based upon what facts?

10 A        Based upon my conversation with him and

11 my -- the overall appearance and the demeanor -- his

12 demeanor during the conversation, as well as the

13 things he told me.

14 Q        What about his demeanor?

15 A        Oftentimes, when working with somebody

16 with mental illness, the way they appear and the way

17 the conversation goes tells you almost as much as

18 the words that the patient tells you.  And I left

19 the room concerned about him, that he was in trouble

20 again.

21 Q        Well, what about his demeanor?  Describe

22 that to me.

23 A        He looked depressed.  He sounded

24 depressed.

25 Q        He looked depressed?  Is that what you

1 said?

2 A        Uh-huh.

3 Q        How did he look depressed?

4 A        It's a general overall -- I don't know

5 that I know a way to describe that.  So think of a

6 6-year-old who's just lost their puppy.  You can

7 imagine that facial expression.  And many times,

8 people with depression look like that.

9 Q        Did you document in your clinical notes on

10 January 6, 2014, that Mr. Hixon's demeanor appeared

11 depressed?

12 A        I did not.

13 Q        Why?

14 A        There is a limit to how much we can

15 practically document in a chart and still get

16 through a day.  So I don't document every finding

17 that I see if I feel that it's adequately summarized

18 in my impression.

19 Q        Are you saying that you can't type in

20 things on this -- I don't know what this is --

21 database?  Are you saying that there's not enough

22 space to type important information?

23 A        I'm saying there's not enough time in the

24 day to record every aspect of every clinical

25 encounter and still get done.

1 Q       But other than you just saying, "Alex
2 Hixon appeared to be depressed to me," there's
3 nothing that's documented here that shows what his
4 demeanor here is. Isn't that true?
5 A       That's true.
6 Q       Okay. So you've told me that he had
7 these -- kind of a sad look about him. You also
8 said that his behavior was bizarre or his responses
9 were bizarre. Or did I mishear that?
10 A       I don't believe I said that.
11 Q       Okay. So he didn't say anything to you
12 that indicated that he was depressed; is that
13 correct?
14 A       One of the things that we do in evaluating
15 depression is ask about symptoms. And at the end of
16 the visit, I felt like that he was in trouble.
17 Q       How many symptoms of depression did you
18 ask Mr. Hixon?
19 A       That's a great question. And after 18
20 months, I can't give you a count.
21 Q       Okay. Can you even approximate a count
22 for me?
23 A       That would be speculation, and I can't
24 give you a number.
25 Q       Okay. And did you record anywhere on this

1 January 6, 2014, three-page document either the
2 questions -- the depressive-symptom questions you
3 asked or the depressive-symptom responses that he
4 gave?
5 A       I did not.
6 Q       That would be important information,
7 wouldn't it?
8 A       No.
9 Q       No?
10 A       No.
11 Q       Weren't you holding him out of work
12 because you thought he was too depressed to do his
13 job?
14 A       It was enough for me to be concerned, that
15 I could ask a psychologist to do a more in-depth
16 evaluation of him.
17 Q       All right. And if you weren't concerned
18 at all, you wouldn't have held him out of work or
19 sent him to Dr. Leigh; isn't that right?
20 A       That's true.
21 Q       Okay. So you're holding this man out of
22 work because you thought he was too depressed to do
23 his job, and you didn't document any of that in your
24 three-page evaluation?
25 A       I documented the reason for sending him to

1 see Dr. Leigh. And at the time, I felt that was
2 sufficient.
3 Q       Did you ever make any attempt to contact
4 Mr. Hixon's three professionals who were treating
5 him for his depression in January of 2014?
6 A       I don't recall the dates that I attempted
7 to contact Dr. Adams, but I did attempt to contact
8 Dr. Adams.
9 Q       Did you ever attempt to contact his
10 treating counselor?
11 A       No.
12 Q       Did you ever make any attempts to contact
13 his treating psychiatrist?
14 A       I did not.
15 Q       If you will flip over to last page, page
16 3, which lists a complete medication list of Alex
17 Hixon. The first medication listed is Ambien. And
18 that's a sleep aid, correct?
19 A       It is.
20 Q       Did you have any concerns about Mr. Hixon
21 taking Ambien at bedtime?
22 A       Ambien is reasonably safe and would be a
23 good choice for somebody like him, because of the
24 short half-life. I had overall concerns with the
25 potential for interaction between Ambien and the

1 other medications plus alcohol, but Ambien alone
2 would not be a big issue.
3 Q       Okay. So Ambien alone would not impair
4 his ability to do his job, correct?
5 A       Probably not.
6 Q       The next one is Zyrtec. That's for
7 allergies, correct?
8 A       It is.
9 Q       Did you have any concerns that he was
10 taking Zyrtec?
11 A       A certain percentage of patients will have
12 CNS side effects from Zyrtec. And Zyrtec's effect
13 can be additive. It's reasonably safe. So I did
14 not counsel him to discontinue that.
15 Q       And Zyrtec would not impair his ability to
16 do his job as a chem-lab tech, correct?
17 A       There are people that Zyrtec impairs their
18 ability to concentrate. And so I can't say that
19 across the board.
20 Q       And, specifically, as to Alex Hixon, you
21 can't say that?
22 A       Well, I don't know, because it's difficult
23 to sort out the effects of multiple potentially
24 sedating medications.
25 Q       But at this point, you didn't have any

1  not. I believe that it all went through Dr. Leigh.
2  That's generally how we do things when the two of us
3  have to collaborate.
4  Q      Do you remember what the purpose of your
5  examination of Mr. Hixon in March of 2014 was?
6  A      It was return to work and ability to work
7  safely, I believe.
8  Q      Was the purpose of this examination the
9  same as the examination we've talked about in
10 January of 2014, or is this a different type of
11 examination?
12 A      It's a different category in the way TVA
13 categorizes them. But in -- for practical purposes,
14 it was to determine whether, after being off, he was
15 ready to go back.
16 Q      So in this March 2014 examination, what
17 was the scope? What was your scope that you were
18 operating under when you examined him?
19 A      I'm expected to do a global assessment and
20 determine whether, in my opinion, he is safe to go
21 back to work or not.
22 Q      Okay. So it was just as broad -- this
23 March 2014 examination of Mr. Hixon was just as
24 broad as the January 2014 examination of Mr. Hixon;
25 is that correct?

1  A      My assessment is expected to be as broad.
2  In practical terms, there's less legwork on my part,
3  because I've seen him recently. We're following up
4  on ongoing issues.
5  Q      But the broadness of the two examinations
6  were essentially the same; is that correct?
7  A      Yes.
8         (Thereupon, a document was marked
9         and subsequently attached hereto as
          Exhibit Number 5.)
10 BY MR. HAMILL:
11 Q      What is this document, Doctor?
12 A      This is handwritten TVA 9081 form.
13 Q      And the handwriting -- whose handwriting
14 is this?
15 A      Some of it's mine. Some of it is a staff
16 member.
17 Q      Okay. Is that "CW" or "AW"?
18 A      That's a good question. I don't know.
19 Q      Okay. But that would be a nurse or some
20 staff member of yours?
21 A      It would be a nurse or an MA or an LPN.
22 Q      Is there a typewritten record -- well,
23 first of all, let me ask you this. This appears to
24 indicate that you did another physical examination
25 of Mr. Hixon on March 14, 2014.

1  A      Yes.
2  Q      Do you have a typewritten record of the
3  March 2014 exam, like the three-page document that
4  we saw from the January 6, 2014, exam?
5  A      I don't think that I do.
6  Q      Was there any reason why you didn't do a
7  typewritten -- create a typewritten record of this
8  March examination?
9  A      I didn't feel the need to.
10 Q      Did you perform a physical examination of
11 Mr. Hixon?
12 A      I did.
13 Q      Was there anything significant from the
14 physical examination that you observed?
15 A      I only documented that he was alert and
16 oriented and no acute distress and noted his cardiac
17 and pulmonary exams to be normal.
18 Q      So did everything appear to be normal to
19 you?
20 A      I think so.
21 Q      And the reason I asked you, you slipped
22 into a little bit of doctor speak there. Just in
23 normal, everyday terms --
24 A      Yes. Go ahead.
25 Q      I'm sorry. We'll try not to talk over one

1  another. But from what you saw in this physical
2  examination of Mr. Hixon in March of 2014,
3  everything appeared to be normal; is that correct?
4  A      Yes.
5  Q      Did you do a drug screen on Mr. Hixon?
6  A      The nurse did.
7  Q      And do you have any kind of documentation
8  showing the drug-screen results?
9  A      No.
10 Q      Was there any documentation from those
11 results?
12 A      We collect the specimens. We turn them
13 over to TVA. So the interpretation and actions
14 related to that are internal to TVA.
15 Q      Who do you turn that in to at TVA?
16 A      That's a good question. You'd have to ask
17 the nurse.
18 Q      Because I -- to be honest with you, I
19 haven't seen any drug-test results from March of
20 2014 in any kind of documentation that I've received
21 from TVA. So that's why I was asking.
22 A      I don't get those back.
23 Q      Okay. So you haven't -- do you know --
24 when you say you don't get it back, does someone
25 tell you what the results are? Or you don't even

```
 1  know what the results are?  No one tells you?
 2  A        Only if it's relevant.
 3  Q        Do you know what the results were from
 4  this drug test in March of 2014?
 5  A        I don't think I do.
 6  Q        When you met with Mr. Hixon on March 14 of
 7  2014, did he exhibit any signs of depression?
 8  A        I don't recall.
 9  Q        Did he exhibit any signs of abnormal
10  behavior?
11  A        None that I recall.
12  Q        Could you please read aloud, at least your
13  handwriting, where it starts "Here for
14  return-to-work exam"?  And the reason is, I can't
15  read all of your writing.  So could you just please
16  read it aloud for me?
17  A        Yes.  "Here for return-to-work exam.
18  Records reviewed.  He's been off work for positive
19  UDS and for psychiatric evaluation.  He reports he's
20  seen his psychiatrist and is, quote, fine, unquote.
21  He says Dr. Charles Adams will handle routine care
22  of medical and psychiatric issues.  Denies
23  significant depressive symptoms.  Has been learning
24  woodworking skills lately.
25         "Physical examination:  Alert and oriented
```

```
 1  white male in no distress" -- "no acute distress.
 2  Cardiovascular: regular rate and rhythm.  Lungs
 3  clear.
 4         "Assessment and plan:  Depression,
 5  anxiety; positive UDS; positive Marinol use.
 6         "I will not clear for safety-sensitive
 7  duty on Marinol.  He agrees to see PCP for
 8  alternative options.  Will communicate this to PCP."
 9  Q        And there are three medications that are
10  written out to the side.  Do you see that?
11  A        Yes.
12  Q        And with respect to Celexa and Ambien, did
13  you have any concerns that those medications might
14  have an adverse effect on Mr. Hixon's ability to do
15  his job in March of 2014?
16  A        I believe that since his medication list
17  had shrunk down to three, that the first two would
18  be safe for him to use.
19  Q        And if, for example, Ativan was added to
20  the list -- although I don't see it there -- would
21  you have any concerns that Celexa, Ambien, and
22  Ativan might have an adverse effect on his ability
23  to do his job in March of 2014?
24  A        I would want him to choose either Ambien
25  or Ativan, but not take them at the same time.  I
```

```
 1  also would not want him to consume alcohol with
 2  either of those.
 3  Q        Of course, at this time -- and I
 4  understood you still had a problem with Marinol,
 5  correct?
 6  A        Yes.
 7  Q        How does Marinol, in your opinion,
 8  adversely affect Mr. Hixon's ability to do his job?
 9  A        Marinol has well-documented psychiatric
10  and neurologic side effects.  The terminal half-life
11  is something around 36 hours.  So it's not like you
12  can take it at bedtime and have it out of your
13  system or even close to out of your system the next
14  morning.
15  Q        And you said -- but your problem with it
16  is the side effects that it could trigger on
17  depression.  Is that -- did I summarize that
18  correctly?
19  A        There are clear warnings with Marinol
20  to -- that it can worsen psychiatric illness.  It's
21  the opposite of what your client should have been
22  taking.
23  Q        But other than Marinol's impact on
24  depression, were there any other concerns about
25  Mr. Hixon taking Marinol and working as a chem-lab
```

```
 1  tech?
 2  A        He's taking Marinol in the context of also
 3  having access to multiple other sedating medications
 4  plus alcohol.  And in a perfect world, I'd like
 5  someone who's in a safety-sensitive position to take
 6  nothing that could potentially impair them.  But I
 7  was willing to accept the risks of the other
 8  medications with the exception of Marinol.
 9  Q        I guess what I'm trying to figure out,
10  the -- what symptom or what effect of taking Marinol
11  would have an adverse impact on his ability to be a
12  chem-lab tech?
13  A        So possible consequences include sedation,
14  memory lapses, worsening of mood.
15  Q        Anything else that you can think of?
16  A        There are pages and pages of potential
17  side effects.
18  Q        Yeah.  That would be the same for every
19  medication, right, Doctor?
20  A        No, not necessarily.
21  Q        If you look at all the possible side
22  effects for every prescription medication, they're
23  pretty long, aren't they?
24  A        So one of the things that I have to do is
25  to weigh the likelihood of those adverse events in
```

```
 1              E R R A T A   P A G E

 2
            I, STEPHEN ADAMS, M.D. the witness
 3      herein, have read the transcript of my
        testimony and the same is true and
 4      correct, to the best of my knowledge, with
        the exception of the following changes
 5      noted below, if any:

 6   Page / Line /          Change          / Reason

 7   _____     _____

 8   _____     _____

 9   _____     _____

10   _____     _____

11   _____     _____

12   _____     _____

13   _____     _____

14   _____     _____

15   _____     _____

16   _____     _____

17   _____     _____

18   _____     _____

19   _____     _____

20

21              _____
                STEPHEN ADAMS, M.D.
22
            Sworn to and subscribed before me,
23      this the _____ day of _____,
        2015.
24

25              _____
                Notary Public
                My commission expires:
```

```
 1              REPORTER'S CERTIFICATE

 2
     STATE OF TENNESSEE  :
 3
     COUNTY OF HAMILTON  :
 4

 5           I, Janet P. Tilley, do hereby certify

 6   that the foregoing deposition was stenographically

 7   recorded by me as stated in the caption; STEPHEN

 8   ADAMS, M.D. was duly sworn by me; that pages 1 to

 9   74, inclusive, were reduced to typewriting under my

10   direction and supervision; and the deposition is a

11   true and correct record, to the best of my ability,

12   of the testimony/evidence given by the deponent.

13           I further certify that I am not a relative

14   or employee of attorney or counsel of any of the

15   parties, nor am I a relative or employee of such

16   attorney or counsel, nor am I financially interested

17   in the action.  All rates charged are usual and

18   customary.

19           This the 7th day of July, 2015.

20

21              _____
                Janet P. Tilley
22              LCR, CCR, and Notary Public.
                Commission Expires: 5/6/2017
23              Tennessee LCR Number: 020

24

25
```