UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ALEX HIXON,                              )
                                        )
        Plaintiff,                       )
                                        )
v.                                       )        No. 1:19-cv-00120-PLR-SKL
                                        )
TENNESSEE VALLEY AUTHORITY               )
BOARD OF DIRECTORS,                      )
                                        )
        Defendant.                       )

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff submits the following memorandum in support of his motion for partial summary judgment.

## I.  INTRODUCTION

An unlawful medical examination can produce a domino effect of harmful consequences – even if those consequences were not intended by the employer.  In this case, the unlawful medical examination ultimately led to the discharge of a long-time employee, whose work performance record was almost spotless.  While federal law allows employers to subject their employees to post-hire medical examinations, there are strict parameters limiting the need for, and scope of, such examinations.  When those parameters are breached – even with good intentions or in ignorance – the examination becomes unlawful, as well as the personnel actions that stem from such unlawful examination.  That is exactly what occurred in this case.

## II.  RELEVANT FACTUAL BACKGROUND

Plaintiff was employed by TVA as a Chemistry Laboratory Technician from May 2001 until his discharge on June 2, 2014.  Tim Cofer was Plaintiff's supervisor from August 2008 until

his discharge. (Cofer depo. p. 17.)[1]  Cofer observed Plaintiff's work on a weekly basis and found that Plaintiff's overall work performance was mostly good. (Id.)  Before January of 2014, Cofer never disciplined Plaintiff. (Id. at 17-18.)  In Plaintiff's last performance review, which occurred in October 2013, Cofer gave Plaintiff an overall satisfactory rating, including a satisfactory rating in the category of working in a safe and conscientious manner. (Id. at 25.)

Plaintiff had a history of depression, which was known by Cofer and TVA's Non-Nuclear Fitness for Duty Program ("NNFFD"). In 2005, Plaintiff took medical leave for a psychiatric hospitalization, which required a fitness-for-duty examination upon his return from leave. (Adams depo. pp. 35-36.)[2]  In the fall of 2012, Plaintiff took another medical leave for psychiatric and alcohol abuse treatment, which also required a fitness-for-duty examination upon returning to work in January 2013. (Adams depo. pp. 35-36; Clepper depo. pp. 25-26.)[3]  NNFFD maintained a file of medical and psychological records pertaining to Plaintiff dating back to 2005. (Id. at 73-74.)  Candace Clepper, who was the head of NNFFD, was aware of Plaintiff's chronic depression, as was Cofer and TVA's contract fitness-for-duty physician, Dr. Stephen Adams. (Id. at 17, 25, 73-74; Cofer depo. pp. 27-28; Adams depo. pp. 6, 35.)

Despite his chronic depression, Plaintiff was performing his job well in 2013. Cofer did not observe Plaintiff working in an unsafe manner, nor were there any reports from co-workers that Plaintiff was working in an unsafe manner. (Cofer depo. pp. 37-38.)  Likewise, Cofer did not observe Plaintiff acting in an abnormal manner in 2013, nor were there any reports from co-workers to that effect. (Id. at 38-39.)  At no point in 2013 was Cofer concerned about Plaintiff's ability to work safely. (Id. at 39.)  Additionally, Cofer never believed that Plaintiff posed a

---

[1] Relevant excerpts of the deposition of Timothy Cofer are attached to the Motion as <u>Exhibit 1</u>.
[2] Relevant excerpts of the deposition of Dr. Stephen Adams are attached to the Motion as <u>Exhibit 2</u>.
[3] Relevant excerpts of the deposition of Candace Clepper are attached to the Motion as <u>Exhibit 3</u>.

2

significant risk to the health or safety of himself or his co-workers. (Id. at 39, 98.) Plaintiff worked alone in the laboratory at times, which never gave any concern to Cofer. (Id. at 39-40.)

In early November 2013, Plaintiff's primary care physician, Dr. Charles Adams, prescribed the drug Marinol to treat Plaintiff's anxiety.[4] (C. Adams decl. ¶5.)[5] Marinol is a synthetic form of the active natural substance in marijuana (cannabis).[6] On December 23, 2013, Plaintiff underwent a random drug screen. When the drug screen reported positive for marijuana, Plaintiff's physician submitted a medical note indicating that Plaintiff had been lawfully prescribed Marinol. (Hixon stmt. p. 28.)[7] TVA's Medical Review Officer ("MRO") reported the results of the drug screen to Clepper as negative with a safety concern for Marinol. (Clepper depo. p. 43.) Other than the MRO's safety concern comment, Clepper had no independent evidence or belief that Plaintiff could not perform his job while taking Marinol. (Id. at 51-52.)

As a result of Dr. Strickler's comment, Clepper ordered Plaintiff to undergo a medical examination with TVA's contract FFD physician, Dr. Stephen Adams, on January 6, 2014. (Clepper depo. p. 55.) The purpose of the medical examination was to determine if Plaintiff could work safely while taking Marinol. (Id.) Clepper, however, understood that the medical examination was actually going to be wide-open, and not narrowly tailored to determining whether Plaintiff could safely perform his job while taking Marinol. (Id. at 60.)

Indeed, the medical examination that Dr. Adams performed on January 6 was not narrowly tailored to determining whether Plaintiff could work safely while taking Marinol. Instead, it was an open-ended, "comprehensive", and "global" assessment of Plaintiff's general health. (Adams

---

[4] Plaintiff believed that Marinol was being prescribed to treat his insomnia, and that is what he advised TVA's fitness for duty physician, Dr. Stephen Adams, during the medical examination. (Adams depo. p. 23; Exhibit 5.)
[5] The declaration of Dr. Charles Adams is attached to the Motion as Exhibit 4.
[6] https://www.webmd.com/drugs/2/drug-9308-7132/marinol/details (viewed 9/6/19).
[7] Excerpts from the sworn statement of Alex Hixon are attached to the Motion as Exhibit 6.

depo. pp. 18, 20-21.)  Dr. Adams admitted that much of the medical information revealed in the examination was not relevant.  (Id. at 33-34.)  Dr. Adams understood that Plaintiff had been prescribed Marinol to treat insomnia.  (Id. at 23.)  However, even though TVA had not indicated any concern about Plaintiff's mental health, Dr. Adams focused much of his intrusive and probing inquiries into Plaintiff's depression.  (Id. at 18-20.)  Prior to the examination, Dr. Adams even reviewed Plaintiff's entire TVA medical file, which contained detailed information about his psychiatric history.  (Id. at 17, 22.)

At the conclusion of the examination, Dr. Adams declared that Plaintiff's "depression is not very well controlled and has not been for a long time."  (Exhibit 5.)  Dr. Adams claimed that Plaintiff manifested "depressive symptoms" during the examination which led him to believe that Plaintiff's depression was not under control.  (Adams depo. pp. 27, 47.)  Yet, Dr. Adams did not record any of his observations of Plaintiff's alleged depressive symptoms in his three-page, detailed chart notes.  (Id. at 28-30, 48-50.)  Dr. Adams had no special training in psychiatry and was board certified *only* in family medicine.  (Id. at 8-9.)  Clepper herself did not believe that Dr. Adams was an expert in the field of psychiatry.  (Clepper depo. p. 75.)  Despite Dr. Adams' lack of psychiatric credentials and expertise, Clepper accepted his recommendation for a psychological evaluation, and ordered Plaintiff to submit to such an evaluation conducted by TVA's chief contract psychologist, Dr. Gary Leigh.  (Id. at 69-70.)

Plaintiff's was initially examined by Dr. Leigh on January 14, 2014.  (Exhibit 7.)  This examination included the administration of the MMPI-2 psychological test.  (Id.)  Dr. Leigh separately communicated with Drs. Charles Adams (primary care physician), Brian Telliho (psychiatrist), and Lon Glover (therapist), who all three opined favorably about Plaintiff's

4

psychological well-being and fitness for work. (Id.) Despite these favorable reports, Dr. Leigh concluded on January 20 that Plaintiff was <u>not</u> psychologically fit for duty. (Id.)

Effective January 21, 2014, Plaintiff was removed from work without pay because he allegedly "did not meet the TVA standards for the ability to work safely." (Exhibit 8.) Plaintiff's return to work was contingent upon his enrolling in TVA's Employee Assistance Program ("EAP") and complying with any EAP recommendations. (Id.)

In the meantime, TVA resubmitted the original urine sample for additional testing, with the results coming back purportedly positive for marijuana "which cannot be the result of the sole use of Marinol." (Exhibit 9.) In accordance with policy, TVA suspended Plaintiff for 14 days. (Exhibit 10.) The successful completion of a drug and alcohol test was added as a condition of Plaintiff's return to work. (Id.)

On March 5, 2014, EAP concluded that Plaintiff was fit for duty, as there were no signs of drug abuse. (Exhibit 11.) Dr. Stephen Adams reached the same conclusion on March 17, 2014, provided that Hixon abstain from the use of Marinol. (Exhibit 12.) Drs. Teliho and Charles Adams concurred in Plaintiff's fitness for duty. (Teliho decl. ¶¶ 6, 9;[8] C. Adams decl. ¶ 7). They also concurred that Plaintiff exhibited no signs of illegal drug use. (C. Adams decl. ¶ 8; Teliho decl. ¶ 10; Adams depo. pp. 63-64.) Clepper was aware that all three of Plaintiff's treating professionals (Drs. Adams, Teliho, and Glover) were giving good assessments of Plaintiff's psychiatric well-being as early as mid-February 2014. (Clepper depo. p 106.)

Despite being cleared to return to work, Plaintiff was ordered to undergo another psychiatric examination with Dr. Leigh, who administered the MMPI once again on March 20, 2014. (Exhibit 14.) Leigh then communicated his concerns about the results with Dr. Teliho.

---

[8] The declaration of Dr. Brian Teliho is attached to the Motion as <u>Exhibit 13</u>.

(Exhibit 15.) Dr. Teliho made clear to Dr. Leigh that he had no concerns about Plaintiff being able to work safely. (Teliho decl. ¶¶ 6, 9.)

Thereafter, Dr. Leigh asked Clepper for a detailed narrative explaining the hazardous elements of Plaintiff's job. (Clepper depo. p. 121.) Clepper was not sure why Dr. Leigh was asking for this information. (Id.) She admitted that she could not directly provide this information to Dr. Leigh because she did not fully understand the details herself of Plaintiff's job or what specifically made his job "safety sensitive." (Id. at 120, 121-22.) Because Clepper could not answer Dr. Leigh's request, she forwarded the request to Cofer. (Id. at 121.) Prior to this time, no one from NNFFD had communicated with Cofer about the specifics of Plaintiff's job. (Id. at 123; Cofer depo. pp. 61-62.)

Plaintiff was eventually returned to work on April 6, 2014, with the following three conditions: (1) that he provide a list of <u>all</u> medications he was taking by the 15th of every month to NNFFD; (2) that he refrain from the use of Marinol, even if lawfully prescribed, and; (3) that he continue to pass random drug and alcohol screenings. (Exhibit 16.) Clepper admitted that Dr. Adams and Dr. Leigh had not recommended that Plaintiff disclose <u>all</u> medications to NNFFD. (Clepper depo. p. 137.) It was Clepper's idea to expand the disclosure to <u>all</u> medications, even if the medications had no likelihood of impairing his ability to work safely. (Id. at 137, 141.)

Plaintiff was fired on June 2, 2014. The reason for discharge given in the termination letter was failure to disclose all medications to NNFFD on May 15, per the terms of the return to work agreement. (Exhibit 17.) Plaintiff attempted to set up an automatic reminder through his email program so that he would remember to report his medications by May 15. (Hixon stmt. p. 53.) The reminder did not work, and the requirement slipped Plaintiff's mind. (Id.). NNFFD notified Cofer on Wednesday, May 28, 2014, that Plaintiff had not provided a list of medications, and

Cofer reminded Plaintiff of the obligation that same day. (Cofer depo. p. 75.) Plaintiff immediately called NNFFD and spoke with Melissa Diamond. (Hixon stmt. p. 53.) He asked for Hannah Lowery, who was in a meeting, and then he asked for Clepper, who was also in a meeting. (Id. at 54.) Plaintiff asked Diamond for one of those ladies to call him, and he also asked Diamond to convey to them that his medications had not changed in the last month. (Id.) This conversation occurred early on Wednesday, May 28, and having heard nothing back from NNFFD by the end of his shift, Hixon went home because his workweek was finished.[9] (Id.) He was fired by Cofer on the following Monday. (Id.)

## III. LEGAL ARGUMENT

### A. Rehabilitation Act Incorporates ADA Standards

The Rehabilitation Act expressly adopts the provisions of Title I of the ADA (42 U.S.C. §12111 *et seq*.). 29 U.S.C. §791(f). Claims brought under the Rehabilitation Act are reviewed under the same standards that govern ADA claims. *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013); *Hale v. Johnson*, 245 F.Supp.3d 979, 985 (E.D. Tenn. 2017) ("cases addressing the ADA are generally relevant for purposes of resolving claims brought under the Rehabilitation Act"). Because the same standards apply, the ADA will be referenced herein.

### B. Medical Examination/Disability Inquiry Claim

Once an employee has been hired, the ADA prohibits an employer from "requir[ing] a medical examination" or making "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007). In the

---

[9] Plaintiff's workweek was Sunday through Wednesday. (Hixon stmt. p. 54.)

7

post-hiring context, "demands for examinations can only be made where shown to be 'job-related and consistent with business necessity.'" *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) (quoting 42 U.S.C. § 12112(d)(4)(A)). A plaintiff need not prove that he is disabled to contest an allegedly improper medical examination or inquiry under 42 U.S.C. § 12112(d)(4)(A). *Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011).

In this case, Plaintiff contends that TVA subjected him to two medical examinations, one psychological examination, and numerous disability-related inquiries in 2014 that violated the ADA. The two medical examinations at issue occurred on January 6, 2014 and March 7, 2014. Both were conducted by Dr. Stephen Adams, a contract physician for TVA, at the instruction of TVA's Non-Nuclear Fitness for Duty Program ("NNFFD"). The psychological examination at issue occurred on January 14, 2014, and it was conducted by Dr. Gary Leigh, a contract psychologist, at the instruction of NNFFD. Finally, Plaintiff contends that he was subjected to numerous disability-related inquiries during the time period January 2014 through March 2014 by both Dr. Adams and Dr. Leigh. Essentially, this case is like the proverbial "domino effect" – the result of the unlawful first medical examination led to an unlawful psychological examination, which then led to a second unlawful medical examination. The evidence will show that TVA's examinations and inquiries were neither job-related nor consistent with business necessity.

The Sixth Circuit has established the following two-part burden-shifting test for proving an unlawful-medical-examination claim under the ADA: (1) whether the employer performed or authorized a medical examination or disability inquiry; and if so, (2) whether the exam/inquiry was job-related and consistent with business necessity. *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 569 (6th Cir. 2014). Put another way, Plaintiff must first establish that TVA has performed or authorized medical examination or disability inquiry. If that is proven, TVA will then bear

8

the burden of proving that the medical examination or inquiry was job-related and consistent with business necessity." *Jackson v. Regal Beloit Am., Inc.*, 2018 WL 3078760, at *6 (E.D. Ky. June 21, 2018) (citing *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014)).

      1.    <u>Medical Examination and Disability Inquiry</u>

For purposes of Plaintiff's burden, a "medical examination" is "a procedure or test that seeks information about an individual's physical or mental impairments or health." *Bates*, 767 F.3d at 574 (citing EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act ("EEOC Guidance"), Part B.2 (July 27, 2000)). A "disability-related inquiry," on the other hand, is a "question (or series of questions) that is likely to elicit information about a disability." *Id.* (quoting EEOC Guidance, Part B.1).

It is undisputed that TVA required Plaintiff to submit to medical and psychological examinations by Drs. Adams and Leigh. TVA required Plaintiff to bring to the examinations "a list of current prescription and over the counter medications, including medication name, dosage, frequency taken, dates taken and reason prescribed." (Exhibit 18.) During these examinations and afterwards, TVA made disability-related inquiries by questioning Plaintiff, his treating doctor (Dr. Charles Adams), his treating psychiatrist (Dr. Brian Teliho), and his therapist (Dr. Lon Glover). These inquiries mainly focused upon Plaintiff's depression, but Dr. Stephen Adams also made broad inquiries into Plaintiff's current health condition, as well as his past medical history. Because Plaintiff easily satisfies his burden, the burden shifts to TVA to prove that the medical examinations and disability inquiries were job-related and consistent with business necessity. *Kroll*, 763 F.3d at 623.

9

2.      Job-Related and Consistent with Business Necessity

An employer "who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Kroll*, 763 F.3d at 623. To show that a particular examination or inquiry was "job-related and consistent with business necessity," TVA must demonstrate that: (1) the employee requested an accommodation; (2) the employee's ability to perform the essential functions of the job was impaired; or (3) the employee posed a direct threat to himself or others. *Id.* (citing *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007)).

TVA simply cannot meet its burden. Plaintiff did not request a reasonable accommodation, so the first method is not applicable. With respect to the second method, TVA cannot demonstrate that Plaintiff's ability to perform the essential functions of the job was impaired. The purpose of the first medical examination with Dr. Adams was to determine if Plaintiff could work safely while taking Marinol. Candace Clepper, who was head of NNFFD, made the decision to send Plaintiff to this mandatory medical examination.

> Q:      And I don't want to beat the dead horse. I just want to make sure the – what was the purpose of having Mr. Hixon medically evaluated by Dr. Stephen Adams?
>
> A:      To determine if he could work safely in his job while taking Marinol.
>
> Q:      Oaky. So this was a medical examination that you were instructing Mr. Hixon to attend, correct?
>
> A:      Yes.

(Clepper depo. p. 55.)

The triggering event for the medical examination was the Medical Review Officer's comment that Marinol posed a "safety concern." (Clepper depo. p. 50.) Other than the MRO's safety concern comment, Clepper had no knowledge or belief that Plaintiff could not safely

10

perform his job while taking Marinol. (Id. at 51-52.) Clepper had no independent evidence that Plaintiff was mentally unfit to perform his job. (Id. at 70.) Clepper admitted that she never spoke to Plaintiff's supervisor about his job performance. (Id. at 71.) She also admitted that she had not received any recent complaints about Plaintiff's work performance. (Id.) In fact, no one from NNFFD ever asked Plaintiff's supervisor about Plaintiff's work performance or behavior. (Cofer depo. p. 47.)

Had anyone from NNFFD bothered to do so, the evidence would have shown that the use of Marinol did not impair Plaintiff's ability to perform his job. Plaintiff's supervisor, Tim Cofer, had never observed Plaintiff working in an unsafe manner, nor was he aware of any reports to that effect from co-workers. (Cofer depo. p. 37-38.) Indeed, Cofer was never concerned that Plaintiff could not safely perform his job. (Id. at 39.) Moreover, during the three-month time period between the first medical examination and NNFFD's approval for Plaintiff to return to work, both Dr. Charles Adams (Plaintiff's treating physician) and Dr. Brian Teliho (Plaintiff's treating psychiatrist) informed TVA that Plaintiff could safely perform his job while taking Marinol. (Clepper depo. pp. 82, 84.) Clepper acknowledged the disagreement between the doctors about whether Marinol had any adverse impact on Plaintiff's work abilities. (Id. at 139.)

With respect to the third method, TVA cannot demonstrate that Plaintiff's Marinol use posed a direct threat to himself or others. To constitute a "direct threat," the disability or requested accommodation (in this case, the use of Marinol) must present "a significant risk to the health or safety of others." 42 U.S.C. §12111(3). "The risk can only be considered when it poses a significant risk, i.e., high probability of substantial harm; a speculative or remote risk is insufficient." *Hamlin v. Charter Township of Flint*, 165 F.3d 426, 432 (6th Cir. 1999). A direct threat determination must be based on an individualized assessment of the individual's present

ability to safely perform the essential functions of the job, using the best available objective evidence. 29 C.F.R. §1630.2(r).

In this case, TVA's MRO noted that Plaintiff's use of Marinol was a "safety concern," but he never explained the details of his comment to TVA. (Clepper depo. p. 49.) TVA's contract physician, Dr. Stephen Adams,[10] claimed it was unsafe for Plaintiff to take Marinol at work, but his decision was based upon "possible consequences [to] include sedation, memory lapses, worsening of mood." (Adams depo. p. 68.) Notably, Dr. Adams' concern was only based upon "**possible**" consequences. However, Dr. Adams' physical examination demonstrated that Plaintiff had no problems with concentration or memory. (Id. at 42.) As stated previously, no one from NNFFD ever contacted Plaintiff's supervisor or co-workers to ask about Plaintiff's job performance or behavior while taking Marinol. Cofer, who observed Plaintiff working on a daily basis, had no problems with Plaintiff's work in 2013. (Cofer depo. pp. 17, 37.) Cofer never observed Plaintiff working in an unsafe manner nor did he hear about any complaints from coworkers about Plaintiff working in an unsafe manner. (Id. at 37-38.) Plaintiff's supervisor was never concerned about Plaintiff's ability to work safely, and he likewise never believed that Plaintiff was a threat to himself or others. (Id. at 39.) In fact, Plaintiff frequently worked alone, and Cofer was never concerned about Plaintiff working alone. (Id. at 39-40.)

Contrary to the cursory opinions of the MRO and Dr. Stephen Adams, Plaintiff's primary care physician (Dr. Charles Adams) and treating psychiatrist (Dr. Brian Teliho) advised TVA that Plaintiff's use of Marinol was not a safety threat in any way. (Clepper depo. pp. 82, 84.) TVA acknowledged the disagreement between the doctors about whether Marinol had any adverse impact on Plaintiff's work abilities. (Id. at 139.) Given the best objective evidence available to

---

[10] Dr. Stephen Adams is only board certified in family medicine. (Adams depo. p. 8.) He has no other board certifications, and he has no special training in addiction medicine or psychiatry. (Id. at 9.)

TVA, clearly Plaintiff's use of Marinol did not rise to level of presenting "a high probability of substantial harm." *Hamlin*, 165 F.3d at 432. Therefore, TVA cannot show that Plaintiff's use of Marinol constituted a direct threat under the ADA.

In addition to Plaintiff's use of Marinol, TVA contends that Plaintiff's mental state – particularly his chronic depression – justified further medical examinations and disability-related inquiries. During Plaintiff's first medical examination, Dr. Stephen Adams claims that Plaintiff's depression was not well-controlled, and for that reason, he referred Plaintiff to Dr. Leigh. (Adams depo. pp. 49-50.) Dr. Leigh, in turn, claims that Plaintiff was in a severe depressive state, warranting multiple in-depth conversations with Plaintiff's psychiatrist and counselor about Plaintiff's chronic depression. (Exhibit 7.)

TVA cannot show that Plaintiff's ability to perform his job was impaired by chronic depression or that Plaintiff's chronic depression posed a direct threat to himself or others. While Dr. Stephen Adams claimed that Plaintiff appeared to be in a depressed state during the first medical examination, he admitted that his clinical notes are devoid of any such reference. (Adams depo. pp. 27-30.) Notably, Dr. Adams' clinical notes make reference to many physical findings regarding irrelevant medical conditions, but no clinical observations regarding depression are recorded. (Id. at 29, 33-34, 38-39.) Dr. Adams also admitted that Plaintiff stated that his depressive symptoms were under fair control, even though Dr. Adams believed otherwise. (Id. at 26.) Of course, Dr. Adams never spoke with Plaintiff's supervisor to find out if Plaintiff was having any trouble performing his job or exhibiting abnormal behavior. (Cofer depo. p. 47.) Clepper never communicated with Dr. Adams about his recommendation for a psychological examination and never received any explanation as to why it was necessary. (Clepper depo. pp. 68, 70.) Finally, Dr. Adams had no special training in psychiatry, and Clepper did not believe that

Dr. Adams was an expert in the field of psychiatry. (Adams depo. pp. 8-9; Clepper depo. 75.) Despite this lack of evidence, Clepper blindly approved and instructed Plaintiff to undergo an unnecessary psychological examination with Dr. Leigh. (Id. at 69-70.)

Interestingly, the evidence highly suggests that Dr. Leigh spoke with Dr. Adams approximately one hour before Plaintiff's January 6, 2014, physical examination. (Exhibit 19.) While the reason for this conversation is unknown, it is clear that Clepper instructed this conversation to occur before Plaintiff's first medical examination. (Exhibit 18.) Thus, at the outset, Clepper wanted TVA's psychologist to influence Dr. Adams' examination, even though there was no evidence or even suspicion that Plaintiff was having mental health issues.

Dr. Leigh had no objective evidence to show that Plaintiff's depression was impairing his ability to work. He never spoke with Plaintiff's supervisor to find out if Plaintiff was having any trouble performing his job or exhibiting abnormal behavior. (Cofer depo. p. 47.) He did, however, communicate with Plaintiff's three treating professionals – Drs. Charles Adams, Brian Teliho, and Lon Glover – who all informed Dr. Leigh that Plaintiff was psychologically doing well and fit for duty. (Exhibit 7.) Dr. Charles Adams opined that Plaintiff was fit for duty and that Marinol was not a safety concern. (Clepper depo. pp. 81-82.) Likewise, Dr. Teliho saw no problem with Plaintiff's use of Marinol, and he clearly communicated with Dr. Leigh that Plaintiff was psychologically fit to perform his job. (Teliho decl. ¶¶6, 9.) Dr. Glover stated that Plaintiff was doing as well as he had ever been. (Clepper depo. p. 87.) Despite all of this evidence, which Clepper admitted was very different than Dr. Leigh's assessment, both Dr. Leigh and Clepper determined that Plaintiff was psychologically unfit to work.

While TVA may point to Dr. Leigh's opinion that Plaintiff appeared to be very anxious during the psychological examination, this is certainly explainable given the scrutiny Plaintiff was

14

experiencing. Indeed, Plaintiff's treating professionals warned Dr. Leigh that TVA's increased scrutiny of Plaintiff was having a detrimental effect on his mental health. (Clepper depo. pp. 89, 126.) Simply put, TVA had no objective evidence to demonstrate that Plaintiff was impaired in his ability to work or that he was a direct threat to himself or others. Therefore, the psychological examination and subsequent disability-related inquiries by Dr. Leigh were not job-related and consistent with business necessity.

Finally, absent evidence of current performance problems or observable evidence suggesting that a particular employee poses a direct threat, employers can require periodic medical examinations of employees in only two other instances: (1) where the employees are in positions affecting public safety (e.g., police officers and firefighters) or (2) where the medical examinations are required or necessitated by other law or regulation (e.g., Federal Aviation Administration and Department of Transportation medical certifications, Occupational Safety and Health Act standards). *Jackson v. Regal Beloit Am., Inc.*, 2018 WL 3078760, at *6 (E.D. Ky. June 21, 2018) (citing EEOC Guidance, Part D.18, 21). Neither of these instances apply to this case. Therefore, TVA has failed to carry its burden by demonstrating that the examinations and inquiries were job-related and consistent with business necessity.

### 3. Scope of Examination

Assuming *arguendo* that TVA can prove that its medical examinations and disability inquiries were job-related and consistent with business necessity, "the scope of the examination and inquiry must remain appropriately narrow." *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 249 (6th Cir. 2009). A medical examination or inquiry under § 12112(d)(4) "is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance;" rather, the examination and the inquiry must

15

be "restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Sullivan*, 197 F.3d at 812-13. Therefore, "an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *Jackson v. Regal Beloit Am., Inc.*, 2018 WL 3078760, at *9 (E.D. Ky. June 21, 2018) (citing *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 782-83 (N.D. Ohio 2002)).

In this case, the scope of TVA's examinations and disability-related inquiries were far broader than necessary. While the purpose of the first medical examination by Dr. Stephen Adams was supposedly "[t]o determine if [Plaintiff] could work safely in his job while taking Marinol" (Clepper depo. p. 55), TVA clearly understood that the medical examination would require Plaintiff to disclose all of his medical conditions – even if those medical conditions were unrelated to Plaintiff's use of Marinol.

> Q:      Did you understand that when you sent Mr. Hixon to be evaluated by Dr. Adams, that Dr. Adams was – and, basically, that Mr. Hixon was going to have to disclose all of his medical conditions, even if those medical conditions did not relate in any way to his taking Marinol?
>
> A:      Yes, I understood that.
>
> Q:      And you authorized that?
>
> A:      Yes.

(Clepper depo. p. 60).

Dr. Adams, as well, admitted that the scope of the medical examination was "an overall assessment", "a comprehensive assessment of whether [Plaintiff] is globally able to function in that job currently or not," and "an overall full examination." (Adams depo. pp. 18, 20-21.) In sum, TVA knowingly gave Dr. Adams *carte blanche* authority to probe into every facet of Plaintiff's health, no matter if the medical inquiries were related to Plaintiff's use of Marinol. Indeed, Dr. Adams made disability-related inquiries into completely irrelevant medical conditions,

such as a stomach ulcer, shoulder dislocation, kidney infection, urinary tract infection, leg numbness, and lumbar disk pain. (Id. at 33-34, 40.)

Dr. Adams also utilized the examination as a "witch hunt" into Plaintiff's depression. Even before the examination began, Dr. Adams admitted that he reviewed Plaintiff's entire TVA medical file, including psychological notes dating back to 2005. (Adams depo. pp. 17, 22, 35-36.) Based upon his review of Plaintiff's medical file, Dr. Adams admitted that, going into the examination, he was "concerned" that Plaintiff's mental health condition was adversely impacting Plaintiff's ability to work safely. (Id. at 18-19.) However, TVA never advised Dr. Adams of any concern related to Plaintiff's mental health. (Id. at 19-20.) Indeed, at that point, NNFFD had no evidence that Plaintiff's was mentally incapable of performing his job, either based upon conversations with Plaintiff's supervisor or upon complaints from other sources. (Clepper depo. pp. 70-71.) Thus, without any instructions from TVA, Dr. Adams initiated an extensive inquiry with Plaintiff about his depression and anxiety, even though Dr. Adams was aware that the Marinol had been prescribed for insomnia, and not depression or anxiety. (Adams depo. pp. 20, 22-23.)

The second medical examination conducted by Dr. Adams on March 7, 2014 was equally as broad and intrusive as the first. The purpose of the second examination was allegedly "return to work and ability to work safely." (Adams depo. p. 61.) As was the first examination, this examination was extremely broad and intrusive.

> Q: So in this March 2014 examination, what was the scope? What was your scope that you were operating under when you examined him?
>
> A: I'm expected to do a global assessment and determine whether, in my opinion, he is safe to go back to work or not.
>
> Q: Okay. So it was just as broad – this March 2014 examination of Mr. Hixon was just as broad as the January 2014 examination of Mr. Hixon; is that correct?

17

A: My assessment is expected to be as broad. In practical terms, there's less legwork on my part, because I've seen him recently. We're following up on ongoing issues.

Q: But the broadness of the two examinations were essentially the same; is that correct?

A: Yes.

(Adams depo. pp. 61-62.)

Clearly, TVA's medical examinations performed by Dr. Stephen Adams were overly broad, and thus violated the Rehabilitation Act.

The overbroad scope of TVA's medical examination is very similar to the illegally overbroad medical examination in the case of *Jackson v. Regal Beloit America, Inc.*, 2018 WL 3078760 (E.D. Ky. June 21, 2018). In *Jackson*, the employer required the plaintiff to submit to a medical examination pursuant to the employer's policy that every three years an employee must undergo such examination. During the examination, the doctor obtained information about the plaintiff's medical history and conducted a physical examination and vision test. *Id*. at *1. The health examination form showed that the plaintiff passed her vision test and that she had no physical abnormalities. *Id*. At some point during the examination, the doctor also inquired about the plaintiff's history of colon cancer and prior surgery. *Id*. at *2. At the conclusion, the doctor requested that the plaintiff provide the following items concerning her colon health: current diagnosis, treatment history received, prognosis, relevant tests, list of medications, and any physical restrictions from such treatment. *Id*. The doctor notified the plaintiff and her employer that he would not clear her for work until such information was provided. *Id*. Ultimately the plaintiff refused to provide such information and she was removed from her work assignment and downgraded to a job that did not involve operating powered industrial equipment. *Id*. at *3.

18

The plaintiff thereafter sued, arguing that the physical examination violated the ADA, specifically 42 U.S.C. § 12112(d)(4)(A). The district court agreed, and *sua sponte* entered partial summary judgment in the plaintiff's favor. *Id*. at *10. Regarding the improper scope of the examination, the district court reasoned as follows:

> Here, any appropriate scope was far surpassed. At the medical examination, Jackson was "required to submit information regarding [her] past medical history, which clearly inquired into the nature and severity of any disabilities." *James v. James Marine, Inc.,* 805 F. Supp. 2d 340, 350 (W.D. Ky. 2011). Jackson was also required to submit medical records related to her colon-cancer surgery, even though her physical examination did not reveal any physical abnormalities or uncover any causes for concern. Regal has put forth no rationale supporting its broad request.

> Put simply, Regal has failed to carry its "burden of proving that" the medical examination or inquiry was "job-related and consistent with business necessity." *Kroll II*, 763 F.3d at 623. Given Regal's failure to provide any particularized reason and inability to satisfy the generalized justification, it appears that Regal simply made a decision to stand by its policy. By failing to limit the scope of the medical examination and inquiry and failing to put forth a legally valid justification for demanding it, Regal violated the ADA and the KCRA.

*Jackson*, 2018 WL 3078760, at *10.

## C.     Requirement that Plaintiff Report All Medications

Plaintiff also challenges the legality of TVA's requirement, imposed in April 2014 as a condition of Plaintiff's continued employment, that he report <u>all</u> medications to NNFFD on a monthly basis. This requirement squarely violates the Rehabilitation Act.

Even though Drs. Adams and Leigh recommended that Plaintiff report only medications that are "likely to impair function" of his job, Clepper expanded the reporting requirement to all medications, no matter whether the medication is likely to impair Plaintiff's ability to do his job. (Clepper depo. p. 137.) When asked to explain why she had expanded the medication reporting requirement, Clepper stated:

> Q:     What right did you have to find out every medication that Mr. Hixon was taking?

A:      Because it **could** impact his job duties.

Q:      How do you know?

A:      **I don't know until he reports them**.

Q:      And so you want him to report every medication, no matter how private in nature, to TVA just so you can decide if that impacts his job?

A:      Well, I have an obligation to try to ensure a safe workplace. And I had information from Mr. Hixon's history with us that he had not been forthright in reporting medications that did impact his job duty, specifically Marinol.[11]

Q:      **Do you know of any federal law that gives TVA the right to pry into every medication that an employee is taking?**

A:      **I don't know of a federal law that gives me the right, but I also don't know if there's one that prohibits it. Not that I'm aware of**.

(Clepper depo. pp. 141-42.) (Emphasis added.)

The ADA's section on medical inquiries, 42 U.S.C. §12112(d)(4) – which is incorporated into the Rehabilitation Act – *does prohibit* TVA from prying into every medication that an employee is taking. Requiring an employee to disclose his medications falls within the meaning of a disability-related inquiry in 42 U.S.C. §12112(d)(4). "A 'disability-related inquiry' is a question that is likely to elicit information about a disability, such as asking employees about: . . . the kinds of prescription medications they are taking . . . ." EEOC Guidance, Part A.1. Requiring employees to disclose all medications that they are currently taking, without demonstrating job-relatedness, violates the ADA's prohibition on disability-related inquiries. *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1230-31 (10th Cir. 1997) (concluding that employer's policy of requiring employee to report all prescription drugs she used violated the ADA because the information was not shown to be job-related).

---

[11] Of course, Marinol did **not** have a negative impact on Hixon's ability to safely perform his job. (C. Adams decl. ¶6; Teliho decl. ¶6.)

In this case, had TVA limited the medication disclosure requirement to those medications "likely to impair function," as recommended by Drs. Adams and Leigh, the requirement would not violate the ADA.  However, when Clepper unnecessarily expanded the requirement to **all** medications – no matter whether the medication has any impact on job function – such expansion obliterated the "job-related" affirmative defense.  In this case, TVA crossed the impermissible boundary by taking upon itself the duty of deciding if a particular medication impacted job functioning.  TVA basically told Plaintiff, "We have the right to rummage through your medicine cabinet and decide for ourselves if your medication 'might' impact your ability to work safely." As a result of this illegal job requirement, Plaintiff was forced to disclose, through his monthly medication list, certain disabilities that had no impact on his ability to do his job.  Such an overly broad disability-related inquiry squarely violates the Rehabilitation Act.

D.     **Unlawful Discharge**

Plaintiff's discharge was the direct and proximate result of TVA's unlawful medical examinations and the unlawfully-imposed requirement that Plaintiff monthly report all medications to NNFFD.  Stated another way, but for Plaintiff's failure to comply with the medication disclosure requirement (a direct product of the multiple medical examinations and disability inquiries), TVA would not have terminated Plaintiff's employment. Therefore, Plaintiff's discharge was an unlawful act under the Rehabilitation Act.

TVA's stated reason for discharging Plaintiff is clearly set forth in the June 2, 2014 termination letter.  "The reason for this termination is your violation of TVA's Fitness for Duty Program for Non-Nuclear Organizations.  **Specifically, you violated the return-to-work agreement you signed April 7, 2014, by not reporting your medications to the Non-Nuclear Fitness for Duty office by May 15, 2014**."  (Exhibit 17.)  As explained previously, the

21

requirement that Plaintiff report all medications to NNFFD is unlawful. As such, termination based upon Plaintiff's failure to comply with an **unlawful** directive is not a legitimate, nondiscriminatory reason.

Again, the case of *Jackson v. Regal Beloit America, Inc.*, 2018 WL 3078760 (E.D. Ky. June 21, 2018) is instructive here. The employee in *Jackson* refused to authorize the disclosure of irrelevant medical information during a fitness-for-duty examination, and refused to provide answers to medical questions, which were not job-related, to the employer's doctor. The court found that the FFD medical examination and its medical inquiries violated the ADA. As a result of the employee's refusal to comply with the unlawful medical inquiries, the employee was discharged. *Id.* at *12. The employer argued that failure to cooperate regarding the medical inquiries constituted legitimate grounds for termination. *Id.* The court disagreed.

> Regal's argument assumes too much. The Sixth Circuit and other district courts within this Circuit have permitted employers to terminate employees for refusal to submit to a medical examination or inquiry only when the request for the medical examination or inquiry was lawful. Likewise, to the extent an employer's medical-examination request or disability-inquiry demand are unlawful, an employee's refusal to relent to such unlawful requests does not constitute a legitimate, nondiscriminatory reason for taking adverse employment action against that employee. Rather, it is the opposite: an illegitimate and unlawful reason.

*Jackson*, 2018 WL 3078760 at *12. (internal citations omitted).

Left without a legitimate nondiscriminatory reason, TVA cannot show that its decision to discharge Plaintiff was lawful. Therefore, Plaintiff is entitled to partial summary judgment in his favor as to liability on his discharge claim.

To the extent TVA claims other reasons for Plaintiff's discharge, such allegations would still not change the outcome. First, the correct causation standard to apply to Plaintiff's unlawful discharge claim is the "but-for" causation standard that applies under the ADA. Section 501(g) of the Rehabilitation Act explicitly incorporates the use of ADA standards "to determine whether this

22

section has been violated." 29 U.S.C. § 791(g); *see also Pinkerton v. Spellings*, 529 F.3d 513, 516-17 (5th Cir. 2008) (the ADA causation standard incorporated by § 501(g) governs claims brought under § 501 of the Rehabilitation Act). The Sixth Circuit rejected the "sole cause" standard, and instead adopted the "but-for" causation standard for claims brought under the ADA. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012).

Second, it is clear that the triggering event for Plaintiff's discharge was his failure to comply with the medication disclosure requirement. It is highly doubtful that Cofer was really the person who made the decision to fire Plaintiff, although Cofer claims so. (Cofer depo. p. 77.) Cofer alleged that he did not "decide" to fire Plaintiff until June 2, 2014, when Human Resources emailed Plaintiff's termination letter to him. (Id. at 80, 88.) Clepper admitted that she drafted Plaintiff's termination letter. (Clepper depo. pp. 154-55.) She sent the draft termination letter to Human Resources on May 16, 2014 – *two full weeks before* Cofer "claimed" to make the termination decision. (Clepper depo. p. 148; Exhibit 20.) Clepper admitted that Human Resources did not request a termination letter. (Clepper depo. p. 150.) Indeed, it was Clepper alone who initiated Plaintiff's termination process. Cofer was not the real decisionmaker; he was merely a functionary in the process. The real decisionmaker was Clepper. In fact, while Clepper was aware that Plaintiff called to report his medications to FFD on May 28, she was determined to move forward with the termination process, even to the point of discussing the matter with TVA's Labor Relations department "on how strong a case we have" against Plaintiff. (Exhibit 21.)

What triggered her decision to author Plaintiff's termination letter?

> Q:     This is an email chain between you [Candace Clepper] and Jesi Shahan. Who is Jesi Shahan?
>
> A:     She was the HR person at the time.

Q:    Okay.  So reading from the bottom, the first email is from Jesi Shahan to you, dated May 15, 2014, at 2:23 p.m.  And Jesi asked you, "Do we know if he submitted his medication list?"

The next day [May 16, 2014], you respond to Ms. Shahan's question by saying, basically, "He didn't report his medications.  This is a violation of the return-to-work agreement.  I have attached the termination letter template for you to use" –

A:    "If needed."

Q:    Why did you attach a termination letter?

A:    It's a template.  We always give HR templates for them to use in administering any discipline related to Fitness for Duty violations.

(Clepper depo. p. 148, referencing Exhibit 20).

This is consistent with the early testimony of Clepper and Cofer.  When asked by TVA's EEO investigator why Plaintiff was fired, Clepper only gave Plaintiff's failure to report his medications to NNFFD by May 15, 2014.  (Exhibit 22, Clepper stmt. p. 32.)  That was the only reason stated by Cofer when he was interviewed under oath by TVA's EEO investigator.

Q:    What are the circumstances that led to Mr. Hixon's termination of employment?

A:    He did not report medications he was on by the 15th.

(Exhibit 23, Cofer stmt. p. 32.)

Clepper included an attachment to her draft termination letter.  The attachment was styled "Failure to Cooperate with FFD Evaluation."  (Exhibit 20.)  Clepper admitted that the attachment was a mistake.  **"That attachment went with a different type of FFD violation: failure to disclose information.  That is not relevant to Hixon's case . . . ."**  (Exhibit 24).  Clearly, the only reason for Plaintiff's discharge was his failure to follow Clepper's illegal requirement that he report all medications by the 15th of each month.

24

Simply put, but for Plaintiff's failure to comply with the unlawful medication disclosure requirement, Plaintiff would not have been discharged. Therefore, Plaintiff's discharge violates the Rehabilitation Act.

## IV. CONCLUSION

Based on the foregoing, Plaintiff submits that he is entitled to judgment as a matter of law in his favor as to: (1) the unlawful medical and psychological examinations and disability-related inquiries to which he was subjected during the period January 2014 through March 2014 (Counts 1-4); (2) the requirement that Plaintiff disclose all medications on a monthly basis to NNFFD (Count 5); and (3) his unlawful discharge (Count 7). As to the Rehabilitation Act claims set forth in Counts 1-5 and 7, Plaintiff seeks a hearing before a jury to determine the amount of damages to be awarded.

Respectfully submitted,

**MIKEL & HAMILL PLLC**

By:   s/ *Doug S. Hamill*
       Doug S. Hamill, BPR No. 022825
       Counsel for Plaintiff
       620 Lindsay Street, Suite 200
       Chattanooga, TN 37403
       (423) 541-5400
       dhamill@mhemploymentlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of October, 2019, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

By:   s/ *Doug S. Hamill*