UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| ALEX HIXON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-cv-00120-PLR-SKL |
| | ) |
| TENNESSEE VALLEY AUTHORITY | ) |
| BOARD OF DIRECTORS, | ) |
| | ) |
| Defendant. | ) |

### REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, through counsel, replies to Defendant's response (Doc. 27) in opposition to Plaintiff's motion for partial summary judgment (Doc. 19) as follows.

### I. CLARIFICATIONS OF FACT

TVA devotes significant energy in the first several sections of its brief describing in detail Plaintiff's history with depression (i.e., his disability). It is undisputed that Plaintiff struggled with depression in 2005 to the extent that he was required to undergo a psychological fitness for duty (FFD) examination. It is also undisputed that Plaintiff was admitted for psychiatric treatment at a local hospital in the fall of 2012, which required that he undergo a second psychological FFD examination. Both times he was cleared to return to work, and he had no work performance problems after 2005. Furthermore, prior to December 2013, TVA never had any evidence (or suspicion) that Plaintiff was using illegal drugs. The "substance abuse" treatment Plaintiff received in 2005 was for alcohol use. (Doc. 25-1, Page ID#405.) Plaintiff once tried marijuana in the mid-1990s and cocaine once when he was a teenager. (Id.) Prior to December 2013, Plaintiff had never failed a drug test.

It is important for the Court to understand that Plaintiff was subjected to the January 6, 2014 medical examination with Dr. Adams and the January 14, 2014 psychological examination with Dr. Leigh *before* the Medical Review Officer ("MRO") opined that Plaintiff's positive drug screen could not have been solely caused by Marinol. Plaintiff's drug screen was re-tested on January 23, 2014. (Doc. 23-1, PageID# 277.) Thus, TVA's justification for Plaintiff's submission to two earlier medical examinations in January 2014 could not have been motivated by the results of the later drug screen retest. Despite the undisputed chronology of events, TVA erroneously states in its brief, "Alarmed by the MRO's finding of negative drug test with a safety concern **and the confirmation of Hixson's marijuana use**, TVA scheduled Hixon for a FFD examination on January 3, 2014, and placed Hixon in non-work, pay status." (Doc. 27, PageID# 465) (emphasis added). In another section of TVA's brief, it conflates the chronology of events so as to imply that Drs. Adams and Leigh were aware of the results of the drug screen retest when they initially examined Plaintiff in early January 2014. (Doc. 27, PageID# 473.) An accurate chronology is important so that the Court can assess what TVA knew at certain times during the FFD process.

TVA asserts that Plaintiff was using Marinol in an attempt to conceal marijuana use. (Doc. 27, PageID# 465, 469, 483; Leigh decl. ¶17, Doc. 25-1; Cofer decl. ¶10, Doc. 26-1; Clepper decl. ¶17, Doc. 23-1.) Such an erroneous assertion is based purely on speculation. Plaintiff's treating professionals all denied any observations or concerns that Plaintiff was using illegal drugs. (C. Adams decl. ¶¶8-9, Doc. 19-4; Teliho decl. ¶10, Doc. 19-13; Doc. 19-11, indicating Dr. Lon Glover's assessment that Plaintiff did not meet criteria for substance abuse.) In addition, EAP declared that Plaintiff did not meet the criteria for substance abuse. (Doc. 19-11.)

One final clarification of fact is warranted. Per TVA's alcohol and drug testing policy, a first positive drug screen mandated a 14-day suspension and mandatory referral to EAP. (Doc.

2

23-3, PageID# 302.) To the extent that TVA implies or argues otherwise, the interpretation of Plaintiff's drug screen being positive for marijuana did not warrant termination.

## II. LEGAL ARGUMENT

### A. Legal Standard for Medical Examinations

TVA begins its legal argument by claiming that Plaintiff has misstated the appropriate legal standard for assessing claims under the ADA's medical examination section, 42 U.S.C. § 12112(d)(4)(A). (Doc. 27, PageID# 471.) Curiously, TVA never explains how Plaintiff allegedly misstates the standard. Nevertheless, Plaintiff articulated the correct legal standard, which is as follows: (1) whether the employer performed or authorized a medical examination or disability inquiry; and if so, (2) whether the exam/inquiry was job-related and consistent with business necessity. *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 569 (6th Cir. 2014). Plaintiff must first establish that TVA performed or authorized a medical examination. If that is proven, **TVA has the burden of proof** to show that the medical examination or inquiry was job-related and consistent with business necessity. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014). Because TVA has conceded that it required Plaintiff to submit to medical examinations, the burden shifts to TVA to prove that the examinations were job-related and consistent with business necessity. To satisfy its burden, TVA must demonstrate that either: (1) the employee's ability to perform the essential functions of the job was impaired; or (2) the employee posed a direct threat to himself or others. *Kroll*, 763 F.3d at 623. In its response, TVA does not demonstrate that Plaintiff's ability to perform his job was impaired. Rather, it focuses upon Plaintiff being allegedly a direct threat to himself or others.

3

B. **Direct Threat**

TVA argues that Plaintiff's use of Marinol *alone* satisfies its burden of proving that Plaintiff posed a direct threat to himself or others. In making this erroneous argument, TVA cites to *James v. Goodyear Tire & Rubber Co.*, 354 Fed. Appx. 246 (6th Cir. 2009). However, the *James* case is inapposite in that there was ample evidence from coworkers that the plaintiff was having great difficulty safely performing his job, including evidence that he had been involved in two recent accidents. Unlike in the *James* case, there is absolutely no evidence that Plaintiff was having any difficultly safely performing his job while taking Marinol.

TVA also cites to the case of *McGee v. City of Greenville*, 2007 WL 465531 (D.S.C. Feb. 7, 2007) for the proposition that use of Marinol *alone* satisfies the employer's direct threat justification for a fitness for duty medical examination. In *McGee*, the employer's doctor requested that the employee furnish a letter from his treating doctor verifying his fitness for duty in a safety-sensitive position while taking Marinol. Because the employee never furnished evidence to rebut the employer's doctor's opinion, the court ruled that the *unrebutted* doctor's opinion justified the employer's opinion that the employee could not safely perform the job. In this case, however, Plaintiff submitted to TVA the opinions of two of his doctors – Dr. Charles Adams and Dr. Brian Teliho – that Plaintiff could safely perform his job while taking Marinol. (Adams decl. ¶¶6-7, Doc. 19-4; Teliho decl. ¶¶5-6, Doc. 19-13.)[1] Thus, the *McGee* case is distinguishable.

---

[1] TVA attacks the credibility of Dr. Charles Adams in its brief, including the assertion that the federal government has sued him for Medicare fraud in regard to chelation therapy. Of course, the filing of a civil claim does not equate to guilt or success on the merits, as the case has not been resolved. More importantly, TVA offers no defense to the opinion of Dr. Brian Teliho, a well-credentialed psychiatrist who is also a faculty member of the Emory University School of Medicine (Teliho decl. ¶3, Doc. 19-13), who clearly informed TVA that Plaintiff could safely perform his job while taking Marinol and that Plaintiff's use of Marinol to treat anxiety was a clinically-accepted practice. (Teliho decl. ¶¶5-7, Doc. 19-13.) In addition, TVA's focus on Marinol's "off label" use is misplaced. Federal law does not prohibit a doctor from prescribing a medication for "off-label" use. *See Planned Parenthood of Cincinnati v. Strickland*, 531 F.3d 406, 408 (6th Cir. 2008) ("Off-label use does not violate federal law or FDA regulations because

Finally, in a last-gasp attempt to justify its decision-making under the direct-threat rubric, TVA cites to the case of *Denman v. Davey Tree Expert Co.*, 266 Fed. Appx. 377 (6th Cir. 2007) for the proposition that evidence of an employee's good job performance is not dispositive on the issue of whether an employee can perform the essential functions of his job. In *Denman*, the employee was absent from work for 16 consecutive days because of his bipolar condition. Upon his return to work, he disclosed his bipolar condition and presented documents about his medical condition, the ADA, and FMLA. Ultimately, the employer requested documentation from the employee's doctor stating that he could perform the essential functions of his job. The employee never provided any such medical evidence and was then discharged. The Sixth Circuit focused upon the fact that the employee's *disability caused him to miss work* and that attendance at work was an essential job function. Of course, this was not a direct threat analysis, but an analysis as to whether the employee's ability to perform the job was impaired because of the disability. Again, the *Denman* case is distinguishable because in this case Plaintiff's disability (or use of Marinol to treat his disability) did not cause him to miss work, and Plaintiff submitted opinions from his treating doctors that he could safely perform his job while taking Marinol.

To constitute a "direct threat," TVA must prove that Plaintiff's Marinol use presented "a significant risk to the health or safety of others." 42 U.S.C. §12111(3). "The risk can only be considered when it poses a significant risk, i.e., high probability of substantial harm; a speculative or remote risk is insufficient." *Hamlin v. Charter Township of Flint*, 165 F.3d 426, 432 (6th Cir. 1999). TVA has failed to carry its burden of proving that Plaintiff's Marinol use constituted a "high probability of substantial harm" to himself or others.

---

the FDA regulates the marketing and distribution of drugs in the United States, not the practice of medicine, which is the exclusive realm of individual states."). Notably, none of TVA's doctors specializes in the field of psychiatry, as does Dr. Teliho.

5

### C. Ability to Perform Job Impaired

To the extent TVA argues that it had objective evidence that Plaintiff's ability to perform his job was impaired, such argument fails. At the very most, TVA only had the MRO's cursory statement that Marinol posed a "safety concern." Clepper admitted that the MRO never explained the details of his "safety concern" comment to TVA. (Clepper depo. p. 49, Doc. 19-3.) Other than the MRO's safety concern comment, Clepper had no independent evidence or belief that Plaintiff could not perform his job while taking Marinol. (Clepper depo. pp. 51-52, Doc. 19-3.) There was no evidence that Plaintiff was exhibiting any abnormal behavior or having trouble performing his tasks. (Cofer depo. pp. 37-40, Doc. 19-1.) In fact, before instructing Plaintiff to submit to a medical examination, it is undisputed that TVA never inquired about his workplace behavior or ability to perform his job. (Clepper depo. pp. 70-71, Doc. 19-3; Cofer depo. p. 47, Doc. 19-1.) Furthermore, Plaintiff's primary care physician and psychiatrist both advised TVA that Plaintiff could safely perform his job duties while taking Marinol. (Adams decl. ¶¶6-7, Doc. 19-4; Teliho decl. ¶¶5-6, Doc. 19-13.) Other than the MRO's opinion that Marinol "potentially" could impair Plaintiff's ability to work safely, TVA had no "significant evidence" to doubt that Plaintiff's ability to perform his job was impaired. *See Sullivan v. River Valley Sch. Dst.*, 197 F.3d 804, 811 (6th Cir. 1999) ("Thus, for an employer's request for an exam to be upheld, there must be **significant evidence** that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job.") (emphasis added).

TVA cites the case of *Pesterfield v. TVA*, 941 F.2d 437 (6th Cir. 1991) for the proposition that the honest belief rule should apply to ADA medical examination claims. However, the Sixth Circuit rejected the application of the honest belief rule to ADA medical examination claims in the later case of *Sullivan v. River Valley Sch. Dst.*, 197 F.3d 804 (6th Cir. 1999).

6

> "[The employer requests the Court] to uphold an employer's request for a medical examination whenever the employer has an honest belief rooted in particularized facts that an employee may not be able to perform the essential functions of his job. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805-07 (6th Cir. 1998). The honest belief standard is appropriate in considering pretext where an employer's intention matters, but ***there is no need to assess an employer's intent in ordering a fitness-for-duty examination***. An employee's protection from harmful intent on an employer's part comes from the dual requirements that there be evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job, and that any examination be limited to determining an employee's ability to perform essential job functions.

*Sullivan*, 197 F.3d at 813 (emphasis added).

Again, TVA has failed to carry its burden. At the very most, all TVA can show is a speculative or potential question as to whether Plaintiff's Marinol use impaired his ability to perform the essential functions of his job. This speculative belief is a far cry from the "significant evidence" standard required by the Sixth Circuit to warrant an employee medical examination.

### C. Scope of Examination

TVA avoids "the elephant in the room" on the issue of the medical examination's overly broad scope by focusing attention on the connection between Plaintiff's Marinol use and depression. However, it is undisputed that TVA never intended the January 6, 2014 medical examination (or any NNFFD initiated medical examination) to be narrowly-tailored in its scope. Clepper admitted that she understood and authorized that Plaintiff was going to have to disclose all of his medical conditions, **even if those medical conditions did not relate in any way to his taking Marinol**. (Clepper depo. p. 60, Doc. 19-3.) Furthermore, Dr. Adams understood that the temporal scope of his medical examination was unlimited and unfettered. (Adams depo. pp. 18, 20-21, Doc. 19-2.)

The overly-broad scope of the January 6 medical examination is evident by Dr. Adams' clinical note. He obtained medical information from Plaintiff about a stomach ulcer in 2005, a

7

right shoulder dislocation, pyelonephritis (kidney infection), urinary tract infection, and bilateral leg pain with numbness. (Doc. 19-5, PageID# 150.) For all of these medical conditions into which he probed, Dr. Adams admitted they were not relevant to the issue of whether Plaintiff could safely perform his job while taking Marinol. (Adams depo. pp. 33-34, Doc. 19-2.) Dr. Adams also probed into Plaintiff's social life and finances, asking questions about his girlfriend and money problems. (Doc. 19-5, PageID# 150.) These topics were certainly not job-related. Dr. Adams also addressed as "Problem #3" (lumbar disc disease) without ever mentioning how, if at all, this medical condition was related to Plaintiff's Marinol use. (Doc. 19-5, PageID# 151-52.) Even excluding Plaintiff's depression, Dr. Adams admittedly strayed far afield in his medical probing during this limitless examination into medical conditions that were completely irrelevant.

In an attempt to "Monday morning quarterback" this unlawfully-broad medical examination, TVA submits a second declaration of Dr. Stephen Adams in which Dr. Adams claims that he basically needed to know everything about Plaintiff (including all medications, physical conditions, and mental conditions) so as to determine the "interplay" in medications. (Adams 2nd decl. ¶¶9-12, Doc. 24.) Notably, TVA avoids any mention of Dr. Adams' admitted pre-examination concern about Plaintiff's depression (gleaned through reviewing Plaintiff's past medical file), even though TVA had not advised Dr. Adams that there was any concern about Plaintiff's depression or mental state. Even before the examination began, Dr. Adams admitted that he reviewed Plaintiff's entire TVA medical file, including psychological notes dating back to 2005. (Adams depo. pp. 17, 22, 35-36, Doc. 19-2.) Based upon his review of Plaintiff's medical file, Dr. Adams admitted that, *going into the examination*, he was "concerned" that Plaintiff's mental health was adversely impacting Plaintiff's ability to work safely. (Id. at 18-19.) However, TVA never advised Dr. Adams of any concern related to Plaintiff's mental health. (Id. at 19-20.)

8

TVA also fails to explain why Clepper instructed Dr. Leigh (psychologist) to communicate with Dr. Adams *before* Plaintiff's first physical examination. (Doc. 19-18; Doc. 19-19.) Clepper wanted TVA's psychologist to influence Dr. Adams' examination, even though there was no evidence or even suspicion that Plaintiff was having mental health issues. At this point, TVA understood that Plaintiff's Marinol use was for the treatment of insomnia, not anxiety or depression. (Adams depo. p. 23, Doc. 19-2; Doc. 19-5, PageID# 150.) The evidence clearly shows that Dr. Adams – likely influenced by Dr. Leigh – initiated the disability inquiries into Plaintiff's depression. These disability inquiries were focused upon Plaintiff's depression before Plaintiff was even examined on January 6, 2014.

A fitness-for-duty examination permitted under 42 U.S.C. § 12112(d)(4)(A) "is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." *Sullivan v. River Valley Sch. Dst.*, 197 F.3d 804, 812 (6th Cir. 1999). "The EEOC's stated position on the scope of medical inquiry is that an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *James v. James Marine, Inc.*, 805 F.Supp.2d 340, 350 (W.D. Ky. 2011) (citing EEOC Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, Question 13 (July 27, 2000)). That is exactly what TVA, through Dr. Stephen Adams, did in this case. Even though Plaintiff's depression was not identified as the source of the MRO's "safety concern," Dr. Adams unlawfully used the medical examination to probe into Plaintiff's depression, as well as every other medical condition from which Plaintiff had suffered during his adult life.

At the conclusion of the examination, Dr. Adams declared that Plaintiff's "depression is not very well controlled and has not been for a long time." (Doc. 19-5, PageID# 151.) Dr. Adams

9

claimed that Plaintiff manifested "depressive symptoms" during the examination which led him to believe that Plaintiff's depression was not under control. (Adams depo. pp. 27, 47, Doc. 19-2.) Yet, Dr. Adams did not record any of his observations of Plaintiff's alleged depressive symptoms in his three-page, detailed chart notes. (Id. at 28-30, 48-50; Doc. 19-5.) This undocumented "problem" that Dr. Adams "discovered" during the examination is proof of a pre-determined outcome and further proof that the wide-open medical examination was simply a tool to probe into Plaintiff's disability, despite any objective evidence that his depression (or use of Marinol) impaired his ability to perform his job safely. Blindly accepting Dr. Adams' recommendation for a psychological evaluation, Clepper ordered Plaintiff to submit to such an evaluation conducted by Dr. Leigh. (Clepper depo. pp. 69-70, Doc. 19-3.)

Importantly, Dr. Adams' recommendation, which was adopted by TVA, resulted in Plaintiff being held off work for further disability-related examinations and inquiries. "In order to prevail on a medical examination claim under the ADA, the plaintiff must establish that he suffered 'some cognizable injury in fact of which the ADA violation is a legal and proximate cause.'" *James v. James Marine, Inc.*, 805 F.Supp.2d 340, 350 (W.D. Ky. 2011). Dr. Adams is not shielded from liability merely because he was aware of Plaintiff's chronic depression prior to the January 6, 2014 examination. Liability arises here because Dr. Adams used such prior knowledge of Plaintiff's disability to medically probe into his current disability so as to find a reason to medically disqualify Plaintiff from returning to work, despite any objective evidence that Plaintiff's depression was currently impairing his ability to work.

### D. Requirement to Monthly Report All Medications

TVA argues that Plaintiff is foreclosed from attacking the legality of the requirement that he report all medications to NNFFD on a monthly basis because he agreed to this return-to-work

10

condition.  Essentially, TVA attempts to apply contract law in an effort to claim waiver of Plaintiff's ADA rights.  This argument is without merit.

TVA improperly characterizes the April 4, 2014 return to work agreement as a "last chance agreement."  (Doc. 27, PageID# 481.)  "A last chance agreement provides a habitually disciplined employee an additional opportunity, outside of the progressive discipline system, to remain employed." *Mitchell v. Georgia-Pacific Corp.*, 91 F.3d 144 (6th Cir. 1996).  Stated another way, a last chance agreement is "used to reinstate an employee whose work misconduct would otherwise allow discharge." *Norden v. Samper*, 503 F.Supp.2d 130, 161 (D. D.C. 2007).  In this case, when TVA offered the return to work agreement to Plaintiff, he had done nothing that warranted termination at that point.  While Plaintiff had been suspended 14 days for a positive drug screen, TVA policy did not allow termination for such an alleged offense.  Plaintiff had been cleared by EAP and NNFFD of any illegal drug abuse notions.  In essence, TVA had been holding Plaintiff off work (unlawfully) because it claimed that Plaintiff's disability (depression) allegedly rendered him unfit for duty.  Thus, under the Rehabilitation Act, in April 2014, TVA was legally required to return Plaintiff to work.  TVA has presented no evidence that it was considering termination of Plaintiff's employment in April 2014, in lieu of returning him to work.  As Plaintiff was not facing a possible discharge or any potential discipline, the April 4, 2014 return to work agreement cannot be considered a "last chance agreement."

Curiously, TVA claims that the return to work agreement "is itself an accommodation to the Plaintiff's disability."  (Doc. 27, PageID# 481.)  TVA never explains how the agreement was an accommodation to Plaintiff's disability.  Plaintiff is baffled how this could be characterized as an accommodation.  The agreement placed new and illegal conditions – reporting all medications monthly to NNFFD – upon Plaintiff, who received nothing tangible in exchange.  TVA was already

11

legally required to return Plaintiff to work. (Plaintiff contends that TVA had unlawfully removed him from duty since early January 2014.) TVA's claim that the agreement was an accommodation to Plaintiff's disability is non-sensical.

Even if the return to work agreement constitutes a last chance agreement, TVA's waiver argument would still fail as it is contrary to public policy. The Supreme Court, in *Alexander v. Gardner Denver Co.*, 415 U.S. 36, 51 (1974), set forth the general principle that an employee cannot prospectively waive his rights under Title VII. The rule prohibiting prospective waivers has been extended to other federal anti-discrimination statutes such as the ADA. *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir. 1996) (ADEA); *Thompson v. Plante & Moran*, 99 F.3d 1140 (6th Cir. 1996) (ADA); *see also N.W. v. Dist. of Columbia*, 107 F.Supp.3d 141, 153 (D. D.C. 2015) ("With respect to Title VII, the ADEA, and the ADA, the Supreme Court and Courts of Appeals have recognized that there can be no prospective waiver of an employee's rights."). Simply because Plaintiff signed the return to work agreement does not mean that he cannot now challenge the validity of the medication reporting requirement contained in the agreement.

A similar argument was made by the Department of Defense in the case of *Callicotte v. Carlucci*, 698 F.Supp. 944 (D. D.C. 1988). In that case, the employee entered into a last chance agreement, which included a provision requiring the employee to waive any substantive right to challenge a later discharge based upon her failure to abide by the agreement. When the employee was discharged for failure to abide by the agreement, the employee then challenged the agreement as violating the Rehabilitation Act. In rejecting the federal agency's waiver defense, the court ruled that an employee's substantive statutory rights under the Rehabilitation Act were not waivable, reasoning that the public interest in enforcing the substantive rights outweighed any contrary interest in private dispute settlement. Because the last chance agreement forced the

employee to waive her substantive statutory rights, the waiver was struck down as contrary to public policy. *Callicotte*, 698 F.Supp. at 947.

"An employer cannot condition an employee's ongoing employment on her acceptance of unreasonable and unlawful working conditions and then rely on the employee's rejection of those conditions as a legitimate reason for discharge." *Norden v. Samper*, 503 F.Supp.2d 130, 162 (D. D.C. 2007). In *Norden*, a case involving Rehabilitation Act violations against a federal agency, the federal employer attempted to condition the employee's return to work upon a release of her legal claims against the employer. The court correctly found that such waiver or release condition was unlawful *per se*. *Id*. at 161-62.

In its argument, TVA cites to the case of *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180 (6th Cir. 1997). In *Mararri*, the plaintiff was fired for failing an alcohol test. The plaintiff then filed a union grievance, and the parties settled the grievance by entering into a last chance agreement whereby the plaintiff would be reinstated upon the condition that he would not test positive at any level for alcohol. When the plaintiff later tested positive for alcohol, he was fired, and he then filed suit under the ADA claiming that his disability was alcoholism. The court first noted the distinction between a discharge based upon misconduct (being intoxicated at work) and a discharge on the basis of a disability (alcoholism). *Id*. at 1183. Next, the court held that the last chance agreement itself was valid, even if construed as a waiver, because the agreement was a settlement of the plaintiff's grievance resulting in reinstatement after being discharged. *Id*. at 1184. The actual terms of the agreement were not unlawful.

Plaintiff's case is distinguishable from *Mararri*. First, the April 4, 2014 return to work agreement was not a settlement of a prior grievance. At the time of the agreement, Plaintiff had not asserted any EEO claim or grievance of any kind. He was simply being returned to work

13

through the FFD process.  Second, unlike the legally valid terms of the agreement in *Mararri*, the medication disclosure requirement in the April 4 return to work agreement violated the ADA. Thus, the *Mararri* case is inapposite.

Simply put, employees cannot lawfully agree in advance that they will submit to monthly ADA violations as a condition of continued employment.  Such agreement, even if knowing and voluntary, would be void as a prospective waiver and contrary to public policy.

TVA's final argument in defending the medication reporting requirement was that it was not a company-wide policy.  Such argument completely misses the point.  The ADA forbids an employer from making medical inquiries (e.g., disclosing all medications) unless it can demonstrate that the medical inquiry is both job-related and consistent with business necessity.  42 U.S.C. §12112(d)(4).  Requiring an employee to disclose all medications without showing job-relatedness and business necessity violates the ADA.  *Roe v. Cheyenne Mount. Conf. Resort, Inc.*, 124 F.3d 1221, 1230 n.6 (10th Cir. 1997); EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, Part A, Question #8 (July 27, 2000); *Lewis v. Gov't of the Dist. of Columbia*, Case No. 15-521(JEB) at *23 (D. D.C. Dec. 7, 2015); *Stahly v. South Bend Public Trans. Corp.*, Case No. 3:10-cv-257-JVB, at *13 (N.D. Ind. Jan. 3, 2013).  "Obviously, asking an employee whether he is taking prescription drugs or medication, or questions "seek[ing] information about illnesses, mental conditions, or other impairments [an employee] has or had in the past[,]" trigger the ADA's (and hence the Rehabilitation Act's) protections." *Lee v. the City of Columbus*, 636 F.3d 245, 254 (6th Cir. 2011) (internal citations omitted).

As stated previously, TVA has failed to carry its burden of proving that the all-medication monthly disclosure requirement was job-related and consistent with business necessity.  TVA's

14

argument that Plaintiff could not be trusted to assess whether medications were likely to impair his ability to safely perform his job is based solely on his use of Marinol. In making the assumption that Marinol impaired his ability to work safely, TVA ignores the testimony of Dr. Charles Adams and Dr. Brian Teliho that Marinol did not pose a safety concern, as well as evidence that Plaintiff had no job performance or behavioral issues while he was actively taking Marinol. Even after reviewing all of Plaintiff's medications during the entire FFD process, TVA's doctors did not raise a concern about any medication other than Marinol, which Plaintiff agreed to discontinue. Simply put, a blanket requirement that Plaintiff disclose all medications in perpetuity violates the ADA.

### E. Wrongful Discharge

TVA's argument that Plaintiff cannot satisfy his prima facie case fails for two reasons. First, TVA applies the wrong standard. A prima facie case of disability discrimination under the ADA requires a plaintiff to show that: (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. State*, 639 F.3d 253, 259 (6th Cir. 2011). TVA incorrectly cites the three-prong standard, which includes as the final prong evidence that plaintiff was terminated "because of his disability." (Doc. 27, PageID# 483.) The Sixth Circuit rejected the three-prong prima facie standard upon which TVA relies. "[The prima facie] element—whether the employee was, in fact, discharged because of the disability—requires at the prima facie stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary." *Whitfield*, 639 F.3d at 259.

15

Second, under the correct legal standard, Plaintiff easily establishes a prima facie case, which is not an onerous burden. *Sjöstrand v. Ohio State Univ.*, 750 F.3d 596, 603 (6th Cir. 2014). TVA contends that Plaintiff was not otherwise qualified for the job. "At the prima facie stage, a court should focus on plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field . . . ." *Id*. at 575-76. "[T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id*. at 576.

At the time of his discharge, Plaintiff was qualified to perform the Chemistry Lab position. His supervisor never observed any performance problems and rated his overall job performance as "mostly good." (Cofer depo. p. 17, Doc. 19-1.) From the time that Plaintiff returned to work on April 4, 2014 through his discharge on June 2, 2014, Plaintiff's supervisor had no problems with his work performance, behavior, or his ability to work safely. (Cofer depo. pp. 76-77, Doc. 19-1.) TVA claims that Plaintiff was not otherwise qualified because he was allegedly using illegal drugs. (Doc. 27, PageID# 483.) Such an argument is completely devoid of merit. There is absolutely no evidence that Plaintiff was currently using illegal drugs when discharged. To the contrary, the evidence shows that Plaintiff passed a drug screen three weeks before his discharge. (**Exhibit 1**.) Without question, Plaintiff was qualified for his job when he was discharged.

TVA claims that its enforcement of the April 4, 2014 return to work agreement constitutes a legitimate, nondiscriminatory reason for discharge. (Doc. 27, PageID# 484.) However, TVA predicates this argument upon the lawfulness of the medication disclosure requirement. As

16

previously argued, TVA's requirement that Plaintiff disclose **all** medications (regardless of whether they are job-related) violates the ADA's medical inquiry provision, 42 U.S.C. §12112(d)(4). Discharge based upon an unlawful medical inquiry cannot constitute a legitimate, nondiscriminatory reason; rather, such a discharge is based upon an illegitimate and unlawful reason. *Jackson v. Regal Beloit America, Inc.*, 2018 WL 3078760, at *12 (E.D. Ky. June 21, 2018).

With respect to pretext, TVA argues that Plaintiff must show discriminatory animus. Such argument has been rejected by the Sixth Circuit.

> Dollar General adds that the verdict cannot stand because Atkins never produced evidence of animus towards the disabled. As support, it invokes this statement by Atkins' counsel at closing argument: "We're not claiming that Dollar General dislikes people with diabetes or that it fired her to get rid of people with diabetes." R. 156 at 129. **But the Act speaks in terms of causation, not animus**. *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–17 (6th Cir. 2012) (en banc). **An employer violates the Act whenever it discharges an employee "on the basis of disability" (a necessary requirement for liability), not only when it harbors ill will (a sufficient way of establishing liability).** 42 U.S.C. § 12112(a). Imagine a company that fired a visually impaired employee to save itself the minimal expense of buying special software for her. Without more, that would constitute termination "on the basis of disability," even if all of the evidence showed that cost-savings, not animus towards the blind, motivated the company.

*EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 436 (6th Cir. 2018) (emphasis added). Stated simply, Plaintiff is not required to prove discriminatory animus.

TVA now claims another reason for Plaintiff's discharge – not being truthful during the fitness for duty process. This reason, however, was not given initially when TVA's EEO investigator interviewed Clepper and Cofer about the discharge decision. When asked by TVA's EEO investigator why Plaintiff was fired, Clepper only gave Plaintiff's failure to report his medications to NNFFD by May 15, 2014. (Clepper stmt. p. 32, Doc. 19-22.) That was the only reason stated by Cofer when he was interviewed under oath by TVA's EEO investigator. (Cofer

17

stmt. p. 32, Doc. 19-23.) Shortly after Plaintiff's discharge, Clepper admitted that the attachment to Plaintiff's termination letter, styled "Failure to Cooperate with FFD Evaluation," was a mistake. **"That attachment went with a different type of FFD violation: failure to disclose information. That is not relevant to Hixon's case . . . ."** (Doc. 19-24). Clearly, the only reason for Plaintiff's discharge was his failure to follow Clepper's illegal requirement that he report all medications by the 15th of each month. The newly added reason (lack of candor) is sufficient evidence of pretext. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.1996).

In summary, TVA cannot show a legitimate, nondiscriminatory reason for Plaintiff's discharge since the medication reporting requirement itself violates the ADA. Plaintiff is entitled to judgment as a matter of law in his favor.

## V.  CONCLUSION

Based on the foregoing, Plaintiff is entitled to judgment in his favor on as to Counts 1-5 and Count 7 as set forth in the Complaint.

Respectfully submitted,

**MIKEL & HAMILL PLLC**

By: s/ *Doug S. Hamill*
Doug S. Hamill, BPR No. 022825
Counsel for Plaintiff
620 Lindsay Street, Suite 200
Chattanooga, TN 37403
(423) 541-5400
dhamill@mhemploymentlaw.com

**CERTIFICATE OF SERVICE**

       I hereby certify that on the 18th day of November, 2019, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

                                                 By:    s/ *Doug S. Hamill*