```
 1          IN THE UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF TENNESSEE AT CHATTANOOGA
 3
    -------------------------------------------------------
 4   ALEX HIXON,                        :
                                        :
 5                                      :
                 Plaintiff,             :
 6                                      :
     -vs-                               :   NO.
 7                                      :   1:19-cv-00120-
     TENNESSEE VALLEY AUTHORITY         :   PLR-SKL
 8   BOARD OF DIRECTORS,                :
                                        :
 9                                      :
                 Defendant.             :
10
    -------------------------------------------------------
11
12
13
14
15                    THE DEPOSITION OF
16                       ALEX HIXON
17                      June 3, 2020
18
19
20  -------------------------------------------------------
21
22          Whitney A. Vaughn, TN LCR# 418
23                   P.O. Box 1145
24            Hixson, Tennessee 37343
25                  (423) 876-4435
```

Case 1:19-cv-00120-CEA-SKL   Document 29-1   Filed 07/17/20   Page 1 of 58   PageID #: 568

1                    INDEX OF EXAMINATION

                                             Page

2

Examination By Mr. Mohr...................... 5

3

4

5

6                     INDEX OF EXHIBITS

7   Exhibit 1  Employment Affidavit...............  83

8   Exhibit 2  Complaint.......................... 165

9   Exhibit 3  Email dated 1/3/05................. 172

10  Exhibit 4  Case Note dated 1/7/05............. 176

11  Exhibit 5  Email dated 10/6/05............... 180

12  Exhibit 6  Email dated 5/19/05............... 180

13  Exhibit 7  Document from EEO counseling....... 188

14  Exhibit 8  Document of Questions.............. 215

15  Exhibit 9  Release for Records................ 230

16  Exhibit 10 Copy of Disability Benefits Claim.. 260

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES:

2

3    Appearing for Plaintiff:

4

           DOUGLAS S. HAMILL, ESQUIRE
5          dhamill@mhemploymentlaw.com
           Mikel & Hamill, PLLC
6          620 Lindsay Street, Suite 200
           Chattanooga, Tennessee 37402
7          (423) 541-5400

8

9    Appearing for Defendant:

10

           MARK A. MOHR, ESQUIRE
11         mamohr@tva.gov
           And
12         MICHAEL V. BERNIER, ESQUIRE
           Office of the General Counsel
13         Tennessee Valley Authority
           400 West Summit Hill Drive
14         Knoxville, Tennessee 37902
           (865) 632-7346

15

16

17

18

19

20

21

22

23

24

25
```

1          The deposition of ALEX HIXON, called

2     as a witness at the instance of the Defendant, for

3     purposes of discovery, pursuant to the Federal Rules

4     of Civil Procedure, taken pursuant to notice on

5     June 3, 2020, at the law offices of Mikel & Hamill,

6     PLLC, 620 Lindsay Street, Suite 200, Chattanooga,

7     Tennessee 37402, commencing at 9:14 a.m., before

8     Whitney A. Vaughn, Court Reporter and Notary Public.

9

10

11               S T I P U L A T I O N

12          It being agreed between counsel for

13     the respective parties that Whitney A. Vaughn, Court

14     Reporter and Notary Public, may swear the witness,

15     take his deposition in machine shorthand, afterwards

16     reducing the same to typewriting.

17          All objections, except as to the form of

18     the question and responsiveness of the answer, are

19     reserved to on or before the hearing.

20          It being further agreed that all

21     formalities as to notice, caption, certificate,

22     transmission, etc., are expressly waived.  Signature

23     waived.

24     //

25     //

1           ALEX HIXON,

2  called at the instance of the Defendant, having been

3  first duly sworn, was examined and testified as

4  follows:

5           EXAMINATION

6  BY MR. MOHR:

7       Q    Good morning.  I'm Mike Mohr.  This is

8  my colleague, Mike Bernier.  I'll be taking your

9  deposition today, as I'm sure you're aware.  Have you

10  done any prior depositions?

11       A    No.

12       Q    So first time.  Have you testified in

13  any proceedings before?

14       A    No, sir.

15       Q    Okay.  We'll just go through a few

16  simple instructions then.  Your attorney may have

17  already gone over this, but just go through this one

18  more time, so bear with me.  Please make sure all

19  your responses are audible so that the court reporter

20  can take them down.

21           Additionally, if I ask something and

22  you don't understand the question, please just ask me

23  to clarify.  I'm happy to do so.  And if you have any

24  questions that you want to speak with your attorney

25  about, you can, but first answer my question and then

1          A     I would have been more involved in

2     organic and physical chemistry.  I actually worked a

3     lot with water chemistry, and I operated the physical

4     chemistry aspect of water testing.

5          Q     What work would you do with coal?

6     What were your assignments?

7          A     I would test different parameters,

8     physical parameters.  And with that it could be --

9     I'm trying to answer your question without using too

10    many acronyms.  A physical parameter would be

11    grindability, which prepares it to a certain solid

12    state, a powder if you will.  And then it would go

13    on.  I would do heat studies, BTUs or british thermal

14    units, loss on ignition, which basically means you're

15    burning it and analyzing one state at the beginning,

16    one state at the end.  I would calibrate and operate

17    various analyzers for, say, sulfur content.  In a

18    nutshell, that's pretty much...

19         Q     So you were performing analysis on

20    coal itself?

21         A     Yes.

22         Q     And what sort of equipment were you

23    using to do this work?

24         A     Again, I would use the calorimeters

25    for BTUs.  I would use different types of furnaces.

1   They were called TGAs, which is thermogravimetric

2   analysis.  Oh, goodness.  And, like I say, the sulfur

3   analyzers are just exactly what they say.

4           Q       How large are these furnaces?

5           A       The furnaces are not that big.  They

6   are probably 3 feet by 3 feet and approximately 18,

7   20 inches tall.  Somewhere around in there.  And they

8   are linked into a computer, of course.

9           Q       So a little bit bigger than a

10  microwave?

11          A       Yes.

12          Q       And how hot would those furnaces get?

13          A       I can't recall.  This is an

14  approximation.  I would say one heat state they would

15  go to, I want to say, 700 degrees, somewhere along in

16  there.  Again, that's an estimate.

17          Q       Did your work require you to use acids

18  or bases at all?

19          A       Sometimes, yes.  Not necessarily in

20  coal, but other -- other areas, yes, I used acids

21  extensively.

22          Q       Did you ever use it when you were in

23  the coal group?

24          A       Again, I would also float to another

25  area as needed.  So -- but I can't recall a situation

1    where we would have needed acids in the -- in the

2    coal area, at least in my duties, no.

3            Q      But at least during the time period

4    when you were working in the coal group you would

5    have used acids and bases even if you weren't doing

6    coal work at that time?

7            A      Yes.  I -- yes.  There were some other

8    analyses I performed that required the --

9            Q      What sort of safety equipment would

10   you use while you were in the lab?

11           A      The basic personal protection is a lab

12   coat, safety glasses, gloves, and it kind of steps up

13   from there if you need to use a face shield, if it's

14   something you use -- whatever is needed for the task

15   accordingly.

16           Q      When would you have to use a face

17   shield?

18           A      I rarely did use one.  That was kind

19   of if I were working on a -- if I were working on a

20   Digestion Block where the acids were heated, we had a

21   hood which had a glass shield on it.  But if I felt

22   like I needed to use a face mask, I would.  So very

23   rarely.

24           Q      And the hood is a vent, correct?

25           A      It is vented, yes.

1      Q      And you would use that when there were
2  gases being emitted?
3      A      Yes.  You have to.
4      Q      Why is that?
5      A      Fumes are noxious.  I mean, they can
6  asphyxiate you, if not, and cause tissue burning,
7  eyes.  You know, they can -- it is an issue when a
8  hood stops operating properly.
9      Q      Did that ever happen?
10      A      It did.  So --
11      Q      Did that happen to you or just your
12  colleagues?
13      A      Well, it happened -- it was nothing --
14  it could have been a facility's malfunction.  You
15  would know.  You could -- the odor would emanate
16  through the lab, and we knew to -- there were also
17  sensors on the hood.  So you would know.
18      Q      So while you were working there were
19  occasionally problems?
20      A      Once in a blue moon.
21      Q      How many other people were working in
22  the lab at that time?
23      A      Approximately -- oh, my goodness --
24  12, I would say, when I left TVA.
25      Q      How many would work in the lab at a

1 examination?

2       A    I can't recall at this moment, but I'm

3 sure there was a medical examination.  I have to say

4 it's been a long time ago, but I'm almost certain

5 there was.

6       Q    And do you recall any details from

7 that examination?

8       A    The initial examination?

9       Q    Yes, sir.

10       A    No, sir, I can't.

11       Q    Was it in a doctor's office?

12       A    Again, the best of my memory, it

13 would -- it was, but that's been so long ago that I

14 can't --

15       Q    Was there anything that stood out

16 about that from that event?

17       A    No, sir.

18       Q    Just a routine doctor's visit?

19       A    The best of my memory, yes.

20       Q    Was there anything objectionable about

21 it to you?

22       A    No, sir.

23       Q    Was there any drug testing as part of

24 your job?

25       A    Yes, sir.

877-373-3660                                                                800.808.4958

1    the first page.

2         A    At the very top?

3         Q    Yeah.  Does that indicate that you

4    were required to call your supervisor's attention to

5    any medical constraints?

6         A    Pardon me while I read.  Okay.  Could

7    you repeat the question again, please?

8         Q    So pursuant to this employment

9    affidavit you were required to inform your

10   supervisors of any medical constraints?

11        A    That's what the document says.

12        Q    And this was a document you were given

13   when you began employment with TVA?

14        A    Yes, sir.  It looks that way.

15        Q    So this was one of the first documents

16   you were given?

17        A    Yes, sir.  It's dated March -- or

18   May 5th -- 7th.  Excuse me.

19        Q    And you signed it?

20        A    Yes, sir.

21        Q    And so you would have read it before

22   you signed it?

23        A    Yes, sir.

24        Q    And this document remained in effect

25   throughout your time at TVA?

1          A     I would assume, yes.

2          Q     Were you ever given a revised

3    employment affidavit?

4          A     No, sir.

5          Q     Were you ever told it was no longer in

6    effect?

7          A     No, sir.

8          Q     And it also indicates that you should

9    be -- notify your supervisor if you're placed on

10   medication that might interfere with your ability to

11   safely perform your duties, correct?  The last

12   sentence in the first paragraph.

13         A     Yes, sir.

14         Q     And is that a fair summary of your

15   obligations?

16                MR. HAMILL:  Objection to the form of

17   the question.

18   BY MR. MOHR:

19         Q     Is that an accurate statement of your

20   obligations?

21         A     That's what the document says.

22         Q     And was this document binding on you?

23         A     Could you please clarify "binding"?

24         Q     Were you required to follow the

25   mandates in the document as part of your employment?

1    A    It's -- from what the document says,
2  it's a condition, yes.
3    Q    Well, I'm asking what you think.  Did
4  you think you were obligated to abide by these terms?
5    A    If I signed the document, yes, sir.
6    Q    Did you ever report any medication
7  pursuant to that employment affidavit?
8    A    I'm sure that I -- I'm -- again, on a
9  couple of occasions on return-to-work requirements I
10  did.  And there more than likely was times when I had
11  surgeries on urinary and shoulder and where I had to
12  be under pain medication.  And I'm sure I notified
13  someone, immediate supervisor.
14    Q    And when were those occasions, the
15  pain medication situations you mentioned?
16    A    Let's see.  I want to give you as many
17  as I can here going back.  I've had several
18  procedures:  2006 on the shoulder; and 2007; and then
19  in the early 2000's, I had urinary tract surgeries;
20  and there would have been 2000 -- 2005 back injury
21  where I acquired -- and I'm trying to think if there
22  were any other surgeries I went through.  Other than
23  the return-to-work agreements, those were, to the
24  best of my memory, what I can tell you.
25    Q    So '05, '06 and '07, three separate

Case 1:19-cv-00120-CEA-SKL  Document 29-1  Filed 07/17/20  Page 13 of 58  PageID #: 580

1   Court's --

2   BY MR. MOHR:

3        Q    You can answer the question.

4             MR. HAMILL:  The Court's order allows

5   me to explain my objection.  Your objection -- my

6   objection is based upon your question.  Your question

7   is incomplete as to what the requirement actually

8   states.  So you are asking an unfair question.

9   BY MR. MOHR:

10       Q    You can still answer the question.

11       A    I feel that I reported any medication

12  that would jeopardize my ability to safely perform my

13  duties.  That's -- I feel I did that.

14       Q    So none of the medications you were on

15  had any impact on your ability to --

16       A    If they did --

17       Q    -- safely perform your duties?

18       A    -- I reported them.

19       Q    Which ones did you report?

20       A    Like I said, pain medications and the

21  return-to-work agreements.  I reported those

22  medications.

23       Q    The return-to-work agreements where

24  you reported your medications, you reported them

25  because you were being ordered to at that time,

```
 1   ever meet her?

 2           A      No, sir.

 3           Q      When did you first interact with her?

 4           A      I want to say 2012 maybe.

 5           Q      Let's change gears a little bit here.

 6   What is your -- what you would classify as your

 7   disability?

 8           A      My disabilities are depression,

 9   anxiety and insomnia.

10           Q      Are those three separate conditions?

11           A      Yes.

12           Q      When did the depression begin?

13           A      It manifested itself in my late teens.

14           Q      And was that when you were diagnosed

15   first?

16           A      I had seen a psychiatrist and, yes,

17   there was a diagnosis.

18           Q      And who diagnosed you with that?

19           A      I can't remember his name at this

20   point.

21           Q      How does your depression affect you?

22           A      It hampers my ability to concentrate

23   and think and it also affects my sleep.

24           Q      Are there any everyday functions that

25   it impacts?
```

877-373-3660                                        800.808.4958

1  depression impact your ability to work?

2          A    Same thing happened.  I had gone

3  through some treatments with a psychiatrist and other

4  approaches, and I worsened into a terrible cycle that

5  I had to be actually hospitalized for a day or two.

6          Q    I lost my train of thought.  So what

7  day-to-day tasks at your job would the depression

8  impact in 2005 and 2012?

9          A    Well, I -- when I got to the point to

10  where I had to leave work, I -- I and my physician at

11  the time felt that I could not do my normal

12  day-to-day tasks, and it was time to take a leave.

13  So to answer your question, I guess it would affect

14  all of them.

15          Q    Okay.  Did people at work know you had

16  suffered from depression?

17          A    Yes, sir.

18          Q    Who all knew?

19          A    Coworkers and some immediate

20  supervisors knew.

21          Q    How many coworkers would have known?

22          A    All -- most of them.

23          Q    And how would they have learned of

24  that?

25          A    They knew that I would have to

Case 1:19-cv-00120-CEA-SKL  Document 29-1  Filed 07/17/20  Page 16 of 58  PageID #: 583

1   leave -- leave of absences.  And I spoke to them in

2   candid.  You know, I work with these people, and

3   there is things I feel that they should have known.

4          Q     How did they react to it?

5          A     For the most part, they were very

6   supportive.

7          Q     And what supervisors would have

8   known -- or did know of the depression, as far as you

9   know?

10         A     Well, the gentleman in 2005 would have

11  known.  And then Tim Cofer would have known.

12         Q     Would Lisa Ortiz have known?

13         A     Yes.

14         Q     Would anyone -- would any of the other

15  supervisors have known, as far as you know?

16         A     Yes.

17         Q     And would you have told any of them?

18         A     There was --

19         Q     Or did you tell any of them?  Excuse

20  me.

21         A     Yes.

22         Q     Who did you tell?

23         A     In 2005 I told Vanessa Ramey.  And

24  then I had a temporary supervisor's name was Ricardo

25  Gilbert.  I told him.  And he was actually -- now

1  receive four hours every -- or eight hours a month.

2  And then maybe three or four years into my career it

3  changed to six hours -- or 12 hours a month.  I'm

4  sorry.  I'm thinking of pay periods.

5       Q    Would you use all of your sick leave?

6       A    Not necessarily.  Like I said, I would

7  use quite a bit of it if I had an injury or something

8  and had to be home; or if I had to take a leave of

9  absence, I would go through that first.

10       Q    When you left TVA, had you had any

11  sick leave left accrued?

12       A    I can't remember how much.  I'm sure I

13  had some.  Like I said, I had the episode in 2014

14  that took quite a bit of it.

15       Q    Okay.  So when these effects were at

16  their worst, did you ever consider violence against

17  yourself or others?

18       A    No.

19       Q    No suicidal tendencies?

20       A    Thoughts.

21       Q    Thoughts.  Okay.  But never went

22  beyond just casual thoughts?

23       A    No, sir.

24       Q    We touched on some of the factors that

25  affect your mental health, but do your physical --

1    does your physical health impact your mental health?

2           A     Yes, sir.

3           Q     How so?

4           A     Would you -- I'll give you an example.

5           Q     Sure.

6           A     I have herniated disks in my lower

7    back.  And when they get aggravated or injured, that

8    affects depression, anxiety, sleep, all of them.

9           Q     And is that true of other physical

10   conditions as well?

11          A     Yes, sir.

12          Q     You've mentioned in passing a host of

13   different physical ailments.  Are there -- do most of

14   them affect your mental health?

15          A     Yes, sir.

16          Q     Does your mental health manifest

17   itself physically at all?

18          A     At times.

19          Q     How does it do that?

20          A     I'll give you -- give you an example:

21   If I'm in a profound depression, it will manifest

22   itself physically by loss of appetite and pain.

23          Q     What sort of pain?

24          A     More like a nerve-type pain, I would

25   say.  Burn.

Case 1:19-cv-00120-CEA-SKL  Document 29-1  Filed 07/17/20  Page 19 of 58  PageID #:
586

1           Q     Any specific locations or could be

2     anywhere?

3           A     More so back and feet.

4           Q     Does it ever give you GI distress?

5           A     It does.

6           Q     So what -- well, what medicines have

7     you taken for your depression?

8           A     Goodness.

9           Q     Or is there -- should we start at a

10    specific time?  2005, what medicines were you taking

11    for your depression?

12          A     Seems -- give me a moment here to --

13    let me -- I'm going to answer these to the best of my

14    recollection.  2005 would have been Lexapro.  It's an

15    antidepressant.  Yes, sir.  2005 would have been

16    Lexapro.  And I'm trying to think if there was

17    anything else.  I think 2005 would -- probably around

18    that time I would have started taking sleeping

19    medication as well.

20          Q     So no --

21          A     Ambien.

22          Q     Okay.  No sleeping medicine before it,

23    then?

24          A     No, not for -- not on a regular basis,

25    no.

1      Q      And what was her specialty?

2      A      She was a psychiatrist.

3      Q      So what would you discuss during your

4   conversations with Dr. Lilly when you were seeking

5   treatment?

6      A      I discussed issues with depression and

7   anxiety and insomnia.

8      Q      Would that cover any specific aspects

9   of your life?

10     A      I can't recall for certain, but, I

11  mean, in the course of a psychiatrist, I'm sure there

12  was some questions that come up.

13     Q      So you're sure you spoke about your

14  personal life some, then?

15     A      Oh, I'm -- at some point, yes, I'm

16  certain I did.

17     Q      And that was necessary to receive

18  treatment?

19     A      That's necessary with pretty much any

20  psychiatrist.

21     Q      And when did you begin seeing

22  Dr. Lilly?

23     A      It would have been -- I can't remember

24  what year.  I remember it was autumn.  Let's see.

25  Autumn of 2005.  Is that right?  Or 2004.  It was --

877-373-3660                                        800-808-4958

1      getting treatment for a mental illness.

2              Q      Anything else?

3              A      No.

4                     MR. HAMILL:  Objection to the form of

5      the question.  You can answer.

6      BY MR. MOHR:

7              Q      You can answer.

8              A      I'm sorry.  I got confused.

9              Q      Are you basing your retaliation claim

10     on anything else?

11                    MR. HAMILL:  Objection to the form of

12     the question.

13     BY MR. MOHR:

14             Q      You can answer.

15             A      I'm basing my retaliation claim on the

16     fact that I took a legal medication and the fact that

17     I am being -- I'm retaliated against because of

18     medical conditions.

19             Q      Is there anything else?

20             A      In my mind, no.

21                    MR. MOHR:  All right.  We can take a

22     break for lunch.  It's almost 1:00.

23                    MR. HAMILL:  Yep.

24                    (Whereupon, a lunch break was had.)

25     //

1            THE WITNESS:  Before -- can I add

2    something before we get started?

3            MR. MOHR:  Sure.  We can get started.

4    BY MR. MOHR:

5        Q    You wanted to add something to one of

6    your questions?

7        A    Yes.  The last -- I apologize.  The

8    last question, in my mind, I kept thinking

9    discrimination.  You asked retaliation.  The reason

10   why I feel like I was retaliated against is in

11   early -- sometime in February of 2014 I filed a

12   complaint with EEO counsel of TVA.  And I feel like

13   because of that I was terminated because of my right.

14   And I apologize.  In my mind, I kept thinking

15   discrimination, but you were asking retaliation.

16       Q    No problem.  Thank you for mentioning

17   that.  To follow up on that, who did you file your

18   EEO complaint with?

19       A    Her name is Patricia Minor, I believe

20   it was.

21       Q    And did you bring up the EEO complaint

22   with anyone else?

23       A    No.  Other than -- no.

24       Q    Did you discuss it with anyone at

25   work?

1        A      No.

2        Q      And why not?

3        A      In my mind, I didn't feel like it was

4    anyone's business, really.

5        Q      And so what evidence -- what reason do

6    you have to believe that you were retaliated against

7    because you filed that complaint?

8        A      Well, I filed the complaint because,

9    like I said, I was denied the right to take a

10   medication and was subjected to overly-intrusive

11   medical examinations.  And I felt like -- I felt like

12   because of a disability I have, or disabilities, I

13   felt like me reaching out to counsel on that, I was

14   retaliated because I did that.

15       Q      Did anyone make any statements in

16   front of you about the EEO complaint?

17       A      No, not in front of me.

18       Q      Are you aware of anyone making any

19   comments about your EEO complaint?

20       A      Not to my knowledge, no.

21       Q      And when was your first contact with

22   EEO?

23       A      I believe I started speaking with

24   Patricia Minor sometime in February.

25       Q      And when did you formally file that

1   depression, anxiety and insomnia?

2          A     The bulk of it, yes.  But like I said,

3   I'm having to disclose medications for other problems

4   too.  I can't answer there.  But it seems to me that

5   it was overreaching.

6          Q     Okay.  Moving on.  And you may have

7   answered this based on your earlier retaliation

8   claim, but how were you discriminated against?

9          A     I feel as if I have got a couple -- a

10  few disabilities here, and I think I was

11  discriminated because I'm trying to treat those.

12         Q     Actually, if I could go back, who

13  specifically retaliated against you?

14         A     I believe Fitness for Duty retaliated

15  against me.

16         Q     Earlier you mentioned a Dr. Leigh as

17  well.  Did he retaliate against you?

18         A     I consider Dr. Leigh all part of the

19  TVA Fitness for Duty.

20         Q     So when you say Fitness for Duty, you

21  mean both -- all the doctors that saw you and Candy

22  Clepper and the administrative staff at Fitness for

23  Duty?

24         A     Candy Clepper is over the whole -- she

25  is -- so I say her, but I feel they all did.

1     Q     She mentioned -- Patricia Minor

2   mentioned Candy Clepper by name?

3           A     Candy Clepper, yes.

4           Q     Did she say Candy or Candice?

5           A     She said Candy.

6           Q     So who at TVA discriminated against

7   you?

8           A     My feeling, I feel that Dr. Stephen

9   Adams did and Dr. Leigh did.

10          Q     Was there anyone else that

11  discriminated against you?

12          A     Well, I can -- I can lump the whole

13  Fitness for Duty or say Candice Clepper and

14  assistants.  And then I can -- in some ways, I can

15  say -- not naming them by person, but human resources

16  in some ways did, too.

17          Q     What about your supervisors?

18          A     I can't say for certain there.

19          Q     Did either your statement --

20  supervisors make any statements to make you think

21  they were discriminating against you?

22          A     No.

23          Q     And when did the doctors specifically

24  discriminate against you?

25          A     The first time I went into -- are

877-373-3660                                                      800-808-4958

1          A     Something like that.

2          Q     Was she speaking during that

3     termination?

4          A     She did speak.

5          Q     Did she say anything discriminatory to

6     you?

7          A     Not to my recollection.

8          Q     Was anyone else from HR in

9     communication with you regarding the events in your

10    complaint?

11         A     Not -- I don't recall anyone

12    personally contacting me.  So no.

13         Q     So you're not aware of any

14    discriminatory statements or comments by HR?

15         A     Not to my knowledge at this time, no.

16         Q     All right.  Count 6 allege a refusal

17    to make reasonable accommodations for your

18    disability; is that correct?

19         A     Correct.

20         Q     What accommodations did you request?

21         A     I requested to continue taking

22    Marinol.

23         Q     Is that your sole accommodation at

24    issue that was -- you allege was refused?

25         A     To my recollection of count 6, yes,

1    that's --

2          Q    Okay.  Who did you make that request

3    to, to take Marinol?

4          A    Well, TVA's -- or Charles Adams and

5    Fitness for Duty.

6          Q    So you went through an intermediary to

7    make the request?

8          A    I think I asked them, and my treating

9    physician wrote a letter supporting why he felt it

10   was a safe alternative.  So I don't know who that

11   request would have been submitted to, but, I mean, I

12   went back to my treating physician and asked him to,

13   you know, make the request.

14         Q    Did you request from your supervisors

15   that they let you return to work while taking

16   Marinol?

17         A    I didn't think I could request that to

18   a supervisor.  I thought that was for Fitness for

19   Duty.

20         Q    Did you make that request directly of

21   Candy Clepper?

22         A    No.  It would have been Fitness for

23   Duty.

24         Q    And by Fitness for Duty, you mean the

25   doctors?

1          A     Yes.

2          Q     Okay.  And how did they -- when you

3    were at the January 6th -- the first examination with

4    Dr. Adams, did you request to continue making Marinol

5    then -- taking Marinol?  Excuse me.  Not making

6    Marinol.

7          A     I -- at the time, I was not told to

8    stop taking.  I just continued.  I had been on the

9    medication and it was helping with a couple of

10   things.  And I continued -- I wasn't told, no, you

11   can't take it at that time.

12         Q     When did you stop taking Marinol?

13         A     That would have been sometime in

14   March.

15         Q     And have you taken it since?

16         A     No, sir.

17         Q     When were you told to stop taking

18   Marinol?

19         A     Sometime mid-March.  Some second,

20   third week, somewhere along in there.  Somewhere.

21         Q     And so you only requested to continue

22   taking Marinol after you were told to stop taking it;

23   is that correct?  Or you only requested permission to

24   take Marinol after you were told you couldn't take

25   it?

```
 1   analysis for TVA.  It's more of a personal probe, if
 2   you will.  That's the way I understand that question.
 3   BY MR. MOHR:
 4        Q     All right.  I'll actually take both
 5   exhibits back from you.
 6        A     Thanks.
 7        Q     So were you -- did you hear any
 8   statements that would indicate TVA had an improper
 9   motive for requesting this disclosure?
10        A     Did I hear any?  No, sir.
11        Q     So regarding your first -- well, your
12   first examination with Dr. Stephen Adams in 2014,
13   when was that?
14        A     First examination would have been the
15   first week or so of January.
16        Q     And what questions in that examination
17   were impermissibly overbroad in your opinion?
18        A     I -- as I said, it asked into all
19   kinds of past history with depression and inquired
20   about other health conditions.  Even -- I mean, even
21   went into personal relationships with, at the time,
22   girlfriend.  There was a lot of questions that
23   weren't just -- I felt that they were not necessary
24   to safety in my job performance.
25        Q     What was the purpose of that first
```

1          Q      When about was that?

2          A      I want to say that had to be sometime

3    in beginning of March, late February, March,

4    somewhere along in there, the best of my memory.

5          Q      What questions during that second

6    examination were impermissible?

7          A      Well, it was more of -- it was more

8    the statement in my mind he pretty much told me that

9    I could not work at TVA and take Marinol because

10   that's just -- it's too dangerous.  And I think he

11   also -- I think he also may have brought up something

12   that he was concerned of a combination of

13   medications.  I'm not a medical doctor, but they

14   were -- it was concerning to me.

15         Q      And Dr. Leigh -- following the

16   December 2013 drug test, when did you see Dr. Leigh?

17         A      I saw him January of 2014, and I want

18   to say it was sometime right around Dr. Adams' second

19   visit, to mid-March.  Somewhere in there.

20         Q      Okay.  So twice?

21         A      Twice.

22         Q      During the first visit January 2014,

23   what questions, if any, were impermissible during

24   that examination?

25         A      More so of statements.  And they were

1    concern on my part.  He made mention that I had --

2    this wasn't the first time I have seen you, and he --

3    he also brought up his concern of Marinol being --

4    its intended purpose, and I was taking it for an

5    off-label use.  And I kind of was explaining to him,

6    you know, my doctor's reasoning and everything.  And

7    it was -- he -- he brought up a concern that my

8    depression -- he felt my depression was not in

9    control.

10          Q    Were there any other lines of

11    questioning or statements that you thought were

12    improper during that examination?

13          A    He probed into personal matters, too,

14    relationships.  He asked me if I -- it seems like I

15    can remember him asking me if I thought I would be a

16    good mate or a good spouse.  I can't remember what

17    the exact words were, but it was -- in my mind, it

18    really had nothing to do with job issues.

19          Q    Were there any other questions or were

20    they primarily the relationship-based questions?

21          A    Primarily relationship-based and my --

22    the medication base and then really probed into my --

23    I have to keep this straight, because I have seen him

24    a couple of times through the years.  So at this

25    point what I can recall from the 2014 visit, those

1    were the -- those with the big ones.  You know, he

2    was really basing a lot of his opinion on a

3    standardized test.

4          Q      So you remembered seeing him from

5    earlier visits?

6          A      Yes, sir.

7          Q      And he recognized you?

8          A      Oh, yes, sir.

9          Q      The second visit with Dr. Leigh in

10   2014, what impermissible questions were asked during

11   that visit, if any?

12         A      At this point, I can't recall.

13         Q      So to briefly go back to that 2004,

14   2005 leave of absence, what precipitated that leave?

15         A      I had taken a leave of absence for

16   depression.  And as I said earlier, I had a terrible

17   bout of insomnia and had to leave work.  And then

18   upon returning was -- upon returning was required to

19   go to Fitness for Duty.

20         Q      Was your leave of absence voluntary?

21         A      Yes.

22         Q      And how did you inform TVA that you

23   were taking a leave of absence?

24         A      I -- the best of my memory, I

25   approached Lisa Ortiz, my supervisor at that time,

1    A    Again, I can't -- it's been so long

2  ago I can't answer at this point with certainty.

3    Q    But after the examination you didn't

4  file any objections with TVA about the scope of the

5  examination?

6    A    No, sir, not to my knowledge.

7    Q    And after your examination with Gary

8  Leigh in 2005 did you object to any of the questions

9  that were asked then?

10    A    No, sir, not to my knowledge.

11    Q    Are you aware if Dr. Leigh reached out

12  to any of your doctors to determine if you were fit

13  to return in 2005?

14    A    No, sir, not -- I cannot remember at

15  this point.

16    Q    Were there any conditions that you had

17  to enter into to return to work in 2005?

18    A    Yes, sir.  I had to, as I said, go to

19  an outpatient program.  And it seems to me like I had

20  to see a therapist through the Employee Assistance

21  Program.  And those are the -- and possibly -- those

22  are the two things that come to mind right now.

23    Q    Do you recall any other conditions?

24    A    At this time, no.

25    Q    Did you agree to report any changes in

1    your medication or treatment providers?

2         A    Now you're jogging me.  There was a

3    condition to report those.  You just -- that jogged

4    my memory.

5         Q    And is that an accurate statement of

6    what the condition was, that you were to report

7    changes in medication or treatment providers to

8    Fitness for Duty?

9         A    Yes.

10        Q    Did you agree to that condition?

11        A    I'm certain I would have had to to go

12   back to work.

13        Q    Did you object to it?

14        A    At this point, I can't remember if I

15   did or not.  Probably not.

16        Q    And did you comply with that

17   condition?

18        A    Yes, sir, to my knowledge.

19        Q    So you reported all the changes in

20   your medication?

21        A    Yes.  I believe at that time there is

22   one different.  I think it was working with Fitness

23   for Duty, but seems like I can remember communicating

24   with her a time or two.

25        Q    So a time or two and then did you

1    Q    Did you ever report your Marinol

2    prescription?

3    A    No, sir, not until I -- I reported it

4    the day I was called for a drug screen.

5    Q    All right.  Wrapping up 2005 here.

6    What happened to your workload while you were off

7    work?

8    A    I can't say for certain.  I don't

9    know.

10    Q    Was there a lot of work waiting for

11    you when you returned?

12    A    I can't remember.

13    Q    How did people treat you when you

14    returned?

15    A    I can't remember.

16    Q    Were there any, you know, expressions

17    of resentment when you returned?

18    A    I can't recall at this time.  Not to

19    my knowledge, no.

20    MR. HAMILL:  Are we talking about in

21    2005?

22    MR. MOHR:  Yes.

23    THE WITNESS:  I mean, that's a long

24    time ago.

25    //

1              A      He did.

2              Q      What was said, if anything, about the

3      potential side effects of the medicine?

4              A      I can't recall.

5              Q      Was that something that was covered at

6      all?

7              A      I can't recall at this time.

8              Q      Did Marinol give you any side effects?

9              A      It -- when I first started taking it,

10     I was taking it two or three times a day.  And it was

11     a bit too sedating, best of my memory, so I cut it

12     back to nightly.

13             Q      Is Marinol a depressant?

14             A      I can't say for certain.  Looking

15     back, I don't recall it depressing me further.

16             Q      But it made you sleepy?

17             A      Yes, it did.  It did help me sleep.

18             Q      And so when you were taking it two to

19     three times, when were you taking it?

20             A      I first started off -- I tried it on

21     my off days, and I can remember taking it in the

22     morning and then sometime after lunch and then at

23     night.

24             Q      So when was -- when did you stop

25     taking it three times a day?

1          A    They were questions asking me about my

2    depression problems, other medical issues, personal

3    questions, social life questions, behavior questions.

4          Q    But just background questions?

5          A    I assume those are what you're asking,

6    yes.

7          Q    Did you discuss your prior history

8    with TVA, your prior medical history?

9          A    I can't recall for certain, but I'm

10   fairly sure it was asked.

11         Q    So what took place during the

12   examination after the background questions and the

13   introduction?

14         A    I'm going by the best memory I have

15   here, but pretty standard physical examination and

16   a -- I can't remember how the exam ended, but it

17   was -- it was -- he referred me to Dr. Leigh, I

18   believe, or -- I believe he requested that I go for

19   an evaluation from him, I believe.

20         Q    Did he ask you about your drug test?

21         A    Yes.

22         Q    So did he also ask you whether or not

23   you had used marijuana?

24         A    I can't remember at this point.  I

25   don't think so.

```
 1          A     That I spoke with the medical review
 2   officer?  Is that what you're asking?
 3          Q     Yes.
 4          A     Yes.
 5          Q     So did Dr. Adams ask you why your drug
 6   test was flagged?
 7          A     Yes.  I mean, he -- and I explained to
 8   him that I was taking Marinol.
 9          Q     So it was in response to the drug test
10   that the Marinol came up?
11          A     Yes.  Yes.  In the conversation, yes.
12          Q     And what did he say upon learning that
13   you were taking Marinol?
14          A     He was concerned that it was a -- it
15   was not indicated for the purpose it was prescribed.
16          Q     How did he learn what the purpose it
17   was prescribed was?
18          A     I told him.
19          Q     And why did you tell him?
20          A     Well, he -- I explained to him why I
21   was taking Marinol, and I explained to him what
22   Dr. Charles Adams' thoughts were.
23          Q     And why were you taking the Marinol?
24          A     For anxiety.
25          Q     And was this early on in the
```

1   examination that this came up?

2          A      Best of my recollection, yes.

3                 MR. HAMILL:  Mark, when you get to a

4   stopping point, can we take a break?

5                 MR. MOHR:  Yeah.  I'm almost at a

6   good stopping point.  Let's see.  It's 3:06.

7   BY MR. MOHR:

8          Q      Were there any questions about your --

9   the hazardous aspects of your job?

10         A      Not to my -- not that I can recall.

11         Q      Did he ask you what you did at work?

12         A      He asked me what my job title was, I

13  think.

14         Q      Did he go into it any further than

15  that?

16         A      Best of my knowledge, no.

17         Q      So were the questions individualized?

18  Were they tailored to you?

19         A      I felt like some of them were.

20         Q      What was his demeanor during the

21  examination?

22         A      I -- let me think for a moment.  I --

23  he was very inquisitive.  I know that.  I can't speak

24  to his demeanor.  I can't remember what his body

25  language was or expressions.

1    in 2014 you did an MMPI examination?

2         A    I'm fairly certain I did.

3         Q    Do you recall discussing the results

4    of either of the examinations?

5         A    I think I can remember the second time

6    discussing the results, I think.  I'm fairly certain.

7         Q    So what subjects came up during your

8    examination with Dr. Leigh?

9         A    More -- it was more -- a lot like the

10   examination with Dr. Adams.  There were a lot of -- a

11   lot of questions going back to years ago from the

12   2005 meeting and a lot of just really personal

13   questions that, in my mind, had nothing to do really

14   with job performance.  It kept -- they kept kind of

15   going back to the past and reminding -- or Dr. Leigh

16   reminding me this isn't the first time I have seen

17   you, and just really overreaching questions, to the

18   point where it was very uncomfortable.

19        Q    Regarding the 2005 examination, did he

20   ask you about his prior interactions with you?

21        A    He didn't -- best of my memory, he

22   didn't ask me.  He just brought them up.  As I said,

23   this is not the first time you have been here.  I've

24   seen you before.

25        Q    Is there any other way he brought it,

1    apart from just saying I've seen you before, it's not

2    the first time?  What else did he say about those

3    incidents?

4          A    He made mention of the fact that I had

5    to go through EAP counseling and go through the

6    outpatient program.

7          Q    So how much was he actually asking

8    questions of you versus making statements like this?

9          A    I hate to -- can you clarify on which

10   type of question?

11         Q    I'm just trying to differentiate

12   between the statements and the questions.  What sort

13   of questions was he asking you about the 2005

14   incident?

15         A    Let me think back for a moment.  He

16   would -- I'm having a hard time answering for certain

17   here, but he -- he kept -- it's hard to -- bear with

18   me.  I'm trying to remember the interview.  I

19   remember the things that really were upsetting, but

20   he kept on making mention of the fact that you're

21   still seeking treatment, and this is not the first

22   time you have been down this before, and we have

23   helped you in the past and, you know, this is a

24   reoccurring problem.  You know, it was -- and he kind

25   of felt like -- in my opinion, he felt like that I

1    wasn't properly treated.

2              And it was a whole lot of questions

3    on, again, both Dr. Adams and Dr. Leigh.  There was a

4    whole lot of personal and historical questions and

5    not very many job-related questions and

6    safety-related questions.

7         Q    So what historical questions was he

8    asking you?

9         A    I can't recall at this time.  He did

10   ask how I was feeling compared to 2005, and asked me

11   what I had done through the years, if I'm still

12   taking medication, this and that.  And at that time I

13   had been to see him in 2012 as well.  And it was

14   upsetting to me because, in my opinion, I didn't go

15   to see him for a depression issue.  I went to see him

16   because I was -- had to go to a medical examination

17   because of a drug test and then was referred to him.

18             And it came being centered in on

19   why -- kind of a "why is this still not resolved" and

20   then went over into personal matters of family and

21   relationship and things like that.  It was just --

22   that was the most -- that was the thing I could

23   remember the most about the interview.

24        Q    Once you were referred to a

25   psychological examination with Dr. Leigh, what did

 1  you expect to be covered during the examination?

 2          A    I really didn't -- the first one, I

 3  really didn't know, other than the fact that Stephen

 4  Adams had told me you're going to have to be reviewed

 5  by Dr. Leigh.  I kind of went in -- at that point in

 6  time I thought I was being sent over for the Marinol

 7  issue.

 8          Q    Were you asked any questions that your

 9  own psychologists have not asked of you?

10          A    Was I asked any question that --

11          Q    Which your psychologist, your personal

12  doctors, have not asked of you.

13          A    I can't recall.

14          Q    Did Marinol come up during the

15  examination?

16          A    With Gary -- Dr. Leigh?

17          Q    Yes, sir.

18          A    Oh, yeah, the use of it.

19          Q    What was said about Marinol?

20          A    You're taking an inappropriate

21  medicine that's prescribed for a totally different

22  situation.  It's a concern.

23          Q    What did you say in response to that?

24          A    I explained to him that I was -- my

25  doctor had told me that it was, in fact, an off-label

Case 1:19-cv-00120-CEA-SKL   Document 29-1   Filed 07/17/20   Page 44 of 58   PageID #: 611

1    controlled.

2          Q     So what did you expect this second

3    examination with Dr. Adams to cover?

4          A     I couldn't -- I can't really remember

5    what I expected out of it.  It was just something

6    that I had to -- it was a requirement to go back to

7    work.

8          Q     Did you speak to anyone beforehand

9    about why you were going to this examination?

10          A     If I did, it would have been family,

11    mother.

12          Q     How long did the examination take?

13          A     Oh, less than an hour.

14          Q     Significantly less?

15          A     I can't really answer for certain, but

16    it was less than an hour.

17          Q     How did the questions in the second

18    examination with Dr. Adams differ from the questions

19    in the first examination?

20          A     I can't recall for certain, but it was

21    more -- seems like it was more of the conditions that

22    I had to abide by.

23          Q     What do you mean by that?

24          A     Well, he told me at that time that I

25    had to stop taking Marinol.

1          Q     So were there many questions then or
2     were they just more him informing you of conditions?
3          A     Informing.
4          Q     And what did you say when he told you
5     you had to stop taking Marinol?
6          A     What did I say?  All right.  I'll stop
7     taking it.
8          Q     Why did you agree to stop taking it?
9          A     I had to to be able to go back to
10    work.
11         Q     Did you take a different drug instead
12    of Marinol?
13         A     We put me on Ativan again.  I was
14    taking it as-needed basis.  So I guess.
15         Q     Who is we?
16         A     At that time, I believe the prescriber
17    for it was Dr. Teliho at that time.
18         Q     And did you, in fact, take Ativan
19    instead?
20         A     I have per required.
21         Q     Were there any side effects from
22    taking Ativan?
23         A     It kind of -- like I say, it kind of
24    made me a little bit more blah.  Seemed like it
25    aggravated depression a little bit more.

```
 1          A     Yes.
 2          Q     Was it that same day that you returned
 3    to work?
 4          A     Seems like it was, yes.
 5          Q     What was -- what did Tim say when he
 6    gave you these return-to-work conditions?
 7          A     Not really much.
 8          Q     Was anything said about it?
 9          A     The document?
10          Q     The document or the conditions.
11          A     No.
12          Q     Did you have any questions about them?
13          A     Not that I recall, no.
14          Q     Did you attempt to negotiate them at
15    all?
16          A     There was no negotiating, the way I
17    understood the document.  You could sign it or I
18    didn't have a job.
19          Q     So there were two options:  Sign it
20    and return to work or refuse and you had to leave?
21          A     Not have a job, yeah.
22          Q     So why did you sign it?
23          A     At that point I had been out of work a
24    long time and bills were mounting.  And I was under a
25    lot of stress, and I had to get back to work.
```

Case 1:19-cv-00120-CEA-SKL   Document 29-1   Filed 07/17/20   Page 47 of 58   PageID #: 614

1          Q     What were the conditions for your

2    return to work?

3          A     Without having the document, I know

4    not taking Marinol obviously was one.  And then I had

5    to provide documentation of all medications I was

6    taking, no matter for what, and had to produce them

7    in a certain way.  I think it was fax or email.  Some

8    way like that.

9          Q     Something in writing?

10         A     Something in writing, yeah.

11         Q     Did you push back at all on the

12   requirement to disclose all medications?

13         A     No.  I really didn't have a choice to

14   push back unless I wanted to leave.

15         Q     What did you interpret that

16   requirement to require of you?

17         A     I interpreted it that I had to go

18   through every -- every medication I was taking for

19   every condition that I may be suffering.

20         Q     Did that include over-the-counter

21   medications?

22         A     As I understood it, yes.

23         Q     Was any explanation given to you for

24   those conditions?

25         A     No.

1   use an outside account.  But it was -- you know,

2   didn't take that long.  I thought about it on the

3   way, my drive home.  When I got access to a computer,

4   I typed it up.

5          Q     So when Tim Cofer reminded you of your

6   obligation to report the meds, what did he say?

7          A     They basically said, Were you supposed

8   to report your meds?  I said, Yeah.  I explained to

9   him what I had done.  And he informed me I didn't

10  report them.  And like I said, I immediately went and

11  called -- I mean --

12         Q     What did you tell him when he --

13         A     I told him something went wrong.  I

14  explained to him I had been working on something in

15  Outlook to get it -- to get it sent.  And I said,

16  I'll handle this right now.

17         Q     So why didn't you submit an email at

18  that time?

19         A     I can't really -- I can't say for

20  certain.  I know -- I know it was towards the end of

21  my shift in the week.  And I was trying to get work

22  done to get squared away for -- it's a situation

23  where you understand that you -- in a laboratory, you

24  have equipment up calibrating.  You've got to keep

25  the machine running, so to speak.

1    matter here.  And I don't know if the conditions they

2    have imposed upon me are legal.  I mean, I'm not an

3    attorney.

4           Q     But you were aware that was a

5    possibility at least?

6           A     Sure, yes.

7           Q     So when were you informed you were

8    being terminated?

9           A     I came to work on June -- well, let me

10   back up here a moment.  I started the workweek on

11   Sunday.  I believe it was June the 1st.  I worked

12   that day.  I believe I was alone in the coal lab that

13   day.  And the following day, Monday, June the 2nd,

14   somewhere in the beginning of the day I was pulled in

15   and informed that I was terminated.

16          Q     And who informed you of that?

17          A     Tim Cofer.  And there was a human

18   resources representative, Tracey.

19          Q     Tracey Walls or Wallace?

20          A     Something, yes.

21          Q     What was said during that meeting?

22          A     Best of my memory, a document was

23   placed in front of me stating that I -- failure to

24   comply with TVA's return-to-work agreement has led to

25   my termination.  I was asked to sign the document.

Case 1:19-cv-00120-CEA-SKL   Document 29-1   Filed 07/17/20   Page 50 of 58   PageID #: 617

1          Q      Did you sign the document?

2          A      No, I didn't.

3          Q      Why did you not sign the document?

4          A      I was in the middle of an EEOC

5     process.

6          Q      And what did you explain to -- is that

7     what you explained to Tim Cofer, why you would not

8     sign?

9          A      I told him at that time I was under

10    counsel and I would not sign it without someone -- I

11    mean, it's a termination document.

12         Q      How did Tim Cofer react to you saying

13    that there was an EEOC claim?

14         A      He didn't really say much.  The

15    meeting ended.  He escorted me to my desk and then

16    escorted me out of the building.

17         Q      Was that your first time mentioning

18    the EEO complaint to Tim Cofer?

19         A      Yes.

20         Q      Did you know if he was aware of that

21    prior to that date?

22         A      At the time, I did not.

23         Q      Was any reason given for your

24    termination?

25         A      Notice to -- failure to comply with

1                  REPORTER'S CERTIFICATE

2

3    STATE OF TENNESSEE  :

4    COUNTY OF HAMILTON   :

5

6          I, Whitney A. Vaughn, Court Reporter and

7    Notary Public, do hereby certify that the foregoing

8    deposition was stenographically recorded by me as

9    stated in the caption.  ALEX HIXON was duly sworn by

10   me; that pages 1 to 272, inclusive, were reduced to

11   typewriting under my direction and supervision, and

12   the deposition is a true and correct record, to the

13   best of my ability, of the testimony/evidence given by

14   the deponent.

15         I further certify that I am not a relative or

16   employee or attorney or counsel of any of the parties,

17   nor am I a relative or employee of such attorney or

18   counsel, nor am I financially interested in the

19   action.  All rates charged are usual and customary.

20         This is the 14th day of June, 2020.

21                  *Whitney Vaughn*

22

23                  Whitney Vaughn, TN LCR #418

24                  Court Reporter and Notary Public

25                  My Commission Expires 10/09/21

# Mahan, Iva J.

| | |
|---|---|
| **From:** | Luckett, Marcus T. |
| **Sent:** | Monday, January 03, 2005 12:16 PM |
| **To:** | Stout, Susan M. |
| **Cc:** | Mahan, Iva J. |
| **Subject:** | FW: Alex Hixon |

**EXHIBIT**

**3**

Request for Fitness for Duty

Susan

We are requesting a Fitness for Duty for Mr. Alex Hixon (SS# 259270085). Mr. Hixon has been in treatment at a clinic for depression. Additionally, he has been talking about suicide at work. His manager's comments are below. He came out to CLS this morning and we sent him home pending the results of the FFD. He hasn't worked for almost a month while he has been in treatment.

In accordance with Occupational Health Practice 1, Occupational Health, we are requesting a FFD Evaluation because we question his ability to work safely.

-----Original Message-----
**From:** Ortiz, Lisa D
**Sent:** Monday, January 03, 2005 10:40 AM
**To:** Luckett, Marcus T.
**Subject:** FW: Alex Hixon

Marcus,

Alex Hixon is ready to return to work. Please prepare the paperwork to have him sent to fitness for duty in preparation for his return.

As you are aware, Alex has been on Family Leave while he was seeking treatment for depression. Prior to him leaving work for treatment, he was often found at work crying, was having trouble concentrating on his work and was talking about suicide (i.e. in conversations he would say he had thought about suicide but had decided to delay it til next week). Just before leaving for treatment, Alex's performance at work was showing a decline e.g. he did not get samples prepped prior to the holding time deadline and made some clerical errors.

**Lisa Ortiz**
**Department Manager**
**Analytical and Environmental Chemistry Services**
**Tennessee Valley Authority**
**Central Laboratories Services**
**Phone: (423) 876-4290**

01/04/2005

A0269

January 22, 2013

Tracey Walls, LP 3A-C

FITNESS FOR DUTY EVALUATION AS TECH, CHEM-LAB

A return-to-work fitness for duty evaluation was performed for Alex J. Hixon (I42M391T7) by this office relative to TVA standards for the ability to work safely in the above-designated position. This evaluation has now been completed.

This individual met psychological fitness-for-duty standards for the ability to work safely for this position. He was also approved medically; see the attached TVA 1444. He may be returned to work at management's discretion.

If there are any questions, or if I can provide any further material, please let me know.

for Candace Clepper
Sr. Program Manager
Non-Nuclear Fitness for Duty & EAP



8

## OMITTED ITEMS

Those items for which there is no response or for which both true and false responses have been entered are considered "omitted." The potential for lowering the elevation of individual scales or the overall profile and rendering the administration invalid increases with the number of omitted items. Defensiveness, confusion, carelessness, and indecision are among the common reasons for omitting items. Examination of the content of the items that were omitted by the respondent may reveal specific problem areas or suggest reasons for their not responding appropriately to all items. Following are the items that were omitted:

None omitted.

## CRITICAL ITEMS

The MMPI-2 contains a number of items whose content may indicate the presence of psychological problems when endorsed in the deviant direction. These "critical items," developed for use in clinical settings, may provide an additional source of hypotheses about the respondent. However, caution should be used in interpreting critical items since responses to single items are very unreliable and should not be treated as scores on full-length scales -- for example, an individual could easily mismark or misunderstand a single item and not intend the answer given. The content of the items and the possibility of misinterpretation make it important to keep the test results strictly confidential. Special caution should be exercised when interpreting these items in nonclinical settings.

**Acute Anxiety State (Koss-Butcher Critical Items)**
  3. I wake up fresh and rested most mornings. (False)
  5. I am easily awakened by noise. (True)
 15. I work under a great deal of tension. (True)
 28. I am bothered by an upset stomach several times a week. (True)
 39. My sleep is fitful and disturbed. (True)
 59. I am troubled by discomfort in the pit of my stomach every few days or oftener. (True)
140. Most nights I go to sleep without thoughts or ideas bothering me. (False)
208. I hardly ever notice my heart pounding and I am seldom short of breath. (False)
223. I believe I am no more nervous than most others. (False)
301. I feel anxiety about something or someone almost all the time. (True)
463. Several times a week I feel as if something dreadful is about to happen. (True)
469. I sometimes feel that I am about to go to pieces. (True)

**Depressed Suicidal Ideation (Koss-Butcher Critical Items)**
 38. I have had periods of days, weeks, or months when I couldn't take care of things because I couldn't "get going." (True)
 65. Most of the time I feel blue. (True)
 71. These days I find it hard not to give up hope of amounting to something. (True)
 75. I usually feel that life is worthwhile. (False)
 95. I am happy most of the time. (False)
130. I certainly feel useless at times. (True)

A0535

215. I brood a great deal. (True)
233. I have difficulty in starting to do things. (True)
273. Life is a strain for me much of the time. (True)
306. No one cares much what happens to you. (True)
388. I very seldom have spells of the blues. (False)
411. At times I think I am no good at all. (True)
454. The future seems hopeless to me. (True)
485. I often feel that I'm not as good as other people. (True)
518. I have made lots of bad mistakes in my life. (True)

**Situational Stress Due to Alcoholism (Koss-Butcher Critical Items)**
518. I have made lots of bad mistakes in my life. (True)

**Mental Confusion (Koss-Butcher Critical Items)**
31. I find it hard to keep my mind on a task or job. (True)
299. I cannot keep my mind on one thing. (True)
325. I have more trouble concentrating than others seem to have. (True)

**Persecutory Ideas (Koss-Butcher Critical Items)**
17. I am sure I get a raw deal from life. (True)
42. If people had not had it in for me, I would have been much more successful. (True)
124. I often wonder what hidden reason another person may have for doing something nice for me. (True)
145. I feel that I have often been punished without cause. (True)
241. It is safer to trust nobody. (True)
259. I am sure I am being talked about. (True)

**Antisocial Attitude (Lachar-Wrobel Critical Items)**
254. Most people make friends because friends are likely to be useful to them. (True)

**Family Conflict (Lachar-Wrobel Critical Items)**
21. At times I have very much wanted to leave home. (True)

**Somatic Symptoms (Lachar-Wrobel Critical Items)**
28. I am bothered by an upset stomach several times a week. (True)
33. I seldom worry about my health. (False)
53. Parts of my body often have feelings like burning, tingling, crawling, or like "going to sleep." (True)
57. I hardly ever feel pain in the back of my neck. (False)
59. I am troubled by discomfort in the pit of my stomach every few days or oftener. (True)
101. Often I feel as if there is a tight band around my head. (True)
111. I have a great deal of stomach trouble. (True)
175. I feel weak all over much of the time. (True)
176. I have very few headaches. (False)
224. I have few or no pains. (False)
255. I do not often notice my ears ringing or buzzing. (False)
464. I feel tired a good deal of the time. (True)

A0536

**Anxiety and Tension (Lachar-Wrobel Critical Items)**
15. I work under a great deal of tension. (True)
17. I am sure I get a raw deal from life. (True)
223. I believe I am no more nervous than most others. (False)
261. I have very few fears compared to my friends. (False)
299. I cannot keep my mind on one thing. (True)
301. I feel anxiety about something or someone almost all the time. (True)
405. I am usually calm and not easily upset. (False)
463. Several times a week I feel as if something dreadful is about to happen. (True)

**Sleep Disturbance (Lachar-Wrobel Critical Items)**
5. I am easily awakened by noise. (True)
30. I have nightmares every few nights. (True)
39. My sleep is fitful and disturbed. (True)
140. Most nights I go to sleep without thoughts or ideas bothering me. (False)
328. Sometimes some unimportant thought will run through my mind and bother me for days. (True)
471. I have often been frightened in the middle of the night. (True)

**Depression and Worry (Lachar-Wrobel Critical Items)**
3. I wake up fresh and rested most mornings. (False)
65. Most of the time I feel blue. (True)
73. I am certainly lacking in self-confidence. (True)
75. I usually feel that life is worthwhile. (False)
130. I certainly feel useless at times. (True)
273. Life is a strain for me much of the time. (True)
339. I have sometimes felt that difficulties were piling up so high that I could not overcome them. (True)
411. At times I think I am no good at all. (True)
415. I worry quite a bit over possible misfortunes. (True)
454. The future seems hopeless to me. (True)

**Deviant Beliefs (Lachar-Wrobel Critical Items)**
42. If people had not had it in for me, I would have been much more  successful. (True)
106. My speech is the same as always (not faster or slower, no slurring or hoarseness). (False)
259. I am sure I am being talked about. (True)

**End of Report**

NOTE: This and previous pages of this report contain trade secrets and are not to be released in response to requests under HIPAA (or any other data disclosure law that exempts trade secret information from release). Further, release in response to litigation discovery demands should be made only in accordance with your profession's ethical guidelines and under an appropriate protective order.

A0537

## ITEM RESPONSES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1: 1 | 2: 1 | 3: 2 | 4: 2 | 5: 1 | 6: 1 | 7: 2 | 8: 1 | 9: 1 | 10: 1 |
| 11: 1 | 12: 1 | 13: 1 | 14: 1 | 15: 1 | 16: 2 | 17: 1 | 18: 2 | 19: 2 | 20: 2 |
| 21: 1 | 22: 2 | 23: 2 | 24: 2 | 25: 2 | 26: 1 | 27: 2 | 28: 1 | 29: 1 | 30: 1 |
| 31: 1 | 32: 2 | 33: 2 | 34: 1 | 35: 2 | 36: 1 | 37: 2 | 38: 1 | 39: 1 | 40: 2 |
| 41: 2 | 42: 1 | 43: 1 | 44: 2 | 45: 2 | 46: 1 | 47: 1 | 48: 2 | 49: 2 | 50: 1 |
| 51: 1 | 52: 1 | 53: 1 | 54: 2 | 55: 2 | 56: 1 | 57: 2 | 58: 2 | 59: 1 | 60: 2 |
| 61: 2 | 62: 2 | 63: 2 | 64: 2 | 65: 1 | 66: 2 | 67: 1 | 68: 2 | 69: 1 | 70: 2 |
| 71: 1 | 72: 2 | 73: 1 | 74: 2 | 75: 2 | 76: 1 | 77: 1 | 78: 1 | 79: 1 | 80: 2 |
| 81: 1 | 82: 2 | 83: 1 | 84: 2 | 85: 2 | 86: 2 | 87: 1 | 88: 1 | 89: 1 | 90: 1 |
| 91: 1 | 92: 2 | 93: 1 | 94: 2 | 95: 2 | 96: 2 | 97: 2 | 98: 2 | 99: 2 | 100: 2 |
| 101: 1 | 102: 1 | 103: 2 | 104: 1 | 105: 2 | 106: 2 | 107: 2 | 108: 2 | 109: 1 | 110: 1 |
| 111: 1 | 112: 2 | 113: 2 | 114: 2 | 115: 1 | 116: 2 | 117: 2 | 118: 2 | 119: 2 | 120: 1 |
| 121: 1 | 122: 2 | 123: 2 | 124: 1 | 125: 1 | 126: 2 | 127: 2 | 128: 1 | 129: 2 | 130: 1 |
| 131: 2 | 132: 2 | 133: 2 | 134: 2 | 135: 1 | 136: 1 | 137: 2 | 138: 2 | 139: 1 | 140: 2 |
| 141: 2 | 142: 1 | 143: 2 | 144: 2 | 145: 1 | 146: 2 | 147: 2 | 148: 2 | 149: 2 | 150: 2 |
| 151: 2 | 152: 2 | 153: 1 | 154: 1 | 155: 2 | 156: 2 | 157: 1 | 158: 1 | 159: 1 | 160: 2 |
| 161: 1 | 162: 2 | 163: 1 | 164: 1 | 165: 1 | 166: 2 | 167: 2 | 168: 2 | 169: 2 | 170: 2 |
| 171: 2 | 172: 2 | 173: 2 | 174: 1 | 175: 2 | 176: 2 | 177: 1 | 178: 2 | 179: 1 | 180: 2 |
| 181: 2 | 182: 2 | 183: 1 | 184: 2 | 185: 2 | 186: 1 | 187: 2 | 188: 1 | 189: 1 | 190: 1 |
| 191: 2 | 192: 1 | 193: 2 | 194: 1 | 195: 1 | 196: 1 | 197: 1 | 198: 2 | 199: 1 | 200: 2 |
| 201: 2 | 202: 2 | 203: 2 | 204: 2 | 205: 1 | 206: 2 | 207: 2 | 208: 2 | 209: 2 | 210: 2 |
| 211: 2 | 212: 2 | 213: 2 | 214: 2 | 215: 1 | 216: 2 | 217: 1 | 218: 2 | 219: 1 | 220: 2 |
| 221: 2 | 222: 1 | 223: 2 | 224: 2 | 225: 1 | 226: 2 | 227: 2 | 228: 2 | 229: 2 | 230: 2 |
| 231: 2 | 232: 2 | 233: 1 | 234: 1 | 235: 1 | 236: 2 | 237: 2 | 238: 1 | 239: 2 | 240: 2 |
| 241: 1 | 242: 2 | 243: 2 | 244: 2 | 245: 2 | 246: 2 | 247: 2 | 248: 2 | 249: 2 | 250: 2 |
| 251: 2 | 252: 2 | 253: 2 | 254: 1 | 255: 2 | 256: 1 | 257: 2 | 258: 2 | 259: 1 | 260: 1 |
| 261: 2 | 262: 1 | 263: 2 | 264: 2 | 265: 1 | 266: 1 | 267: 2 | 268: 2 | 269: 2 | 270: 2 |
| 271: 1 | 272: 1 | 273: 1 | 274: 1 | 275: 2 | 276: 1 | 277: 1 | 278: 2 | 279: 1 | 280: 1 |
| 281: 2 | 282: 2 | 283: 2 | 284: 1 | 285: 1 | 286: 1 | 287: 2 | 288: 2 | 289: 1 | 290: 1 |
| 291: 2 | 292: 1 | 293: 2 | 294: 2 | 295: 1 | 296: 1 | 297: 1 | 298: 2 | 299: 1 | 300: 2 |
| 301: 1 | 302: 2 | 303: 2 | 304: 2 | 305: 1 | 306: 1 | 307: 2 | 308: 2 | 309: 2 | 310: 1 |
| 311: 2 | 312: 2 | 313: 2 | 314: 1 | 315: 1 | 316: 2 | 317: 1 | 318: 2 | 319: 2 | 320: 2 |
| 321: 1 | 322: 2 | 323: 2 | 324: 2 | 325: 1 | 326: 1 | 327: 2 | 328: 1 | 329: 2 | 330: 2 |
| 331: 1 | 332: 2 | 333: 2 | 334: 2 | 335: 2 | 336: 2 | 337: 2 | 338: 1 | 339: 1 | 340: 2 |
| 341: 1 | 342: 2 | 343: 1 | 344: 2 | 345: 1 | 346: 1 | 347: 1 | 348: 2 | 349: 1 | 350: 1 |
| 351: 2 | 352: 1 | 353: 2 | 354: 1 | 355: 2 | 356: 2 | 357: 1 | 358: 2 | 359: 2 | 360: 1 |
| 361: 2 | 362: 2 | 363: 2 | 364: 2 | 365: 1 | 366: 2 | 367: 1 | 368: 2 | 369: 1 | 370: 2 |
| 371: 2 | 372: 2 | 373: 2 | 374: 1 | 375: 2 | 376: 1 | 377: 1 | 378: 1 | 379: 1 | 380: 1 |
| 381: 2 | 382: 1 | 383: 1 | 384: 2 | 385: 1 | 386: 1 | 387: 2 | 388: 2 | 389: 2 | 390: 1 |
| 391: 2 | 392: 2 | 393: 2 | 394: 1 | 395: 2 | 396: 1 | 397: 2 | 398: 2 | 399: 1 | 400: 2 |
| 401: 1 | 402: 2 | 403: 1 | 404: 1 | 405: 2 | 406: 1 | 407: 2 | 408: 1 | 409: 1 | 410: 1 |
| 411: 1 | 412: 2 | 413: 1 | 414: 2 | 415: 1 | 416: 1 | 417: 1 | 418: 2 | 419: 1 | 420: 2 |
| 421: 1 | 422: 2 | 423: 1 | 424: 2 | 425: 1 | 426: 2 | 427: 1 | 428: 1 | 429: 1 | 430: 1 |
| 431: 2 | 432: 2 | 433: 2 | 434: 2 | 435: 2 | 436: 2 | 437: 1 | 438: 1 | 439: 2 | 440: 1 |