1

2                UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TENNESSEE
3                      AT CHATTANOOGA

4
    ALEX HIXON,                   )
5                                 )
                     Plaintiff,   )
6                                 ) CIVIL ACTION FILE NO.
            vs.                   )
7                                 ) 1:19-CV-00120-PLR-SKL
    TENNESSEE VALLEY AUTHORITY    )
8   BOARD OF DIRECTORS,           )
                                  )
9                    Defendant.   )

10

11

12

13

14

15        TELEPHONIC DEPOSITION OF LON GLOVER

16               CHATTANOOGA, TENNESSEE

17              TUESDAY, JUNE 9, 2020

18

19

20

21

22

23  REPORTED BY:  TANYA L. VERHOVEN-PAGE,
                  CCR-B-1790
24

25  JOB NO.  180372

1

2            June 9, 2020

3             8:59 a.m.

4

5            Telephonic deposition of

6  LON GLOVER, held in Chattanooga,

7  Tennessee before Tanya L. Verhoven-Page,

8  Certified Court Reporter and Notary Public of

9  the State of Tennessee.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2              APPEARANCES OF COUNSEL

 3

     On behalf of the Plaintiff:
 4
             MIKEL & HAMILL
 5           620 Lindsay Street
             Chattanooga, Tennessee 37403
 6           BY:  DOUG HAMILL, ESQ.
                  (By Telephone)
 7

 8

 9


10   On behalf of the Defendant:

11           TENNESSEE VALLEY AUTHORITY
             400 West Summit Hill Drive
12           Knoxville, Tennessee 37902
             BY:  MARK MOHR, ESQ.
13           BY:  MIKE BERNIER, ESQ.
                  (By Telephone)
14

15

16

17                      -     -     -

18

19

20

21

22

23

24

25
```

```
 1

 2                       I N D E X

 3

 4              WITNESS: LON GLOVER

 5

 6    Examination                              Page

 7  BY MR. MOHR                                  6
    BY MR. HAMILL                              144
 8  BY MR. MOHR                                000

 9

10                     EXHIBITS:

11    Glover
    Deposition
12    Exhibit            Description          Page

13
    Exhibit 1         Subpoena to Testify
14                    at Deposition            8

15  Exhibit 2         Progress notes from
                      September 3, 2009
16                    initial visit           47

17  Exhibit 3         Progress notes dated
                      October 1, 2009         55
18
    Exhibit 4         October 28, 2012
19                    letter from Brian
                      Teliho, M.D.            63
20
    Exhibit 5         Progress notes dated
21                    June 21, 2013           71

22  Exhibit 6         Progress notes dated
                      December 12, 2013       72
23
    Exhibit 7         Progress notes dated
24                    January 9, 2014         78

25
```

1

2                          EXHIBITS:

3     Glover
     Deposition
4      Exhibit            Description              Page

5

     Exhibit 8          Progress notes dated
6                       October 29, 2009           102

7    Exhibit 9          Progress notes dated
                        June 3, 2010               104
8
     Exhibit 10         Case note dated
9                       January 17, 2013 from
                        G. Gary Leigh, Ph.D.       111
10
     Exhibit 11         Case note dated
11                      January 20, 2014 from
                        G. Gary Leigh, Ph.D.       121
12
     Exhibit 12         Progress notes dated
13                      January 16, 2014           123

14   Exhibit 13         Progress notes dated
                        February 20, 2014          130
15
     Exhibit 14         Progress notes dated
16                      April 17, 2014             140

17   Exhibit 15         E-mail exchange dated
                        August 12, 2014            143
18
     Exhibit 16         Progress notes dated
19                      August 15, 2014            145

20

21

22

23

24

25

1                       L. GLOVER

2          CHATTANOOGA, TENNESSEE; TUESDAY, JUNE 9, 2020

3                        8:59 A.M.

4

5     Thereupon --

6                        LON GLOVER,

7     called as a witness, having been first duly sworn,

8     was examined and testified as follows:

9

10                      EXAMINATION

11   BY MR. MOHR:

12        Q    All right.  Well, good morning,

13   Mr. Glover.  I'm Mark Mohr with TVA.  I have my

14   colleague, Mike Bernier, here.

15              As we get started here, have you

16   testified on any depositions before?

17        A    I've never done a deposition before.

18        Q    Have you testified in any other capacity

19   before?

20        A    Never have.

21        Q    Well, there are a couple of background

22   issues I'd like to go over, background questions

23   before we really begin.

24              First of all, this is a remote deposition

25   as you're aware.  So if you have any technical

1                                    L. GLOVER

2          A      That's --

3          Q      And why did you do that?

4          A      Well, probably because it was troubling

5     him.

6          Q      Was that something that he brought up or

7     you brought up?

8          A      I wouldn't know now, but I -- it

9     wouldn't -- it wouldn't surprise me if he brought it

10    up.  He's a fairly open person.

11         Q      Would he frequently volunteer information

12    like that?

13         A      Yes.

14         Q      And who was Sarah?

15         A      Sarah was his long-standing girlfriend at

16    the time.

17         Q      Okay.  And why did you follow-up on that

18    topic?

19         A      Well, it's not an unusual topic for me to

20    be involved with.  In my counseling practice,

21    people -- I see a number of couples.  I see people

22    who have intimate relationship problems, and that's

23    going to be part of the depression he's experiencing.

24                He had broken up with a woman earlier,

25    and he had this relationship with her, and she had a

1           L. GLOVER

2    small son, and their -- how they are getting along

3    affects his mood, and his mood is the main subject of

4    the therapy.

5            So, as I said, their main -- there are

6    main drivers for mood.  One of them would be work,

7    one would be girlfriend, one would be maybe he wasn't

8    able to do what he wanted to do, one would be family

9    of origin, and those would be the main four areas,

10   health issues, et cetera.

11           So all of them affect mood.

12      Q     Did Mr. Hixon's conditions change over

13   time?

14      A     Well, he -- he's a little bit like the

15   more things change, the more they remain the same.

16           You know, it's like his moods would

17   change, circumstances could change, but he wasn't

18   quite getting to the level of feeling better about

19   his life that he wanted to get to except for brief

20   periods of time.

21      Q     When was his condition at its worst?

22      A     I thought, in my five years, the

23   particular -- well, actually, I'd say three.  One

24   would be at the time he went back into the hospital

25   in October 2012 because that meant a resumption of

L. GLOVER

```
 1
 2   medication for pretty much the next year, and that's
 3   sort of a regression from his point of view.  That
 4   would be one area where things just went to a lower
 5   level of functioning.  In mood, I'm talking about.
 6   He could still work and still do the things he's
 7   required to do, but I'm talking about how he felt
 8   inside, and then --
 9        Q     What was that last line you said?  I
10   couldn't hear you.
11        A     It had to do with how he felt inside.  I
12   mean, he could feel really bad, but he could still
13   function is what I'm saying.  It would be like --
14        Q     Okay.
15        A     He could do what he --
16        Q     And what else were you saying?
17        A     So then the second time would have been
18   the -- from about Christmas of 2013 through the
19   termination at TVA, that's been a pretty rough time.
20   There was a lot of -- I think when he realized he was
21   under scrutiny and so forth and not being able to
22   work, his -- his -- he went -- he would have a pretty
23   negative time, and then -- and then since I've
24   learned that he was going to -- we were going to be
25   in this legal process, I discovered he's having a
```

L. GLOVER

 1   pretty hard time with a current knee problem from an

 2   injury he had.  So, I mean, that's -- that's just

 3   knowledge I had.  It's not like I'm in treatment with

 4   him, but --

 5   Q     Okay.

 6   A     Those are the three times.  I don't

 7   really know how he's been doing that much in the last

 8   four years.  So there might have been some worst

 9   times in there.  Doug may know better than me.

10   Q     So between 2012 and 2013, were they about

11   on par with one another, or was one worse than the

12   other?

13   A     I think -- I think 2012 was -- that's

14   hard to say.  Hard to say.  I mean, I think he was --

15   he was feeling pretty good about things going into

16   Christmas of 2013, but then when he got the urine

17   screen thing, and then it started to change.  I think

18   it -- it had some pretty deflating time for him.

19           I don't know how -- I don't know how to

20   rate which one is worse for him.  I mean, they were

21   both bad.

22   Q     Okay.  What led to the onset of his

23   depression in 2012?

24   A     I'd have to go back and start looking at

L. GLOVER

1

2    the notes again.

3         Q     You don't recall?

4         A     Again, it's usually a combination of A,

5    B, C and D.  It's not one thing.  I can't --

6         Q     Okay.

7         A     I think he had tried to go through the

8    transcranial work with Dr. Teliho and had high hopes

9    for that being a good antidepressant effect, and I

10   think it disappointed him overall, and so I think he

11   had a downer after that.

12              I think he was having troubles with his

13   relationship with Sarah after that.  So I think he

14   had a negative spiral.

15              I'd have to look at --

16        Q     How long did that period last for?

17        A     How long did what last?

18        Q     How long did that episode last for?

19        A     That depressive episode was acute for the

20   two days of hospitalization, but I think it was more

21   like -- again, I'd have to look at the notes to see,

22   but, like, three or four months trying to -- I

23   characterize it as sort of being like in

24   psychological intensive care.

25        Q     And how did that episode affect his

1                          L. GLOVER

2    day-to-day life?

3         A     More of a slog, more of -- you know, it's

4    hard to -- if you're in -- if you're just feeling a

5    little bit of depression, you can learn from it, but

6    if you have clinical depression, it's hard to do what

7    would be good for you even if you know what to do.

8              So he might know it's good to go take a

9    walk, but he might not do it anyway.

10        Q     Did it have any concrete impacts on his

11   day-to-day life?

12        A     Sure.

13        Q     What sort of impacts?

14        A     I'm not going to be able to pull that up

15   from memory.  I mean, I know that it affects outlook,

16   mood, feelings of, you know, despair, hopelessness,

17   nothing to look forward to, but then you go through

18   the motions more than you feel good.

19             Again --

20        Q     And was he able to go through the

21   motions?

22        A     Excuse me?

23        Q     Was he able to go through the motions?

24        A     Say that again.

25        Q     Was he able to go through the motions?

L. GLOVER

1

2      A      Yes.  That's what I've said about the

3  whole five years is he was like a clock.  He could --

4  he would go even when he was in misery.  That's

5  impressive about it him.

6      Q      Was he able to work in 2012 during that

7  episode?

8      A      My memory is he took a three-month

9  medical leave.  I think that was signed off by

10 Dr. Teliho.

11     Q      And so, at that point, he wasn't able to

12 mentally work?

13     A      That would have been -- I don't know if

14 it was his conclusion, but it was his doctor's

15 conclusion, and he accepted it, and he took time off.

16     Q      Could he have worked --

17     A      I don't --

18     Q      Did you disagree with that conclusion?

19     A      No, I don't have a disagreement about it.

20 I'm just saying I don't know if Alex could have

21 worked even during that time.  You know, I just don't

22 know.  He's sort of strong-willed, but I think he

23 accepted the help and took the time off.

24     Q      I'm going to pull up an exhibit here.

25     A      What year are we in now?

```
 1                    L. GLOVER

 2              (Glover Deposition Exhibit No. 4

 3         was marked for the record.)

 4   BY MR. MOHR:

 5         Q     Hang on.  I'm introducing this as Exhibit

 6   4.

 7               Do you recognize this?

 8         A     Yes, I do.

 9         Q     And what is this?

10         A     That's -- that's the doctor's statement

11   of -- that he's recommending medical leave for 120

12   days.

13         Q     And do you see where Dr. Teliho says

14   symptoms include inability to focus -- focus or

15   concentrate?

16         A     Right.

17         Q     Do you agree with that assessment that he

18   couldn't focus or concentrate?

19         A     Yes.  At the time, I would say that would

20   be -- that would be my conclusion.

21         Q     And do you see where Dr. Teliho said he

22   was suffering from poor memory?

23         A     Yeah.  I wouldn't have knowledge about

24   whether he was suffering from poor memory at the

25   time, but it wouldn't surprise me.
```

```
1                      L. GLOVER

2      Q    Why wouldn't it have surprised you?

3      A    Because major depression, full on,

4  affects our sensorium.  It affects our capacity to

5  think clearly, to focus, to recall.  I mean, it's

6  just -- it can be overwhelming at times.

7      Q    And did you notice this during your

8  interactions with him?

9      A    I noticed it going up into the need to go

10  into the hospital, and I was telling him to -- we

11  call it PRN.  It means as-needed.  I was saying

12  you're not looking like you feel that good to me.

13  You let me know if something is getting worse, and

14  about a week later he admitted himself for a brief

15  hospitalization.  I don't know -- it was quick.  It

16  was over, but then he was kind of in the medication

17  world again.

18      Q    Do you see where Dr. Teliho said he had a

19  decreased ability to interact with others adequately

20  in a work or social environment?

21      A    Yes.  I think -- I think he's saying that

22  that's why he would like him to take time off.  I

23  don't know that that meant he was actually doing

24  that.  I think he was saying that was a risk.

25      Q    So do you disagree with that assessment
```

1                       L. GLOVER

2    that he had a decreased ability to interact with

3    others?

4         A     I don't disagree with it.  I'm just

5    saying I don't think he was -- that he actually had

6    that happen because he went in the hospital and then

7    he didn't go back to work, at least I think that's

8    what happened.

9         Q     This letter was -- so why was this letter

10   written?  Did he have a decreased ability to interact

11   with others in your opinion?

12               Did you hear me?

13        A     I did.  I'm just -- I'm --

14        Q     No, that's fine.  I just wanted to make

15   sure there wasn't a technical problem.

16        A     I don't know if I'm -- if I'm not

17   answering clearly.  I would say that, as depressed as

18   he was, it would affect his ability to interact with

19   people at work and at home.

20               I would just think -- I would assume that

21   to be true.  I don't have direct recall for whether

22   he was reporting that or if that's just a statement

23   that goes with depression itself and then, therefore,

24   you assume it.

25        Q     How would it affect his ability to

                              L. GLOVER

 1

 2    interact with others?

 3         A    How would it?

 4         Q    Yes.  How?

 5         A    Well, when you're depressed, you don't

 6    have much energy for interaction unless you just will

 7    yourself to overcome it.

 8              Your natural --

 9         Q    And Dr. Teliho wrote -- what was that?

10         A    You want to withdraw when you're really

11    depressed.

12         Q    Dr. Teliho below that says these symptoms

13    now prevent him from working.

14              Do you agree that these symptoms

15    prevented him from working?

16         A    I don't disagree.

17         Q    So why were you -- why were you saying

18    that he was able to work then at this time?  How do

19    you square those two?

20         A    I don't actually remember.  When he --

21    what I'm saying is, from what I know of Alex, he was

22    able to work for years with a depressed level of some

23    kind.  Whether it's, you know, severe enough to be

24    hospitalized or above, he would carry a level of

25    depression that he could still work and do his job

                          L. GLOVER

1

2   and still do his home -- work on his home.

3            It's impressive how much he could still

4   do while depressed.  I'm not saying -- I think it's

5   wise that he wasn't working once he had been in the

6   hospital for those three months.  I think it was a

7   good decision not to.

8            I don't know how he would have been at

9   work.  That's just a speculation, but it wouldn't --

10       Q     Why do you feel it was a good decision?

11       A     Because he was hurting.

12       Q     So was it a good decision for his work or

13  for him to get treatment or both?

14            What -- can you be more specific?

15       A     Well, there is a thing called impairment,

16  and if you do get to a place where you're hurting so

17  much you're impaired, it's probably wise not to be at

18  work.

19            So, in that instance, it probably was

20  good for TVA.  It was probably good for him not to be

21  at work while he was in that degree of distress.

22            Could he have done it is a speculation.

23  You know, I wouldn't have wanted to see him doing it

24  because he was hurting so much.

25       Q     Okay.  And how did this condition resolve

```
 1                        L. GLOVER

 2   itself?  How did that episode resolve itself in 2012?

 3         A      Well, I guess you'd say it resolved out

 4   of the acute phase by medical management assistance

 5   as a starter, and then I'd have to review the notes

 6   to see what he was doing -- what he was able to

 7   gradually generate in the way of what I call agency,

 8   his own ability to pull himself out.  Like --

 9         Q      What was his condition in the summer and

10   early fall of 2013?

11         A      Say that again?  What --

12         Q      What was his condition like in the summer

13   and early fall of 2013?

14         A      2013?

15         Q      And are you looking at anything to help

16   you refresh your recollection?

17         A      No.  I was thinking -- I was thinking if

18   I knew, and then I was thinking I would have to look.

19         Q      Okay.  If you look at anything, please

20   let me know what it is you're looking at.

21         A      Where are we looking?

22         Q      Please ask me if there's anything you

23   need to look at.

24         A      Okay.  But where in 2013 am I looking?

25         Q      Don't look at any documents right now.
```

1                     L. GLOVER

2              What was his condition in the summer and

3      early fall of 2013?

4         A     I would -- I was needing to look at

5      documents to remind myself.  I don't really know.

6         Q     And is there something that would refresh

7      your recollection?

8         A     If I just looked at some of my notes at

9      that time.

10        Q     And which notes do you need to look at?

11        A     The ones --

12              MR. HAMILL:  Lon, take a look at --

13        hey, Lon.  Go ahead and take a look at

14        your notes.

15              THE WITNESS:  Okay.

16   BY MR. MOHR:

17        Q     Well, if he -- if you could tell me what

18   notes you're looking at, please.

19              MR. HAMILL:  He's looking at his

20        notes of 2013.

21              THE WITNESS:  Well, are we talking

22        about the whole summer --

23   BY MR. MOHR:

24        Q     What notes are you looking at?

25        A     I'm just opening it up to August '13,

1                         L. GLOVER

2     August 22nd.  I don't know how to answer sort of the

3     overview of the summer and fall of '13.

4               I mean, I -- I'd have to really just look

5     at these and kind of go through them.

6          Q     So you don't recall?

7          A     No.  Because it's just like trying to

8     recall a chapter in a book.  I don't remember what --

9          Q     I'm going to show you an exhibit here.

10    Hang on.

11         A     Okay.

12         Q     This is the June 21st, 2013 notes?

13         A     June 21st?

14         Q     2013.  Why is it not letting me --

15         A     Okay.

16         Q     Or did I already share this one?

17         A     I've got a note, 6/21.  Is that the one

18    you're talking about?

19         Q     Yeah.  For some reason the exhibit button

20    is grayed out.  I'm having trouble loading the file.

21    I wonder if it's because I have this other one open,

22    I guess.  There we go.

23               All right.  Do you see on this page a

24    note indicating that his girlfriend broke up with

25    him?

1                      L. GLOVER

2          A     Yeah, but it's not on my screen.  Is it

3     supposed to be?

4          Q     Thank you for pointing that out.  I

5     apologize.  New technology for me, too.

6          A     Now it's there.  Yeah, I see it.

7                (Glover Deposition Exhibit No. 5

8          was marked for the record.)

9     BY MR. MOHR:

10         Q     Okay.  And this is Exhibit No. 5.

11               All right.  I'll submit Exhibit 5.

12               Do you see that his girlfriend broke up

13    with him?

14         A     Right.

15         Q     And how did that impact his condition?

16         A     Strongly.

17         Q     Does this help refresh your recollection

18    how his condition was that summer and fall?

19         A     It -- it helps me understand how he was

20    doing that day and during that period of time.  I

21    don't know about the whole season.

22         Q     How was he sleeping around that time?

23         A     He's had sleeping trouble the whole time

24    I was knowing him.

25         Q     And was that a constant?

1                          L. GLOVER

2    he mentioned it?

3         A     Not a whole lot.

4         Q     Did you know what it was at all?

5         A     Yeah, I knew it was synthetic THC, but I

6    didn't -- I wasn't informed about what it's used for.

7    I know now.  I mean, I know it's used for nausea

8    with --

9         Q     At the time, were you aware of any

10   potential side-effects?

11        A     No, I wasn't at the time.

12        Q     What were your -- did you have an opinion

13   regarding his Marinol use?

14        A     Well, knowing what I know, I would -- I

15   would wonder why it would be prescribed to him.  I

16   know why it was.  I know it was helpful to his sleep,

17   but also the -- the dangers of its use seemed to be

18   contraindicated to the job he's in.

19        Q     And were those dangers that you were

20   aware of at the time or dangers you've learned of

21   since?

22        A     Learned of since.

23        Q     And what dangers are those?

24        A     I'd have to refresh my memory.  I think

25   things like hallucinations, even.  I mean, I think

                          L. GLOVER

1   contacted by TVA regarding Mr. Hixon?  Do you recall?

2        A     Well, mine would be, I think, 2014,

3   January, is when I talked to Dr. Leigh, and then we

4   had a series of letters and e-mails and stuff

5   through, like, February and March.

6              So like January through March I was

7   having -- actually through April.

8        Q     Okay.  Regarding that first communication

9   in January 2014, how did he contact you?

10       A     Some conversation.  I don't remember.

11       Q     And what did he contact you regarding?

12       A     This would be where, I guess, he's

13  wanting input on how Gary -- I mean, how Alex is

14  doing in his therapy to help them with their overall

15  assessment of how he's doing at TVA.

16       Q     And what was your response?

17       A     Trying to know what you expect from me,

18  what you need from me, what I can do to help.

19       Q     Did you provide an opinion on his

20  condition?

21       A     I did, but it's -- but I think it was in

22  real generalized terms, and it wasn't specific enough

23  to what he wanted or needed.

24       Q     And why did you provide a general as

1          L. GLOVER

2  opposed to a specific response?

3       A    As I told you at the beginning of this

4  deposition, I'm a pretty private person, and I'm very

5  serious about confidentiality.  I live by the rule

6  that if you didn't -- if you can't say something to

7  somebody's face, don't say it behind their back, and

8  so I'm very cautious about exchanging knowledge as if

9  TVA is starting to be a client to me as well as Alex.

10 Because my obligation is to Alex.

11          So I tried to make that really clear to

12 Alex.  You know, you have a right to confidentiality

13 if you don't want me talking to your employer, and

14 I'm uneasy, actually, in the role of talking to your

15 employer, but if you want me to, and he said he did,

16 and so I'm willing to do it, but I want to have what

17 I call full transparency.  That means you will know

18 what I'm saying to them and they will know what -- in

19 reverse.

20      Q    So Mr. Hixon did give you approval to

21 speak to TVA?

22      A    Yes.

23      Q    So at that point, did you provide any

24 specific examples or opinions regarding his

25 condition?

L. GLOVER

1

2    Q    What was said about Marinol?

3    A    That it's -- that he would have concerns

4  about it -- Dr. Leigh would have concerns about its

5  application in this instance, and that also that, if

6  Alex were concerned about not passing the marijuana

7  thing, that it was -- that it wouldn't be -- a

8  positive wouldn't be grounds for termination because

9  it would be a first offense for him.

10    Q    Did you have many disagreements with what

11  TVA was telling you about the Marinol and his

12  condition?

13    A    Well, I didn't have that much interaction

14  with TVA about it.  I don't have any argument with

15  their point of view about the risk of Marinol in the

16  work setting.

17    Q    Okay.  So did you ever provide TVA with

18  an opinion on whether or not Mr. Hixon could work

19  safely at TVA?

20    A    No.

21    Q    No, you did not provide an opinion?

22    A    Right.

23    Q    Do you have an opinion?

24    A    Well, when he was working at TVA and

25  working well and getting good reviews, I have a good

1          L. GLOVER

2     any further questions.  So I think we're

3     concluded, unless you need to amend a

4     response.

5          Well, I appreciate your help, and

6     I'll let you guys go.

7

8

9          (Thereupon, the deposition was

10    concluded at approximately 1:30 p.m.)

11

12

13

14

15                    _____

16                    LON GLOVER

17

18

19  Subscribed and sworn to before me

20  this_____ day of_____, 2020.

21  _____

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    STATE OF TENNESSEE:

5    HAMILTON COUNTY    :

6

7            I hereby certify that the foregoing

8        deposition was reported, as stated in the

9        caption, and the questions and answers

10       thereto were reduced to written page

11       under my direction, that the preceding

12       pages represent a true and correct

13       transcript of the evidence given by said

14       witness.

15            I further certify that I am not of

16       kin or counsel to the parties in the

17       case, am not in the regular employ of

18       counsel for any of said parties, nor am I

19       in any way financially interested in the

20       result of said case.

21            Dated this 19th day of June, 2020.

22

23       _____

24       Tanya L. Verhoven-Page,
         Certified Court Reporter,
         B-1790.

25