UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA


ALEX HIXON,
Plaintiff,


     v.                         No. 1:19-cv-00120-PLR-SKL


TENNESSEE VALLEY AUTHORITY
BOARD OF DIRECTORS,
Defendant.


---

## BRIEF IN SUPPORT OF TENNESSEE VALLEY AUTHORITY'S
## MOTION FOR SUMMARY JUDGMENT

---

David D. Ayliffe
Director, Litigation
Mark A. Mohr
Michael V. Bernier
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7346
mamohr@tva.gov

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................1

    I.      Hixon Worked in a Safety Sensitive Position. ...........................................1

    II.     TVA Had Previously Conducted Fitness for Duty Examinations of Hixon and Accommodated His Depression. .......................................................2

    III.   Hixon's Positive Drug Test Was Reported as Negative with a Safety Concern. ......................................................................................................4

    IV.   Hixon's Marinol Use Prompted TVA to Conduct a Medical and Psychological Examination of Hixon to Assess His Fitness to Work in a Safety-Sensitive Position. .......................................................................6

    V.    Hixon's Failure to Comply with the Terms of his Return to Work Agreement and Untrustworthiness Resulted in His Termination. ..........................9

ARGUMENT .......................................................................................................................11

    I.      Hixon's Fitness for Duty Examinations Were Job Related and Consistent with a Business Necessity. .....................................................................11

          A.     Legal Standard Applicable to Hixon's Medical Examination Claims .......11

          B.     The Safety Concern Raised by Marinol Provided a Reasonable, Objective Basis for TVA to Refer Hixon for an Examination. .................12

          C.     Hixon's Initial Fitness for Duty Examination Was an Appropriate, Individualized Inquiry. ............................................................14

          D.     Hixon's Psychological Evaluation Was Necessary Because He Placed His Mental Health into Issue Before and During His Initial Examination. ..............................................................................17

          E.     Even Greater Justification Existed for Requiring Return to Work Examinations After Hixon was Found Unfit for Duty .............................18

    II.     Hixon's Agreed Disclosure Requirement Was Job Related and Consistent with a Business Necessity. .....................................................................19

    III.   Hixon Never Requested an Accommodation for His Disability from TVA. .........21

    IV.   Hixon's Termination Was Justified by His Violation of a Last Chance Agreement and Not Motivated by His Disability. ................................................22

Case 1:19-cv-00120-CEA-SKL   Document 30   Filed 07/17/20   Page 2 of 30   PageID #: 686

V.    Hixon Cannot Establish a Prima Facie Case that His EEO Complaint and
        Termination Are Causally Connected....................................................................25

CONCLUSION.............................................................................................................................25

# INTRODUCTION

The results of a drug test caused the Tennessee Valley Authority to question Alex Hixon's ability to work in a safety sensitive position in a chemistry laboratory. Following well-established procedures and given his documented history of depression, TVA referred Hixon to a fitness for duty examination to assess his ability to work safely. After examining Hixon, TVA permitted him to return to duty subject to a last chance agreement. Hixon failed to abide by its conditions and was subsequently terminated for that failure and for his lack of trustworthiness. TVA acted reasonably and responsibly to ensure a safe work environment.

Summary judgment is due to be granted to TVA. First, TVA had a reasonable, objective belief that an individualized inquiry was necessary to guarantee that Hixon could work safely. Second, the medication disclosure requirement to which Hixon agreed in the last chance agreement was appropriate given his medical history and his failure to comply with prior disclosure requirements. Third, Hixon agreed to cease using Marinol, the prescription that gave rise to the positive drug test, without requesting an accommodation. Fourth, Hixon's termination was justified by his violation of a last chance agreement and not motivated by any disability. Fifth, Hixon cannot establish a causal link between his EEO complaint and his termination.

# FACTUAL BACKGROUND

## I. Hixon Worked in a Safety Sensitive Position.

Hixon worked as a chemistry laboratory technician at TVA's Central Laboratories from May 2001, until his termination on June 2, 2014. It is undisputed that this position was classified as "safety sensitive." (Clepper Decl., Doc. 23-1 at PageID##248–49, 256–70.)[1] Lab technicians

---

[1]    TVA previously filed multiple Declarations (Docs. 23-26) in response to Hixon's motion for summary judgment. To avoid duplication, TVA will refer to them by their ECF Docket numbers.

must be able to manage many hazards: high temperatures, harmful chemicals, and high voltages, all of which create potential for burns, severe injuries, or death. (Doc. 23-1 at PageID#283.) In his deposition testimony, Hixon did not dispute the existence of those hazards. (Hixon Dep., Doc. 29-1, 21:22–24:20 ("[F]umes… can asphyxiate you… and cause tissue burning.").) "[A] chemistry laboratory technician who is not fit for duty presents a danger to the technician and to coworkers." (Cofer Decl., Doc. 26-1 at PageID#448; *see also* Hixon Dep., Doc. 29-1, 92:11-92:24.) For these reasons, TVA requires those who hold safety sensitive positions, like Hixon, to meet fitness for duty requirements, which include reporting potentially impairing medications and undergoing random drug tests. (Doc. 23-1 at PageID##256, 265-70, 293.)

Hixon acknowledged and accepted TVA's prescription drug reporting policy and alcohol and drug testing policy when he was hired. (Doc. 23-1 at PageID##249, 265-69; Hixon Dep., Doc. 29-1, 84:8-86:5.) He knew that the drug testing policy states that an employee who tests positive for alcohol or drugs will be removed from duty and referred to TVA's Psychology and Fitness for Duty ("FFD") Program. (*Id.; see also* Clepper Supp. Decl., Doc. 23 at PageID#245; TVA-SPP-11.511, Doc. 23-3 at PageID#301–05; Hixon Dep., Doc. 29-1, 80:4-16.)

## II. TVA Had Previously Conducted Fitness for Duty Examinations of Hixon and Accommodated His Depression.

Hixon had a long history with TVA's FFD program by the time of his 2013 drug test. He has suffered from depression since his teenage years and continued to do so during employment with TVA. (Leigh Decl., Doc. 25-1 at PageID##395-96; Hixon Dep., Doc. 29-1, 102:12-17.) In 2005, while working for TVA, his depression worsened, and he was seen crying at work and talking about suicide. (Email Dated Jan. 3, 2005, Doc. 29-1 at PageID##620-621.) TVA gave him time off from work to receive inpatient treatment for substance abuse and depression (Hixon Dep., Doc. 29-1, 73:10-75:23), but Hixon left that treatment early against medical advice and

fired the doctor who referred him to inpatient treatment. (*Id*; Doc. 25-1 at PageID#403-05.) TVA did not react punitively when Hixon tried to return to work; rather, TVA referred him to FFD to assess his fitness to carry out his job duties.

FFD protocol included a medical examination from Dr. Stephen Adams and a psychological examination from Dr. Gary Leigh, medical consultants who have worked for TVA over the past 15 years conducting FFD evaluations, and the same doctors who examined him in 2014. Hixon disclosed that he had psychiatric issues, and Dr. Adams noted he appeared to abuse alcohol. (Adams Decl., Doc. 24-1 at PageID##332, 340-41.) During his psychological examination, Hixon stated that he has suffered from depression all of his life. (Doc. 25-1 at PageID##403-05.) Hixon confirmed his alcohol use and told Dr. Leigh that he had experimented with marijuana and cocaine in his past. Dr. Leigh's examination revealed a severe psychiatric disorder and a degree of psychopathology "seldom seen on fitness for duty evaluations." (*Id.*) Dr. Leigh assessed Hixon as depressed, angry, and likely to "openly demonstrate hostility" towards others and to direct the anger towards himself. (*Id.*) Dr. Leigh concluded that he had a severe psychiatric disorder that posed a risk to his ability to work safely. Dr. Leigh deemed Hixon unfit for duty. (*Id.*) As a result, Hixon could not work until he was psychiatrically stable. Hixon completed an intensive outpatient program as recommended by TVA's Employee Assistance Program (EAP). He was allowed to return to work on the condition that he sign a return to work agreement designed to ensure his continued fitness for duty. (Doc. 23 at PageID##244-45; 2005 Return to Work Agreement, Doc. 23-2; Doc. 23-1 at PageID#249.) Under that agreement, he was required to "report any changes in medication or treatment providers" to FFD. (Doc. 23-2; Hixon Dep., Doc. 29-1, 178:16-179:12.)

Later, in 2012, Hixon again took time away from work to receive inpatient treatment for depression. (Doc. 23-1 at PageID##249-50; Doc. 25-1 at PageID##429-31.) Following Hixon's extended medical absence, Dr. Leigh again evaluated him in January 2013 as part of the standard FFD examination before a return to work. (Doc. 25-1 at PageID##419, 429-31.) Dr. Leigh concluded Hixon was fit for duty and able to return. (*Id.* at PageID#431.)

### III.    Hixon's Positive Drug Test Was Reported as Negative with a Safety Concern.

The next year, in December 2013, when Hixon was scheduled for a drug test under his work agreement, he informed his manager, Tim Cofer, that the test would be positive due to a prescription drug. (Doc. 26-1 at PageID#449.) The drug test came back positive for a cannabinoid. (Doc. 23-1 at PageID#250, 278.) Hixon denied using illegal drugs and submitted documentation to the independent Medical Review Officer (MRO), Dr. Howard Strickler, which suggested his positive drug test was attributable to Marinol. (*Id.* at PageID#273.) The fact that Hixon first informed someone at TVA about his use of Marinol only when he was scheduled to take a random drug test gave TVA reason to suspect he was attempting to use it to mask illicit drug use. (Doc. 23-1 at PageID#251.) Hixon had not disclosed his prescription as required by both his employment contract and his 2005 return to work agreement. (Doc. 23-2; Doc. 23-1 at PageID##266-69, 273; Hixon Dep., Doc. 29-1, 178:25-179:4, 182:1-4.)

In light of Hixon's Marinol prescription and because of the serious known side effects of Marinol, Dr. Strickler changed the test result from positive to "negative with a safety concern." (Doc. 23-1 at PageID##272-73.) Dr. Strickler's classification was consistent with the applicable Manual for Federal Agency Workplace Drug Testing Programs,[2] issued by the Substance Abuse

---

[2]    Manual for Federal Agency Workplace Drug Testing Programs, *available at* www.samhsa.gov/sites/default/files/workplace/MRO_Manual_2010_100908.pdf (last visited

and Mental Health Services Administration (SAMHSA), an agency within the Department of Health and Human Services. The Manual dictates the procedures MROs are to follow when reviewing drug tests. It states that when an employee appears to have an explanation for a positive drug test, the MRO should report a negative result to the agency but may also report to the agency that the medication may affect the employee's ability to perform their duties in a safety sensitive occupation. (MRO Manual at 80, Doc. 27, Attach. 1 (excerpts).) That is what Dr. Strickler did, and his reason for doing so is supported by the Manual which classifies Marinol as a drug presenting safety concerns. (*Id*. at 15 ("Marinol has psychoactive effect that may present safety issues."); *see also id*. at 46 ("Patients prescribed Marinol should be warned not to drive, operate complex machinery, or engage in hazardous activity.").)

Based on Dr. Stickler's finding of a negative drug test with a safety concern and in accordance with TVA's drug testing policy, TVA referred Hixon for a FFD examination to assess whether he could work safely and placed him in non-work, pay status. (Doc. 23-1 at PageID ##250, 274; Doc. 23-3 at PageID##300–01.) Dr. Strickler also resubmitted Hixon's sample to a second SAMHSA-certified laboratory that could determine whether Hixon's THC positive test result was due to illegal marijuana or Marinol alone. That laboratory concluded that Hixon's positive test result "cannot be the result of the sole use of Marinol" but instead indicated illegal drug use. (Doc. 23-1 at PageID#277; *see also id.* at PageID#251.)

---

July 13, 2020). Courts may take judicial notice of facts from "public records and government documents available from reliable sources on the Internet." *U.S. ex rel. Dingle v. BioPort Corp*., 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003), *aff'd sub nom.,* 388 F.3d 209 (6th Cir. 2004); *see also Roane Cnty., Tenn. v. Jacobs Eng'g Grp., Inc.*, No. 3:19-cv-00206, 2020 WL 2025613, *2-3 (E.D. Tenn. Apr. 27, 2020) (taking judicial notice of CERCLA documents published to TVA's governmental website).

**IV.    Hixon's Marinol Use Prompted TVA to Conduct a Medical and Psychological Examination of Hixon to Assess His Fitness to Work in a Safety-Sensitive Position.**

On January 6, 2014, Dr. Stephen Adams, a professor of medicine and medical doctor at the University of Tennessee Family Medical Center, conducted Hixon's FFD examination. Dr. Adams was familiar with Hixon from his 2005 examination, including his history of depression and suspected alcohol abuse, and reviewed his file before the examination. (Doc. 24-1 at PageID#332, 340-41.) Dr. Adams began the examination the way he begins all of his examinations, by asking the patient to explain why he is there. (S. Adams Dep., Doc. 27, Attach. 2 at 16-17, 22-23.) Hixon explained he was there because "his drug test was positive for THC" and then "launched . . . into a discussion of why he was taking [Marinol] and what symptoms he was having, what side effects he was having." (*Id*. at 23; *see also* Hixon Dep., Doc. 29-1, 208:5-11.) Hixon again attributed the positive drug test to Marinol (S. Adams Dep., Doc. 27, Attach. 2 at 22-23) and denied any illicit drug use, including marijuana. (Doc. 24-1 at PageID##334-35.)

Dr. Adams learned Hixon had been prescribed Marinol by Dr. Charles Adams, an "Integrative Holistic Medicine Specialist" with a suspected history of prescribing medically inappropriate treatments. (Adams Supp. Decl., Doc. 24 at PageID#327; Doc. 24-1 at PageID#334.)[3] Hixon described his off-label prescription of Marinol as a "trial" to treat his anxiety and insomnia. (Doc. 24-1 at PageID##334.) This unorthodox "trial" that had been started without regular psychiatric monitoring (*id*. at PageID#337) raised concerns for Dr. Stephen

_____

[3]     Dr. Charles Adams stands accused of violations of the False Claims Act. *United States v. Charles Adams*, 4:18-cv-191-HLM (N.D. Ga.) (Comp. filed Aug. 27, 2018).  He allegedly submitted false Medicare claims seeking reimbursement for over $1.5 million worth of claims for chelation therapy with false diagnostic codes. Chelation therapy is a highly dangerous and potentially fatal treatment for acute heavy metal poisoning. *Id*. Medicare covers chelation therapy only for severe cases of heavy metal poisoning. Dr. Charles Adams advertised and prescribed chelation therapy as an elixir for "anti-aging," "cancer prevention," and a host of other ailments.

Adams because he recognized that Marinol is known to cause psychoactive effects, hallucinations, depression, anxiety, somnolence, confusion, amnesia, dizziness, ataxia lead to addiction. (Doc. 24-1 at PageID##333-34, 347-54, 370-74.) While the FDA had approved the use of Marinol to stimulate appetite in AIDS and cancer patients and to reduce chemotherapy-induced nausea (*id*., PageID## 342–43), Hixon had none of these conditions. Most importantly, medical literature and accepted standards recommend that Marinol be avoided by individuals engaged in hazardous activities, individuals with a history of alcohol or substance abuse, and those with psychiatric illnesses such as depression. (Doc. 24-1 at PageID##347, 371-72.) All three of these precautions applied to Hixon. Treating anxiety, insomnia, and depression, with Marinol was not only unusual but could have lethal results. (Doc. 24-1 at PageID##337, 347-51, 371-72.) In fact, Dr. Adams has never seen another example of a doctor prescribing Marinol for any purpose besides treating severe nausea. (Doc. 24 at PageID#327.) Hixon's own psychiatrist, Dr. Brian Teliho, described the prescription of Marinol to treat anxiety and depression as "odd" because it was typically prescribed for appetite stimulation and pain management and was not something he would prescribe for someone with those symptoms due to its hallucinogenic effects. (Teliho Dep., Doc. 29-4, 14:9-16:2.) His psychologist, Dr. Glover, similarly said, "[K]nowing what I know, I would – I would wonder why it would be prescribed to him… the dangers seemed to be contraindicated to the job he's in." (Glover Dep., Doc. 29-3, 106:14-18.)

Because Marinol implicated depression and because Dr. Adams was familiar with Hixon's psychological history, he assessed the depth of Hixon's depression. He did so by making standard medical inquiries. (Hixon Dep., Doc. 29-1, 205:11-19 ("[It was a] pretty standard physical examination.")) He asked about the health of Hixon's personal relationships and made general inquiries into his physical health. (Hixon Dep., Doc. 29-1, 166:16-24.) Because Marinol

is known to have potentially negative interactions with other medicines, including antihistamines, sedatives, other cannabinoids, or prescription narcotics (Doc. 24-1 at PageID#333.), Dr. Adams assessed the risk for such interactions by requesting a list of Hixon's medications. Hixon informed Dr. Adams he was taking zolpidem, Marinol, lorazepam, Celexa, hydrocodone, testosterone cream, Zyrtec, letrozole, as well as chelation therapy. (Doc. 24 at PageID#326; Adams Notes, Doc. 24-2; Medication List, Doc. 24-3.) Dr. Adams determined Hixon's depression was not well controlled which could be an effect of Marinol as it is known to *worsen* depression. (Doc. 24-1 at PageID##332-35, 347, 350, 371.) Dr. Adams nonetheless proceeded cautiously; he referred Hixon to Dr. Leigh, a clinical psychologist, to ascertain whether Hixon's depression impaired his ability to work safely. (Doc. 24-1 at PageID#335.)

Approximately a week later, Dr. Leigh conducted a psychological examination, consisting of a clinical interview and a standard test. (Doc. 25-1 at PageID#397.) Hixon's responses showed that he felt that people "had it in for him," and he had "anxiety about something or someone almost all the time." (MMPI Results, Doc. 29-1 at PageID##622-23.) He indicated on the test that he was "get[ting] a raw deal from life," he sometimes was "about to go to pieces," and he thought his "future seem[ed] hopeless." (*Id.*) Hixon endorsed statements that he worked "under a great deal of tension," found it "hard to keep [his] mind on a task or job," and had "trouble concentrating." (*Id.*at PageID##623-24.) Dr. Leigh assessed Hixon as exhibiting signs of depression that appeared to be affecting his work life. (Doc. 25-1 at PageID##397-99.)

Dr. Leigh also learned Hixon had not seen his psychiatrist, Dr. Teliho, in six months, the entirety of his Marinol "trial." (*Id.*) When asked why he did not report his use of Marinol prior to the drug test, Hixon responded, "It just dawned on me afterward," (Doc. 25-2 at PageID#444)

despite that it made him drowsy during the day and he had to reduce his dosage from three times per day to once per night. (Hixon Dep., Doc. 29-1, 198:8-12; Doc. 25-1 at PageID##410-12.) Following this evaluation, Dr. Leigh and Dr. Stephen Adams agreed that Hixon's return to work could result in serious, if not fatal, consequences. (Doc. 24-1 at PageID##335-36.) Accordingly, they recommended that FFD not return him to duty at that time. (Doc. 25-1 at PageID#399.)

Notwithstanding that recommendation, TVA gave Hixon another opportunity to return to work. FFD informed him that before he could return to work he needed to contact the Employee Assistance Program (EAP) which would evaluate him and provide treatment recommendations to reestablish his fitness for duty. (Doc. 23-4; Clepper Dep., Doc. 27, Attach. 3 at 90.) Hixon agreed to proceed with EAP. He requested no disability accommodations. (Hixon Dep., Doc.29-1 at 160:16-163:3.)

The following day, January 22, 2014, TVA received the results of the second drug test confirming "the presence of THCV metabolite in his urine [which] indicates prior ingestion of marijuana (or a related product) and cannot be the result of the sole use of Marinol." (Doc. 23-1 at PageID#277.) In accordance with TVA procedure, TVA notified Hixon that he would be suspended for 14 days but not terminated. (Doc. 26-1 at PageID##451, 454.) To be reinstated, he would have to comply with EAP's recommendations, pass an alcohol and drug test, be declared fit for duty following an evaluation by TVA medical personnel, and sign a "last chance," return to work agreement. (*Id*. at PageID##451-52; Doc. 26-1 at PageID# 455-56.)

## V.    Hixon's Failure to Comply with the Terms of his Return to Work Agreement and Untrustworthiness Resulted in His Termination.

Following the EAP process, FFD requested a return to work exam to assess Hixon's fitness to work safely. (Doc. 23-6 at PageID##323-24.) Hixon was reevaluated by Dr. Adams on March 14 and by Dr. Leigh on March 20. The examinations consisted of inquiries similar to

9

before, again focusing on his ability to work safely. (Doc. 24 at PageID##327-29; Leigh Supp. Decl., Doc. 25 at PageID##392-93.) During Hixon's examination, he revealed that he had ceased using Marinol and had replaced it with Ativan. (Doc 25-1 at PageID#415; Hixon Dep., Doc. 29-1, 235:11-17.) Drs. Leigh and Stephen Adams attempted to obtain input from Hixon's healthcare providers, but Drs. Glover and Charles Adams were reticent to cooperate. (Glover Dep., Doc. 29-3, 113:20-114:19; Doc. 25-1 at PageID##399-401; Doc. 24-1 at PageID##384, 386.) Despite Drs. Adams's and Leigh's reluctance to return Hixon to work given his condition, history, and incomplete answers from his personal doctors, they agreed to approve Hixon's fitness to return subject to the continued cessation of the use of Marinol and Hixon's future disclosure of any medications likely to impair him. (Doc. 25-1 at PageID##399-402; Doc. 24-1 at PageID##338-39.)

TVA had additional concerns about Hixon's ability to work safely due to his failure to disclose potentially impairing medications as required by his employment contract, TVA policy, and his prior return to work agreement (Doc. 23-2; Doc. 23-1 at PageID##254, 266) as well as the evidence indicating Hixon may have used Marinol to conceal marijuana use. (Doc. 26-1 at PageID#451; Doc. 23-1 at PageID#254.) TVA therefore offered Hixon a "last chance" return to work agreement. It included Drs. Leigh's and Adams's recommendations and further required Hixon to report all of his medications to FFD on a monthly basis. (Doc. 25 at PageID##401-02; Doc. 26-1 at PageID##451, 457; Doc. 23-1 at PageID#254.) Hixon had by then demonstrated his unreliability to discern and disclose changes in medication with the potential to impair his fitness for duty. (Clepper Dep., Doc. 27, Attach. 3 at 136:6-138:19; Doc. 23-1 at PageID#254.) Hixon accepted this agreement without requesting any accommodations or objecting to its terms. (Doc. 26-1 at PageID##451-52, 457; Hixon Dep., Doc. 29-1, 243:5-244:14.)

In his first month back at work, Hixon failed to comply with the agreement. (Doc. 26-1 at PageID#452; Doc. 23-1 at PageID##254-55.) Cofer reminded him on May 28 to disclose his medications, and Hixon responded, "I'll handle this right now." (Hixon Dep., Doc. 29-1, 250:5-16.) Hixon did not. In early June, Cofer was informed for the first time that Hixon had "not been truthful" in his FFD examinations by denying marijuana use; Cofer "thought this was believable" since the Marinol disclosure occurred immediately prior to the random drug test and after Hixon had uncharacteristic problems adhering to laboratory procedures. (Doc. 26-1 at PageID#452.) For his violation and demonstrated lack of trustworthiness, Cofer decided that Hixon should be terminated. (*Id.* at 452-53.) Only after Cofer informed Hixon of his termination did Hixon tell Cofer he previously had filed an EEO complaint. (Hixon Dep., Doc. 29-1, 255:7-256:22.)

## ARGUMENT

### I.     HIXON'S FITNESS FOR DUTY EXAMINATIONS WERE JOB RELATED AND CONSISTENT WITH A BUSINESS NECESSITY.

#### A.     Legal Standard Applicable to Hixon's Medical Examination Claims

Employers may require employees to undergo medical examinations provided they are job-related and consistent with a business necessity. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014). To support the necessity of a particular examination, the employer must demonstrate "(1) the employee request[ed] an accommodation; (2) the employee's ability to perform the essential functions of the job [was] impaired; or (3) the employee pose[d] a direct threat to himself or others." *Kroll*, 763 F.3d at 623. An employer's request for an exam will be upheld where there is "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Mitchell v. United States Postal Serv.*, 738 F. App'x 838, 845 (6th Cir. 2018) (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)). The inquiry into whether the evidence was sufficient to create a

reasonable belief that a medical examination was warranted is an objective one. *Kroll*, 763 F.3d at 623-24; *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 581-82 (6th Cir. 2014) (same).

**B.**  **The Safety Concern Raised by Marinol Provided a Reasonable, Objective Basis for TVA to Refer Hixon for an Examination.**

Hixon concedes that TVA referred him for the January 2014 fitness for duty exam because a safety concern was raised in connection with his drug test. (*See* Doc. 20 at PageID#215, 222.) TVA maintains this safety concern was sufficient to cause TVA to have a reasonable belief that a fitness for duty examination was warranted; Hixon disagrees.

Supporting TVA's position, the Sixth Circuit has held that asking an employee "to undergo a medical or mental fitness evaluation [is] a legitimate, nondiscriminatory action to address a workplace safety concern." *Mitchell*, 738 F. App'x at 844-45 ("At least three of our sister circuits have held that an employer's concern about workplace safety is a legitimate, nondiscriminatory reason for requesting a medical examination consistent with a business necessity."). *See also James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 249(6th Cir. 2009) ("Concerns about [plaintiff's] safety and the safety of other employees prompted [employer] to seek a direct-threat assessment, as permitted by the ADA.").[4]

Hixon's use of Marinol while in a safety sensitive position raised safety concerns and justified a direct threat assessment. *E.g., McGee v. City of Greenville,* No. 6:05-2261-HMH-BHH, 2007 WL 465531, at *2-3 (D.S.C. Feb. 7, 2007), *aff'd*, 264 F. App'x 282 (4th Cir. 2008)

---

[4]  "The determination that an individual poses a 'direct threat' shall be based on an individual assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. 1630.2(r). Relevant factors for that determination include (1) the duration of the risk; (2) the nature and potential severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Holiday v. City of Chattanooga*, 206 F.3d 637, 648 n.4 (6th Cir. 2000) (citing 29 C.F.R. 1630.2(r)).

The court in *McGee* granted summary judgment to the employer and held that a fitness for duty exam to conduct a direct threat assessment was warranted when an applicant for a safety sensitive position was taking Marinol. *Id.* The court relied upon the fact that "[Marinol] could affect the [applicant's] performance in [the] safety sensitive position" and could cause him to be unable to safely perform the essential functions of his position. *Id.* Here, as in *McGee*, Hixon worked in a safety sensitive position, and the ability to work safely was an essential job requirement. Therefore, TVA's concerns about Hixon's ability to work safely warranted a fitness for duty examination because his ability to perform an essential function of his job was potentially impaired and he posed a potential direct threat.

There were additional objective signs that raised questions of Hixon's ability to work safely and further supported TVA's referring him for an examination. *See Hustvet v. Allina Health Sys.*, 910 F.3d 399, 408 (8th Cir. 2018) (burden of showing an examination is consistent with business necessity is satisfied when the employer shows a reasonable basis for showing a safety risk). For instance, it was the independent MRO who raised a safety concern associated with Hixon's drug test and Marinol prescription. His doing so was consistent with the MRO Manual and federal SAMSHA standards which provide "[Marinol] has psychoactive effects that may present safety issues, [and] patients that are prescribed Marinol should be warned not to drive, operate complex machinery, or engage in hazardous activity." (MRO Manual, Doc. 27, Attach. 1 at 15, 46.) Thus, it was objectively reasonable for the MRO to raise the safety concern and for TVA to assess that concern. Hixon's own psychologist, Dr. Glover, stated, "I don't have any argument with [TVA's] point of view about the risk of Marinol in the work setting." (Glover Dep., Doc. 29-3, 134:14-16.) Finally, the circumstances surrounding Hixon's drug test raised questions. He disclosed the Marinol prescription only when he was required to take a drug test

which would reveal it.[5] Because evaluating whether Hixon was safe to work in a safety sensitive position following his untimely Marinol disclosure is an objectively justifiable reason to examine his fitness, referring him for a fitness for duty examination was consistent with business necessity and, therefore, lawful.

### C. Hixon's Initial Fitness for Duty Examination Was an Appropriate, Individualized Inquiry.

The scope of Dr. Stephen Adams's examination was permissible as a matter of law. Medical examinations must be "no broader or more intrusive than necessary." *Hustvet*, 910 F.3d at 408. While employers cannot unnecessarily inquire into disabilities, examinations are lawful "even if the examination might disclose whether the employee is disabled or the extent of any disability." *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999).

The crux of Hixon's argument about the scope of his examination is that it should not have covered his depression, physical ailments, and his personal relationships. (Hixon Dep., Doc. 29-1, 166:16-24.) As an initial matter, the record shows that *Hixon* initiated the discussions into his mental health. Dr. Adams began the examination the way he begins all of his examinations, by asking the patient to explain why he is there. (S. Adams Dep., Doc. 27, Attach. 2, at 16-17, 22-23.) In response, Hixon explained he was there because "his drug test was positive for THC" and "launched . . . into a discussion of why he was taking [Marinol] and what symptoms he was having, what side effects he was having." (*Id.* at 23; *see also* Hixon Dep., Doc. 29-1, 208:5-11.) Regardless of who broached the topic of Hixon's depression, it was lawful and appropriate.

First, because Dr. Adams and TVA already knew about Hixon's depression from previous examinations, the general prohibition against disability inquiries did not apply. *See*

---

5       TVA would have been required to refer Hixon to a fitness for duty test following a positive drug test. (Doc. 23-3, at PageID##301-05.)

*E.E.O.C. v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 & n.8 (6th Cir. 1998) (noting that ADA discrimination concerns are not implicated where the employee already has communicated the medical condition to the employer). Hixon freely admits Dr. Adams, Clepper, and Cofer knew about his depression long before the 2014 examinations. (Hixon Dep., Doc. 29-1, 109:15-110:21; Doc. 20 at PageID#214.)

Second, Dr. Adams's examination was an appropriate, individualized inquiry based on the circumstances. Courts within the Sixth Circuit have defined

> [a]n individualized inquiry [a]s one that focuses on 'the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question.' An inquiry meets this requirement if the examining doctor is familiar with the relevant job duties, obtains individualized information about the employee's medical condition, has current knowledge of the employee's medical condition, examines the employee in person, and reviews the records of the employee's other treating physicians.

*Ferrari v. Ford Motor Co.*, 96 F. Supp. 3d 668, 676 (E.D. Mich. 2015) (citing *Holiday v. City of Chattanooga,* 206 F.3d 637, 643 (6th Cir. 2000)). Dr. Adams knew Hixon's medical history and reviewed his file beforehand, examined Hixon in person, and consulted with Hixon's treatment providers. Hixon concedes that some of the questions were individualized. (Hixon Dep., 29-1 at 209:17-19.) This was not a general inquiry made of all employees, but rather each question was tailored for evaluating Hixon.

Third, given what Dr. Adams understood about Marinol, determining whether Hixon could work safely while taking the drug dictated an evaluation of his mental health. As he explained, Marinol presented a potential safety concern because even when used properly it can cause psychoactive effects, hallucinations, *depression, anxiety,* somnolence, confusion, amnesia, dizziness, and ataxia. (Doc. 24-1 at PageID##347-54, 370-74.) The literature specifically cautions that Marinol can exacerbate depression. (*Id.*) These concerns were compounded when

Hixon informed Dr. Adams that he was taking Marinol as a trial to treat anxiety and not for its FDA approved use – nausea. (Doc. 24 at PageID#327.) Dr. Adams was faced with a situation in which Hixon was taking a medication that was known to exacerbate a serious condition Dr. Adams already knew Hixon to have (depression), *and* Hixon informed Dr. Adams that the prescription was for a condition (anxiety) that Dr. Adams understood from the literature the prescription could cause. Furthermore, the medical literature indicated that the prescription could compound addiction problems. Dr. Adams was justified in discussing Hixon's depression to assess at minimum whether he should refer Hixon to a specialist for a mental health evaluation. To do otherwise would have been *un*reasonable if not outright malpractice.

As for the discussions of Hixon's physical ailments, the questions Dr. Adams asked were intended to assess Hixon's ability to work; none was intended to or did reveal new disabilities. Examining psychological issues necessitates a broader inquiry covering physical wellbeing. *Grassel v. Dep't of Educ. New York*, No. 12-CV-1016, 2017 WL 1051115, at *8-9 (E.D.N.Y. Mar. 20, 2017) (because "[m]ental health and physical health are directly connected, and no medical professional can look at one condition in isolation," a psychological examination examining medical issues like vision was "no broader or more intrusive than necessary"). Inquiries into physical ailments such as his stomach ulcer and herniated disc were necessary and standard inquiries to assess both the medications Hixon was taking and any potential effect on his mental health. (*See* Doc. 24 at PageID##327-29; Teliho Dep., Doc. 29-4, 27:14-28:13, 38:4-8; C. Adams Dep., Doc. 29-2, 35:14-25 (It is "necessary to get an idea of the whole person in order to make a diagnosis.")) As Dr. Teliho noted, "[p]hysical health conditions . . . will frequently have comorbidities with depression." (Teliho Dep., Doc. 29-4, 28:10-13.) Hixon's testimony confirmed that physical ailments impacted his mental health, and his herniated disc

aggravated his depression, anxiety, and insomnia. (Hixon Dep., Doc. 29-1, 114:24-115:15.)

Hixon further testified that his depression would also manifest itself physically. (Hixon Dep.,

Doc. 29-1, 115:16-116:5.) Such physical manifestations of pain are typical for individuals with

depression. (Teliho Dep., Doc. 29-4, 50:18-51:8.)

Questions regarding Hixon's personal relationships also were necessary and standard

inquiries to assess Hixon's mental health. Hixon's own doctors confirmed that they similarly ask

patients about their interpersonal relationships as part of their own practice. (Teliho Dep., Doc.

29-4 at 29:10-23; Glover Dep., Doc. 29-3, 56:14-71:11) Relationships directly impact mental

health, and conversely, "[depression] may negatively affect interpersonal relationships." (Teliho

Dep., Doc. 29-4, 26:22-23.) Hixon admits inquiries about a patient's personal life are "necessary

with pretty much any psychiatrist." (Hixon Dep., Doc. 29-1, 128:13-20.) Not only did these

inquiries about personal relationships and physical health help diagnose Hixon's depression, they

caused no discernible injury and are not actionable. *See, e.g., Gailes v. Fed. Express Corp.,* No.

06-2874, 2009 WL 10700548, at *7-8 (W.D. Tenn. July 6, 2009), *aff'd sub nom. Gailes v. Fed.*

*Exp. Corp.*, 386 F. App'x 506 (6th Cir. 2010) (adopting a tangible injury requirement for medical

examination claims). These inquiries into matters considered by all involved to be relevant to

Hixon's mental health were appropriate and lawful once Hixon placed his mental health into

issue with his untimely disclosure of a prescription known to exacerbate mental health problems.

### D. Hixon's Psychological Evaluation Was Necessary Because He Placed His Mental Health into Issue Before and During His Initial Examination.

The mental health concerns raised before and during Dr. Adams's examination warranted

Dr. Leigh's subsequent psychological evaluation. The MRO Manual provided an objective,

reasonable belief to question the impact of Marinol on Hixon's ability to work safely. Dr.

Adams's own observations regarding Hixon's unusual prescription and mental health state

corroborated those concerns. After Dr. Adams's examination, the justification for a psychological examination was even stronger.

Dr. Leigh conducted a standard psychological examination that was no broader than necessary. This examination mirrored Dr. Leigh's previous, unchallenged examinations of Hixon. Hixon could not identify any specific disability inquiries that were inappropriate. (*See* Hixon Dep., Doc. 29-1, 168:15-170:3, 218:7-221:13.) Dr. Leigh already knew of Hixon's disability from his previous evaluations, and no additional disabilities were revealed. During the exam, Dr. Leigh administered the Minnesota Multiphasic Personality Inventory (MMPI) standardized test, a commonly accepted method of assessing an individual's mental health. (Teliho Dep., Doc. 29-4, 30:10-19.) This standardized test asks about topics such as personal relationships and physical wellbeing. Hixon's test raised serious concerns about his mental health (Doc. 29-1 at PageID##622-23), and Dr. Leigh was justified in asking follow-up questions. And because physical health and mental health and personal relationships and mental health are directly linked (*see supra* 16-17), Dr. Leigh was justified in inquiring into these issues to assess the depths of Hixon's depression, the necessity of medication, and any side effects of medication. Doctors must be permitted to ask questions from "multiple angles," and psychological issues involve a broader inquiry. *See Grassel*, 2017 WL 1051115, at *8-9 (because "[m]ental health and physical health are directly connected, and no medical professional can look at one condition in isolation," a psychological examination examining medical issues like vision was "no broader or more intrusive than necessary").

### E. Even Greater Justification Existed for Requiring Return to Work Examinations After Hixon was Found Unfit for Duty.

Given that doctors had declared Hixon unfit for duty following his second examination, TVA had a reasonable, objective basis for requiring that he pass a return to work examination

18

before being allowed to return. *McGee*, 2007 WL 465531, at *3-4 (finding that an employer was permitted to rely on the judgment of a physician who demanded additional medical information after determining Marinol rendered an individual unfit). TVA could not ignore the results of prior examinations, and once Hixon's ability to work safely was called into question, further examinations necessarily were job related and consistent with a business necessity, namely ensuring a safe work environment. The subsequent report that Hixon's drug test was positive due to marijuana and not Marinol further justified the return to work examinations. That testing result led TVA to believe that Hixon had lied about his drug use during his examinations. Moreover, the indication that he had been using illegal drugs and self-medicating raised independent safety concerns. These concerns were heightened due to Marinol's potential for abuse and addiction.

As for the scope, Hixon identified no specific impermissible questions. (Hixon Dep., Doc. 29-1, 168:5-14, 170:9-12 (stating that he "can't recall" any impermissible questions during Dr. Leigh's second examination), 234:17-235:3 (Dr. Adams's second examination merely informed him of conditions he had to abide by.)) Especially given the lack of discernible damage or injury, Hixon cannot establish a *prima facie* case that the subsequent examinations were unjustified or overbroad. *See Gailes,* 2009 WL 10700548, at *7-8.

**II.    Hixon's Agreed Disclosure Requirement Was Job Related and Consistent with a Business Necessity.**

Even after all of the red flags raised by Hixon's untimely medication disclosure, drug test, and examination results, TVA did not react hastily or punitively. Instead, TVA gave Hixon another chance to return to work. Before doing so, however, TVA justifiably sought reasonable, safety-related measures, including a medication disclosure commensurate with the circumstances. As Hixon acknowledged when he was hired, all safety sensitive employees at TVA must disclose medications that could potentially impair their fitness for duty. (Doc. 23-1 at

PageID##266-69; Hixon Dep., Doc. 29-1, 84:8-85:13). Hixon also explicitly agreed to disclose *all* changes in his medications as a condition of Hixon's returning to work in 2005 following his medical leave of absence. (Doc. 23-2 at PageID#285.) Given Hixon's previous non-compliance with disclosure requirements, TVA's return to work agreement was decidedly lenient. (Doc. 26-1 at PageID##451-52; 457.) But, again, Hixon breached that agreement

Last chance work agreements have consistently been upheld as valid contracts. *See, e.g., Longen v. Waterous Co.*, 347 F.3d 685, 689 (8th Cir. 2003) ("[C]ourts have consistently found no disability discrimination in discharges pursuant to such agreements."); *Krzewinski v. United States Postal Ser.*, No. 99-3080, 1999 WL 446874, at *2 (Fed. Cir. June 18, 1999) ("All last chance agreements are entered in the face of severe consequences . . . That the alternative is highly unattractive does not render a last chance agreement coerced."); *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1184 (6th Cir. 1997) (holding that federal claims can be waived by employees under last chance agreements); *Ohio Edison Co. v. Ohio Edison Joint Council*, 947 F.2d 786, 787 (6th Cir. 1991) (holding that a labor arbitrator does not have the authority to disregard the explicit terms of a last chance agreement); *Shaheen v. B.F. Goodrich Co.,* 873 F.2d 105, 107 (6th Cir.1989) ("Public policy does not prohibit an otherwise valid release from acting as a waiver of a federal statutory cause of action . . . waivers of federal statutory rights have been upheld in numerous contexts."). An employee may surrender rights which they would otherwise have. As the court in *Longen* noted, "under the ADA there are no restrictions on what type of further constraints a party may place upon himself." *Longen*, 347 F.3d at 689.

To suggest, as Hixon does, that his last chance agreement was an impermissible inquiry into his disability ignores the fact that the agreement *is itself an accommodation to the Plaintiff's disability*. *See, e.g.*, *Golson-El v. Runyon*, 812 F. Supp. 558 (E.D. Pa. 1993), *aff'd* F.3d 811 (3d

Cir. 1993). In *Golson-El*, an employee would have been terminated due to excessive absenteeism caused by her alcoholism, but she was allowed to return pursuant to a last chance agreement. When she was later terminated for being absent in violation of the agreement, she alleged that she was being terminated because of her alcoholism. The court disagreed:

> To attribute the firing to alcoholism is defective reasoning that skips the key step of reality, i.e., the prior accommodation to alcoholism by the Last Chance Agreement. Such defective reasoning would render Last Chance Agreements nugatory, because every breach would be attributed to a development connected to an alcoholic's problems.

*Id.* at 561. That analysis was cited with approval by the Sixth Circuit in *Mararri*, 130 F.3d at 1183. Hixon received valuable consideration for entering into the last chance agreement— not being terminated. Hixon accepted these terms without objection, and then he breached the contract. (Hixon Dep., Doc. 29-1, 243:5-18.)

**III.     Hixon Never Requested an Accommodation for His Disability from TVA.**

Notwithstanding that he agreed to and executed a last chance, return to work agreement stating that he would no longer use Marinol, Hixon alleges TVA failed to accommodate his disability by not letting him continue to use this potentially dangerous drug for an off-label use. But Hixon, by his own admission, never requested an accommodation. (Hixon Dep., Doc. 29-1, 161:2-163:3; s*ee also* Pl. Br., Doc. 20 at PageID#222 ("Plaintiff did not request a reasonable accommodation.")) This is fatal; Hixon bears the burden of demonstrating that he requested a reasonable accommodation. *Lockard v. Gen. Motors Corp*, 52 F. App'x. 782, 786 (6th Cir. 2002) (upholding summary judgment "because [plaintiff] failed to present evidence that she requested an accommodation"); *see also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 n.4 (6th Cir. 1998) ("It is well settled in cases brought under the Rehabilitation Act of 1973 . . . that reasonable accommodation is not at issue if the plaintiff has never requested accommodations.")

Since Hixon never requested an accommodation, TVA's duty to engage in an interactive process to identify a reasonable accommodation never arose. *Lockard*, 52 F. App'x. at 788. Even if he requested an accommodation, he had a duty to engage in an interactive process to identify reasonable accommodations in good faith. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007); *Lockard*, 52 F. App'x. 782. Hixon did not so engage; instead, he agreed to the last chance agreement without even suggesting that there was a problem. (Hixon Dep., Doc. 29-1, 243:5-18.) Hixon cannot remain silent and later claim that TVA failed to accommodate him.

Finally, Hixon voluntarily ceased using Marinol; this was not a refused accommodation. He replaced Marinol with Ativan *before* he was presented with the last chance agreement which is itself an accommodation. *Golson El*, 812 F. Supp. 558. *See also supra* 22. He reaffirmed this decision by voluntarily entering into the agreement. (Hixon Dep., Doc. 29-1, 235:11-17; Doc 25-1 at PageID#415.) Furthermore, he has not used Marinol since leaving TVA over six years ago. (Hixon Dep., Doc. 29-1, 162:12-16.) He cannot credibly argue Marinol was medically necessary.

## IV. Hixon's Termination Was Justified by His Violation of a Last Chance Agreement and Not Motivated by His Disability.

Hixon's wrongful termination and retaliation claims are analyzed under the *McDonnell-Douglas* burden shifting framework which requires Hixon to first establish a *prima facie* case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To do so, Hixon must show he has a disability, he is "otherwise qualified" for the job, he suffered an adverse employment action, TVA knew of his disability, and the position remained open while TVA sought other applicants or Hixon was replaced.[6] *Babb v. Maryville Anesthesiologists P.C.*,

---

[6]    TVA cited in its previous response brief (Doc. 27) the three-part test used in *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996). The Sixth Circuit arguably now applies the five-part test cited above; however, the five-part test does not help Hixon since his inability to prove causation remains fatal to his claims under the analysis for pretext.

942 F.3d 308, 320 (6th Cir. 2019). If Hixon establishes a *prima facie* case, TVA may rebut the resulting presumption of discrimination by articulating a legitimate, nondiscriminatory reason for its actions. *Id.* The presumption of discrimination then disappears, and Hixon, who bears the ultimate burden of persuasion, must demonstrate that TVA's proffered reason was pretextual. *Id.*

Hixon cannot establish a *prima facie* case of disability discrimination. Hixon was not "otherwise qualified" for the job; he failed to abide by his return to work agreements and TVA's policy requiring cooperation with FFD evaluations, which demonstrated untrustworthiness. (Doc. 23-2 at PageID#285; Doc. 26-1 at PageID# 455-56; Doc. 23-3 at PageID##299-300, 303.) TVA was not obligated to waive its policy of enforcing return to work agreements or its FFD policy. *See Leeds v. Potter*, 249 F. App'x 442, 448–49 (6th Cir. 2007) (holding an adverse action dictated by an employer's non-discriminatory policy rendered employee unqualified and the employer was not obligated to waive that policy as an accommodation).[7]

Even if Hixon were able to establish a *prima facie* case of discrimination, summary judgment is still appropriate because TVA had legitimate, nondiscriminatory reasons for termination. Cofer terminated him for violating a last chance agreement and untrustworthiness. (Doc. 26-1 at PageID#453, 458-59.) Hixon had agreed to disclose his medications, and TVA's enforcement of its agreement constitutes a legitimate, nondiscriminatory reason for termination. *Longen*, 347 F.3d at 689 ("[C]ourts have consistently found no disability discrimination in discharges pursuant to such agreements.")

---

[7]     TVA terminated Hixon specifically because he failed to adhere to a return to work agreement, *which he signed without objection*. If he needed an accommodation or objected to the scope of his medication disclosure requirement, he had an opportunity to raise these issues. He did not do so. Thus, Hixon has waived the objection and cannot retract that waiver by claiming discrimination. *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1184 (6th Cir. 1997) (holding that federal claims can be waived by employees under last chance agreements).

Hixon cannot show that TVA's reasons for terminating him were pretextual. Hixon has no evidence of intentional discrimination or that any improper reasons motivated TVA's decision to terminate him. In fact, Hixon acknowledges that Cofer, the individual who took the adverse action, did not discriminate against him. (Hixon Dep., Doc. 29-1, 155:6-22.) It was not until he failed a drug test, gave a specious explanation, was discovered to have failed to disclose a reportable medication, and violated a last chance agreement that TVA was forced to terminate him out of concern for his safety and the safety of his co-workers.

While Hixon continues to maintain that he never used marijuana, it is immaterial whether Hixon was, in fact, untruthful when he repeatedly claimed his positive drug test was not caused by marijuana. Rather, the governing analysis is whether TVA honestly believed, based upon the laboratory tests and analysis, that Hixon was being untruthful. *Ferrari.*, 826 F.3d at 895 (applying the "honest belief" rule — as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken). Cofer made the decision to terminate Hixon based on the violation of the last chance agreement and his reasonable belief that Hixon lacked candor during the FFD process. (Doc. 26-1 at PageID##452-53; Cofer Dep., Doc. 27, Attach. 4 at 77-79, 88-93.) Hixon's lack of evidence of an ulterior motive is fatal to his claim of pretext. *See Babb*, 942 F.3d at 322 ("[A]n employee's *bare assertion* that the employer's proffered reason *has no basis in fact* is insufficient to call an employer's honest belief into question, and fails to create a genuine dispute of fact") (citation omitted). Because Hixon cannot establish that he was terminated because of his disability, his claim must be dismissed. *See Ferrari*, 826 F.3d at 891.

24

## V.  Hixon Cannot Establish a Prima Facie Case that His EEO Complaint and Termination Are Causally Connected.

Hixon has no direct evidence of retaliation. (Hixon Dep., Doc. 29-1, 148:15-150:20.) Therefore, he must demonstrate that he engaged in a protected activity, that TVA knew of that activity, that TVA took an adverse action, and that there was a causal connection between the protected activity and adverse action. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Hixon cannot show Cofer, the decision-maker, knew of his EEO complaint. According to Hixon, he informed Cofer about his EEO complaint *after he was terminated*. (Hixon Dep., Doc. 29-1, 255:7-256:22.) Nor can Hixon show a causal connection between his protected activity and the adverse action. He cannot identify any facts supporting his claim that his termination was due to retaliation. (Hixon Dep., Doc. 29-1, 148:15-150:20.) He also acknowledges that Cofer did not retaliate against him. (Hixon Dep., Doc. 29-1, 155:6-22; *see also id.* at 152:12-19.) Although he accuses TVA's doctors and the FFD department of retaliation, they were not the decision-makers. Cofer was. (Cofer Dep., Doc. 27, Attach. 4 at 77; Doc. 26-1 at PageID##452-53.)

Moreover, the progression of events undermines an allegation of retaliation. Hixon contacted TVA's EEO office in February, and he was not terminated until June. (Hixon Dep., Doc. 29-1, 150:21-24.) In the meantime, there were numerous intervening events, including TVA's permitting Hixon to return to work subject to a last chance agreement, Hixon's acceptance of that agreement, and his failure to adhere to its terms. And, as discussed above, TVA had legitimate nondiscriminatory reasons for terminating him. *Supra* 23-24. His retaliation claim fails and, therefore, must be dismissed.

## CONCLUSION

For the reasons stated and upon the authorities cited, the Court should grant TVA's motion for summary judgment on all of Plaintiff's claims and dismiss this action with prejudice.

Respectfully submitted,

*s/Mark A. Mohr*
David D. Ayliffe, (TN BPR 024297)
Director, Litigation
Mark A. Mohr (NY BPR 5012489)
Michael V. Bernier (MS BPR 103960)
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7346
mamohr@tva.gov
mvbernier@tva.gov

Attorneys for Tennessee Valley Authority

100255186

26

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

*s/Mark A. Mohr*
Attorney for Tennessee Valley Authority
