UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| ALEX HIXON, | ) | |
| | ) | |
| Plaintiff, | ) | Jury Demanded |
| | ) | |
| v. | ) | No. 1:19-cv-00120-PLR-SKL |
| | ) | |
| TENNESSEE VALLEY AUTHORITY | ) | |
| BOARD OF DIRECTORS, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Plaintiff, through counsel, responds in opposition to Defendant's motion for summary judgment (Doc. 29) as follows.

### I. INTRODUCTION

Several pleadings have already been filed in this case, which provide detailed summary and background information. *See, e.g.*, Plaintiff's Motion for Partial Summary Judgment and accompanying briefs (Doc. 19, 20, and 28.) To avoid redundancy, Plaintiff will refer the Court to his previous pleadings. Simply put, TVA has not produced sufficient evidence to show that it is entitled to summary judgment in its favor on any of Plaintiff's claims.

### II. RELEVANT FACTUAL BACKGROUND

From May 7, 2001 until June 2, 2014, Plaintiff was employed by TVA as a Chemistry Laboratory Technician. Until January 2014, Plaintiff had a clean work record, and his performance reviews were all satisfactory. (Hixon depo. p. 98.)[1] Plaintiff's supervisor from August 2008 until

---

[1] Relevant excerpts of the deposition of Alex Hixon are attached as <u>Exhibit 1</u>.

his discharge was Tim Cofer. (Cofer depo. p. 17.)[2] Cofer observed Plaintiff's work on a weekly basis and found that Plaintiff's overall work performance was mostly good. (Id.) Before January of 2014, Cofer never disciplined Plaintiff. (Id. at 17-18.) In Plaintiff's last performance review, which occurred in October 2013, Cofer gave Plaintiff an overall satisfactory rating, including a satisfactory rating in the category of working in a safe and conscientious manner. (Id. at 25.)

It is undisputed that Plaintiff has been diagnosed and has been receiving treatment for depression and anxiety for well over 20 years. (Hixon depo. pp. 102, 111.) For example, Plaintiff's treating psychiatrist, Dr. Brian Teliho, diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder when he first began treating Plaintiff in May 2012. (Teliho depo. p. 67.)[3] TVA was aware of Plaintiff's depression and anxiety because he had twice taken medical leaves of absence for his disabilities – once in 2005 and then again in October 2012. (Cofer depo. pp. 27-28; Clepper depo. pp. 24-25, 73-74.)[4] Despite his disabilities – which both Dr. Teliho and Dr. Charles Adams described as a chronic "roller coaster" pattern of ups and downs in mood (C. Adams depo. pp. 63-64[5]; Teliho depo. pp. 26, 49-50) – Plaintiff was still able to perform the essential functions of his job, as demonstrated by his consistent good work evaluations, Cofer's confidence in allowing Plaintiff to frequently work alone, Plaintiff never having any work accidents, and Plaintiff's less than one percent error rate. (Hixon depo. pp. 94, 98-100; Cofer depo. pp. 17, 37, 39-40.)

In August 2012, Plaintiff began seeing Dr. Charles Adams as his primary care physician. (C. Adams depo. pp. 29-30.) Dr. Adams, who is board certified in integrative and holistic medicine, treated Plaintiff's depression, anxiety, and insomnia. (Id. at 12, 32.) On November 8,

---

[2] Relevant excerpts of the deposition of Timothy Cofer are attached as <u>Exhibit 2.</u>
[3] Relevant excerpts of the deposition of Dr. Brian Teliho are attached as <u>Exhibit 3.</u>
[4] Relevant excerpts of the deposition of Candace Clepper are attached as <u>Exhibit 4.</u>
[5] Relevant excerpts of the deposition of Dr. Charles Adams are attached as <u>Exhibit 5.</u>

2

2013, Dr. Adams prescribed Marinol to treat Plaintiff's anxiety and insomnia because the benzodiazepine (Ativan) previously prescribed to treat anxiety was not effective and potentially was aggravating depressive symptoms. (C. Adams depo. pp. 68, 103; Hixon depo. p. 72.) Marinol was prescribed at a low dose, for a trial period, so that Plaintiff could safely determine what, if any, side effects presented. (C. Adams depo. pp. 72-73, 166-67.) Plaintiff began the trial of Marinol on his days off work and within a few days determined that it was most effective by limiting his dosage to once at bedtime. (Hixon depo. pp. 198-99.) Plaintiff did not experience any negative side effects once he began taking Marinol at bedtime. (Id. at 198-99.)

Marinol as an "off-label" treatment for anxiety and sleep disorders is not unsafe or dangerous. (C. Adams depo. pp. 158-59; Teliho depo. pp. 63-64; Sulak decl. ¶5.)[6] "Off-label" use of medication in the field of psychiatry is common and not illegal. (Teliho depo. p. 64.) When Plaintiff was prescribed Marinol, medical literature existed that supported the use of Marinol to effectively treat anxiety and insomnia. (C. Adams depo. p. 165; Teliho depo. pp. 15, 72; Sulak decl. ¶5.) Moreover, in the fall of 2013, many doctors were prescribing Marinol to effectively treat anxiety and depression. (C. Adams depo. pp. 70, 165; Teliho depo. pp. 14-15, 83-84; Sulak decl. ¶5 and report p. 1.) Because the use of Marinol to treat anxiety and insomnia was so well accepted in the medical community, doctors who criticize the use of Marinol to treat anxiety are actually in the minority. (Teliho depo. p. 73; Sulak decl. ¶5.) The primary side effects of Marinol – addiction, psychosis, and fatigue – were not a serious concern to Plaintiff's treating doctors at the time. (Teliho depo. pp. 19, 32, 76; C. Adams depo. pp. 77, 99-103.) Finally, Marinol had no negative drug interactions with any other medications that Plaintiff was taking. (C. Adams depo. p. 77; Teliho depo. p. 46; Sulak decl. ¶5 and report p. 2.) Marinol is actually a safer alternative to

---

[6] The declaration and report of Dustin Sulak, D.O. are attached as Exhibit 6.

3

Ativan and other benzodiazepines, with less risk of fatigue and addiction. (Teliho depo. pp. 63-64; Sulak decl. ¶5 and report p. 2.) Marinol was ultimately effective in helping Plaintiff fall asleep and stay asleep. (C. Adams depo. p. 44; Teliho depo. p. 19; Hixon depo. p. 201.)

On December 23, 2013, Cofer advised Plaintiff that he was to undergo a random drug screen. (Hixon depo. p. 192.) Plaintiff advised Cofer that he was taking a medication that could produce a false positive. (Id. at 192-93.) At the time, Plaintiff was only required to disclose "medication that might interfere with [his] ability to safely perform [his] duties." (Exhibit 7.) Plaintiff normally obtained knowledge as to whether a medication might interfere with his ability to safely perform his duties from the prescribing doctor. (Hixon depo. p. 92.) Dr. Adams did not tell him that Marinol would pose a risk of interfering with his ability to perform his job. (Id. at 195, 199.) Indeed, Marinol had no adverse effect on Plaintiff's ability to safely perform his job. (Hixon decl. ¶3.)[7] He did not feel groggy, and he had no problems concentrating while taking Marinol. (Id.) Because Plaintiff did not experience any adverse reactions to Marinol, he did not consider Marinol to be a safety risk. (Id.) Thus, there was no need to disclose Marinol to TVA.

After the drug test reported positive for cannabinoids, the Medical Review Officer ("MRO") was provided a prescription for Marinol. The MRO reported the results of the drug screen to Candace Clepper as "negative with a safety concern for Marinol." (Clepper depo. p. 43.) At that point, Plaintiff was ordered to undergo a medical examination with Dr. Stephen Adams. The purpose of the medical examination was to determine if Plaintiff could work safely while taking Marinol. (Id.) Clepper and Dr. Stephen Adams, however, understood that the medical examination was actually wide-open, and not narrowly tailored to determining whether Plaintiff

---

[7] The declaration of Alex Hixon is attached hereto as Exhibit 8.

4

could safely perform his job while taking Marinol. (Clepper depo. p. 60; S. Adams depo. pp. 18, 20-21.)[8]

Before Plaintiff's medical examination, Clepper instructed TVA's psychologist, Dr. Gary Leigh, to communicate with Dr. Stephen Adams. (Doc. 19-18; Doc. 19-19.) Dr. Leigh had previously examined Plaintiff for his depression in 2005 and January 2013. Dr. Adams admitted that he reviewed Plaintiff's entire TVA medical file, including psychological notes dating back to 2005 before the examination. (Doc. 19-2; S. Adams depo. pp. 17, 22, 35-36.) Based upon his review of Plaintiff's past file, Dr. Adams admitted that, ***going into the examination***, he was "concerned" that Plaintiff's mental health was adversely impacting Plaintiff's ability to work safely. (Id. at 18-19.) However, TVA never advised Dr. Adams of any current concerns related to Plaintiff's mental health. (Id. at 19-20.) Other than the MRO's safety concern comment, Clepper had no knowledge or belief that Plaintiff could not safely perform his job while taking Marinol. (Clepper depo. pp. 51-52.) Clepper had no independent evidence that Plaintiff was mentally unfit to perform his job. (Id. at 70.) She never spoke to Plaintiff's supervisor about his job performance and had not received any recent complaints about Plaintiff's work performance. (Id. at 71.) In fact, no one from NNFFD ever asked Cofer about Plaintiff's work performance or behavior. (Cofer depo. p. 47.) Cofer certainly had no complaints about Plaintiff's work or behavior. (Id. at 27, 37-39.)

Not surprisingly, the medical exam was overly focused on Plaintiff's past depression. (Hixon depo. p. 156.) Dr. Adams spent well over half of the examination asking about Plaintiff's past depression history. (Id. at 210.) Contrary to TVA's claim, Plaintiff did not volunteer information about his past depression, but only begrudgingly answered Dr. Adam's intrusive

---

[8] Relevant excerpts of the deposition of Dr. Stephan Adams are attached as Exhibit 9.

questions.  (Hixon decl. ¶2.)  Dr. Adams asked no questions about Plaintiff's job hazards, and very few questions were job or safety related.  (Hixon depo. pp. 209, 220.)  Plaintiff was not asked how Marinol affected him or whether he had problems performing his job.  (Id. at 156.)

Dr. Adams concluded that Marinol was a safety hazard, based upon "possible consequences [to] include sedation, memory lapses, worsening of mood."  (S. Adams depo. p. 68.) He also opined that Plaintiff's depression was not well controlled, even though Plaintiff told him that his depression was being treated and under control.  (Hixon depo. p. 203; S. Adams depo. p. 26.)  As a result of Dr. Adams' exam, Plaintiff was forced to undergo a psychological exam with TVA's psychologist, Dr. Gary Leigh.  (Clepper depo. pp. 69-70.)

Plaintiff's urine drug sample was re-tested on January 23, 2014.  (Doc. 23-1, PageID# 277.) The re-test was performed by ElSohly Laboratories, which reported that Plaintiff's urine contained 51 ng/mL of THC-COOH and 21 ng/mL of THCV-COOH, and interpreted as the "prior ingestion of marijuana (or related product) and cannot be the result of the sole use of Marinol."  (Doc. 19-9.)  However, this conclusion was inaccurate and flawed.  (Wilton decl. ¶5.)[9]  The reported ratio of THC-COOH to THCV-COOH was highly unusual and indicative of analytical error.  (Id.)  The normal ratio is 120:1, yet the ElShohly Laboratories data indicated a ratio of 2.4:1.  (Id.)  If Plaintiff had truly ingested marijuana (which he did not) in addition to Marinol, the THC-COOH to THCV-COOH ratio would have been much higher than reported.  (Id.)  Simply stated, the abnormally strange THC-COOH to THCV-COOH ratio should have been a red flag error to any laboratory chemist, prompting at least a review or retest.  (Id.)  Additionally, the theory that THCV-COOH is conclusive proof of ingestion of marijuana (but not Marinol) has been scientifically disputed for many years.  (Sulak decl. ¶5 and report, pp. 2-3.)  In fact, this theory was rejected by a federal

---

[9] The declaration and report of Nicholas Wilton, Ph.D. is attached as <u>Exhibit 10.</u>

district court as not meeting the *Daubert* standard for being scientifically supported. (Id.) Despite the obviously flawed re-test, based upon a junk-science theory, TVA accused Plaintiff of using marijuana and suspended him for 14 days.

On January 21, 2014, TVA ordered Plaintiff to undergo drug rehabilitation testing through the Employee Assistance Program ("EAP"). (Doc. 19-8.) Not surprisingly, EAP concluded that Plaintiff exhibited no signs of drug abuse and did not meet the criteria for substance abuse. (Doc. 19-11.) Plaintiff's treating professionals all denied any observations or concerns that Plaintiff was using illegal drugs. Plaintiff's therapist, Dr. Lon Glover, who had been counseling Plaintiff since August 2009, and who had background and training in alcohol and drug rehabilitation, was confident that Plaintiff had not used illegal drugs. (Glover depo. pp. 151-52.)[10] Plaintiff's psychiatrist never observed any signs that Plaintiff was using illegal drugs. (Teliho depo. pp. 66-67.) Plaintiff's primary care physician likewise never observed Plaintiff exhibiting signs of using illegal drugs. (C. Adams depo. pp. 97, 168.)

Between January 6, 2014 and April 6, 2014, TVA held Plaintiff off work, claiming that Plaintiff's Marinol use was a safety threat and that Plaintiff was not psychologically fit to work. During this time, Plaintiff's treating professionals advised TVA on several occasions that Plaintiff's Marinol use was safe and that Plaintiff was psychologically fit to work. For example, Dr. Teliho had several conversations with Dr. Leigh in which he clearly communicated his opinion that: Marinol was appropriate to treat Plaintiff's anxiety; he had no concerns about Plaintiff taking Marinol while working; Marinol was less fatiguing than other medications; and Plaintiff was psychologically fit to perform his job. (Teliho depo. pp. 61-63, 65-66.) Dr. Charles Adams likewise advised TVA that: Marinol was safe and effective treatment for Plaintiff's anxiety and

---

[10] Relevant excerpts of the deposition of Dr. Lon Glover are attached as <u>Exhibit 11</u>.

insomnia; Plaintiff could safely perform his job while taking Marinol; and that Plaintiff was fit to return to work. (C. Adams depo. pp. 96, 158-59, 168; C. Adams decl. ¶7, Doc. 19-4.) Dr. Glover even advised Dr. Leigh that Plaintiff's increased anxiety about his job security was a significant factor influencing Plaintiff's poor MMPI test scores. (Glover depo. pp. 159-60.)

On April 6, 2014, Cofer presented Plaintiff with a take-it-or-leave-it return to work agreement. (Hixon depo. p. 243.) Because Plaintiff needed his job, he reluctantly signed the agreement. (Id. at 244.) The agreement required Plaintiff to disclose all medications he was taking by the 15th of every month and to stop using Marinol. (Doc. 19-16.) While Dr. Adams and Dr. Leigh had not recommended that Plaintiff disclose all medications, Clepper expanded the disclosure to all medications, even if the medications had no likelihood of impairing Plaintiff's ability to work safely. (Clepper depo. pp. 137, 141.)

In order to comply with the monthly medication disclosure requirement, Plaintiff consulted with an IT member about setting up an automated reminder and email that would send his list of medications to NNFFD on the 15th day of each month. (Hixon depo. pp. 246-48.) Hixon assumed that the automated email was sent to NNFFD on May 15, 2014. (Id. at 251, 254.) NNFFD notified Cofer on Wednesday, May 28, 2014, that Plaintiff had not provided a list of medications, and Cofer reminded Plaintiff of the obligation that same day. (Cofer depo. p. 75.) Plaintiff immediately called NNFFD and spoke with Melissa Diamond. (Hixon stmt. p. 53, Doc. 19-6.) He asked for Hannah Lowery, who was in a meeting, and then he asked for Clepper, who was also in a meeting. (Id. at 54.) Plaintiff asked that Lowery or Clepper call him, and he also asked Diamond to convey to them that his medications had not changed in the last month. (Id.) This conversation occurred early on Wednesday, May 28, 2014, and having heard nothing back from NNFFD by the

end of his shift, Hixon went home because his workweek was finished. (Id.) On the following Monday, June 2, 2014, Cofer notified Plaintiff of his termination. (Id.)

## III. LEGAL AGRUMENT

### A. Unlawful Medical Examinations

The January 6, 2014 medical examination conducted by Dr. Stephen Adams was unlawful. Because the first examination was unlawful, the resulting next three examinations (two conducted by Dr. Gary Leigh and a later one conducted by Dr. Stephen Adams) were likewise unlawful. TVA cannot sustain its burden of proving that any of the medical examinations were job-related and consistent with business necessity.

An employer "who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014). To show that a particular examination or inquiry was "job-related and consistent with business necessity," TVA must demonstrate that: (1) the employee requested an accommodation; (2) the employee's ability to perform the essential functions of the job was impaired; or (3) the employee posed a direct threat to himself or others. *Id.* (citing *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007)). **TVA has the burden of proof** to show that the medical examination or inquiry was job-related and consistent with business necessity. *Kroll*, 763 F.3d at 623. In this case, TVA argues for the application of the direct threat method to prove that the January 2014 medical examination was job-related and consistent with business necessity. (Doc. 30, PageID#: 699) ("Hixon's use of Marinol . . . justified a direct threat assessment.").

The direct threat defense[11] is an affirmative defense; as such, the burden is upon the employer. *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002); *Rizzo v. Children's World Learning* Centers, 84 F.3d 758, 764 (5th Cir. 1996); *Kroll*, 763 F.3d at 623; *Wells v. Cincinnati Children's Hosp. Med. Ctr.*, 860 F. Supp. 2d 469, 481 (S.D. Ohio 2012) ("burden to show that the individual presents a direct threat to the health and safety of others is on the employer").

The direct threat defense must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence," and upon an expressly "individualized assessment of the individual's present ability to safely perform the essential functions of the job," reached after considering, among other things, the imminence of the risk and the severity of the harm portended. *Chevron*, 536 U.S. at 86 (citing 29 CFR § 1630.2(r)). A court must consider four factors to determine whether the defendant can prove the direct threat defense: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r).

"[A]n employer cannot disqualify an applicant simply because of a slightly increased risk of harm." *Siewertsen v. Worthington Steel Co.*, 134 F. Supp. 3d 1091, 1102 (N.D. Ohio 2015) (citing *Backhaus v. General Motors LLC*, 54 F.Supp.3d 741, 751 (E.D. Mich. 2014)) "The risk must be highly probable and the harm must be substantial." *Id.* A high probability of substantial harm is required; a speculative or remote risk will not satisfy that standard. 29 C.F.R. § 1630(r); *Hamlin v. Charter Township of Flint*, 165 F.3d 426, 432 (6th Cir. 1999). "Whether one

---

[11] While the ADA uses the term "direct threat," the Rehabilitation Act uses the term "significant risk." *Hale v. Johnson*, 245 F. Supp. 3d 979, 996 (E.D. Tenn. 2017). These terms are analyzed the same because "[t]he 'direct threat' standard applied in the American with Disabilities Act is based on the same standard as 'significant risk' applied in the Rehabilitation Act." *Id.* (quoting *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998)).

is a direct threat is a complicated, fact intensive determination, not a question of law. To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm." *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996). *See also Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 411 (6th Cir. 1998) (citing *Rizzo* and explaining why jury is best suited for assessing whether plaintiff posed a significant risk to health and safety of himself and coworkers).

### 1. Marinol Use Not a Direct Threat

TVA cannot prove that Plaintiff's Marinol use presented a high probability of substantial harm to himself or others. First, TVA has no proof that Plaintiff's ability to work was impaired while taking Marinol. To the contrary, Plaintiff's work was not impaired. (Cofer depo. pp. 27, 37-40; Hixon decl. ¶3.) Plaintiff's supervisor did not believe that Plaintiff posed a significant risk to the health and safety of himself or others. (Cofer depo. p. 98.) Not only does TVA lack proof of actual impairment, TVA did not ask about Plaintiff's job performance before requiring him to submit to multiple examinations. (Cofer depo. pp. 47, 61; Clepper depo. pp. 71, 124.)

Second, TVA has no proof that Plaintiff's behavior was abnormal or different. To the contrary, Plaintiff's behavior was normal. (Cofer depo. pp. 27, 37-40.) Not only does TVA lack proof of actual behavioral changes, it did not even bother to inquire about Plaintiff's behavior from his supervisor or coworkers. (Cofer depo. pp. 47, 61; Clepper depo. pp. 71, 124.)

Third, TVA's proffered justification for the medical examination was based solely upon a cursory statement by the MRO that Marinol was a safety concern. The MRO never explained the details of his cursory comment to TVA. (Clepper depo. p. 49.) At that point, TVA had not received any complaints about Plaintiff's behavior or his work performance. (Id. at 71.) Other than the

MRO's cursory comment, Clepper had no knowledge or belief that Plaintiff could not safely perform his job while taking Marinol. (Id. at 51-52.) While she could have made inquiries, Clepper never spoke to Plaintiff's supervisor about his job performance. (Id. at 71.) Nor did she contact Plaintiff's doctor who prescribed the Marinol. Instead, based upon a single cursory comment by the MRO, Clepper ordered an all-encompassing medical examination. (Id. at 60.)

The only medical doctor that TVA relied upon to assess whether Plaintiff could safely work while taking Marinol based his decision upon **possible** side-effects of the medication. Dr. Stephen Adams' opinion that Plaintiff could not work safely while taking Marinol was based upon "**possible** consequences [to] include sedation, memory lapses, worsening of mood." (S. Adams depo. p. 68.) However, Dr. Adams' physical examination demonstrated that Plaintiff had no problems with concentration or memory. (Id. at 42.) Decisions based upon possible medication side effects does not meet the direct threat standard.

In *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505 (W.D. Pa. 2010), the plaintiff applied for a safety-sensitive job. Upon receiving a conditional offer of employment, the plaintiff underwent a medical examination. The results of the examination revealed that the plaintiff was a recovering narcotic addict and was taking methadone. As a result, the conditional offer was rescinded on the grounds that methadone constituted a safety risk. In its defense, the employer relied upon its company doctor/MRO who opined about the industrial dangers of methadone based upon medical literature regarding the risks and threat to the safety of a person and their co-workers when a person is a long-term regular user of methadone and attempting to perform safety-sensitive work, as well as potential side-effects of methadone. The court found that the employer had failed to carry its burden on the direct threat affirmative defense based on: (1) the employer's speculation that there may be some future adverse side-effect from methadone use; (2) no individualized

12

testing to see how the plaintiff actually reacted to methadone, versus generalizations from medical literature; (3) the examination performed did not reveal that the plaintiff suffered from any methadone-related side effects; and (4) failure to ask the plaintiff's treating professionals as to whether he had ever experienced methadone-related complications. *Id*. at 520-21.

The same outcome occurred in the following cases: *Breaux v. Bollinger Shipyards, LLC*, 2018 WL 3329059, at *13 (E.D. La. July 5, 2018) (direct threat defense not established by showing that medication had listed side-effects of sedation, analgesia, and other symptoms of central nervous system depression, where plaintiff presented evidence that he did not experience those side-effects); *Pollard v. Drummond Co., Inc.*, 2015 WL 5306084, at *7 (N.D. Ala. Sept. 10, 2015) (assessment based upon high-dosage of Methadone not by itself sufficient to justify disqualifying plaintiff from work); *Haynes v. City of Montgomery,* 2008 WL 4495711, at *4–5 (M.D. Ala. Oct. 6, 2008) (assessment based on the known possible side effects of a medication, as opposed to an individualized inquiry into a patient's present ability to perform his job functions, is insufficient). Moreover, EEOC guidance warns employers not to disqualify an employee based solely upon a medication's possible side effects.

> Example: An individual receives an offer for a job in which she will operate an electric saw, conditioned on a post-offer medical examination. In response to questions at this medical examination, the individual discloses her psychiatric disability and states that she takes a medication to control it. This medication is known to sometimes affect coordination and concentration. The company doctor determines that the individual experiences negligible side effects from the medication because she takes a relatively low dosage. She also had an excellent safety record at a previous job, where she operated similar machinery while taking the same medication. This individual does not pose a direct threat.

EEOC Enforcement Guidance on the ADA and Psychiatric Disabilities, 1997 WL 34622315, at *17, Question #33 (Mar. 25, 1997).

Fourth, countervailing medical opinions[12] demonstrate that Plaintiff's Marinol use was not a direct threat to his safety or the safety of his coworkers. (Doc. 19-7, PageID#: 160.) According to Plaintiff's treating psychiatrist:

> Q:     When you say the use of Marinol was not dangerous, what do you mean by that?
>
> A:     It's not a danger to his life or well-being. In other words, the potential benefit to Mr. Hixon for better sleep and anxiety control would certainly outweigh any slight risk for fatigue or – even though I wouldn't list Alex as someone is who is prone to psychosis, you know, I wouldn't – I wouldn't see that risk as high. So the – so the cross-benefit ration there is – is reasonable.

(Teliho depo. p. 76.) Marinol use for the treatment of Plaintiff's anxiety and insomnia "would not be outside of mainstream or standard of care," and it "is not dangerous or imprudent." (Id. at 63, 84.) A body of medical literature supporting Marinol use for the treatment of anxiety and insomnia already existed in January 2014. (Id. at 72.) Dr. Teliho had no concerns about Marinol's adverse interactions with other medications that Plaintiff was taking. (Id. at 16, 46.) Importantly, Dr. Teliho clearly communicated to TVA on several occasions in the spring of 2014 that he had no concerns about Plaintiff working as a chemistry lab technician while taking Marinol. (Id. at 61, 63.) TVA ignored Dr. Teliho's medical opinions, even though Dr. Teliho was Plaintiff's treating psychiatrist, with impeccable credentials and training. (Id. at 52-53, 57-60.) Unlike Dr. Teliho, Dr. Stephen Adams had no special training in psychiatry. (S. Adams depo. p. 9.)

Plaintiff's primary care physician, Dr. Charles Adams, likewise advised TVA that Marinol was a safe and effective treatment for Plaintiff's anxiety and insomnia and that Plaintiff could safely perform his job while taking Marinol. (C. Adams depo. pp. 96, 158-59, 168; C. Adams decl. ¶7, Doc. 19-4.) He had no concerns about Plaintiff experiencing side effects, negative drug

---

[12] While Plaintiff's counselor was leery of Plaintiff taking Marinol after-the-fact, he admitted not being knowledgeable about Marinol. (Glover depo. p. 105-06.)

14

interactions, or Plaintiff abusing or becoming addicted to Marinol. (C. Adams depo. pp. 77, 166-67.) Because Dr. Adams had been previously employed by TVA in a chemistry laboratory position similar to Plaintiff, he understood the hazards associated with Plaintiff's job when he opined that Plaintiff was safe to work while taking Marinol. (Id. at 14-15, 78-79.)

Dr. Dustin Sulak also confirms the medical opinions of Drs. Teliho and Charles Adams that Marinol was a safe and medically supported medication to treat Plaintiff's disabilities. (Sulak decl. ¶5 and report pp. 1-2.) Upon reviewing TVA's job description and Cofer's list of laboratory hazards, Dr. Sulak confirms that Plaintiff could safely perform his chemistry lab technician duties while taking Marinol. (Id.) Finally, Dr. Sulak confirms, upon reviewing Plaintiff's medication list, that Marinol would present no adverse interactions with Plaintiff's other medications. (Id.)

Simply put, TVA's direct threat assessment regarding Plaintiff's Marinol use was not based upon the most current medical knowledge and/or the best available objective evidence. Rather, TVA's assessment was incomplete, contrary to the opinions of Plaintiff's treating professionals, and based upon pure speculation about potential (rather than actual) side-effects.

2.  Plaintiff's Depression Not a Direct Threat

TVA claims that the psychological exams with Dr. Gary Leigh were justified because of Dr. Stephen Adams' concerns relating to Plaintiff's depression. However, Dr. Adams' concerns that Plaintiff's depression "was not well controlled" did not meet the direct threat standard.

First, Plaintiff's depression was not within the proper scope of the January 6, 2014 medical examination. TVA instructed Dr. Adams to determine whether Plaintiff could safely work while taking Marinol. (S. Adams depo. p. 18.) Dr. Adams knew that the Marinol was not prescribed to treat Plaintiff's depression, but insomnia. (Id. at 23.) Contrary to TVA's claim, Plaintiff did not volunteer information to Dr. Adams about his past depression; instead, it was Dr. Adams who

brought up the topic of Plaintiff's history of depression. (Hixon decl. ¶2.). Plaintiff only begrudgingly answered Dr. Adams' intrusive questions about depression, even though Plaintiff's depression was under control at the time. (Id.) Dr. Adams admitted that many of his disability-related inquiries were irrelevant. (S. Adams depo. pp. 33-34.) Dr. Adams also delved into improper inquiries about Plaintiff's relationship with his girlfriend, his sex life, whether he thought he would be a good mate or spouse, and his relationship with his girlfriend's son. (Hixon depo. pp. 166-67, 169.) TVA's argument that Dr. Adams needed to explore all facets of Plaintiff's life – including unrelated medical conditions, depression, personal relationships, etc. – completely ignores the fact that an **employer-mandated** medical exam is legally constrained by the ADA's rules and regulations. TVA's argument would be valid if the medical exam was Plaintiff's free choice, outside of the workplace context, and for the purpose of obtaining treatment. But the exams being challenged here were employer-mandated, and thus subject to the ADA's constraints and limitations. Giving wide latitude to the scope of an employer-mandated medical exam would in essence gut the ADA's medical exam restrictions.

Second, Dr. Stephen Adams' claim that Plaintiff's depression was not well controlled is suspect and dubious. While Dr. Adams claimed that Plaintiff appeared to be in a depressed state during the first medical examination, **he admitted that his clinical notes are devoid of any such reference**. (S. Adams depo. pp. 27-30.) Notably, Dr. Adams' detailed clinical notes reference many physical findings regarding irrelevant medical conditions, but **absolutely no clinical observations regarding depression are recorded**. (Id. at 29, 33-34, 38-39.) Dr. Adams also admitted that Plaintiff stated that his depressive symptoms were under fair control. (Id. at 26.) Before concluding that Plaintiff's depression was not well-controlled, he never communicated with Plaintiff's psychiatrist, primary care doctor, or counselor.

Third, Plaintiff's treating professionals opined that Plaintiff was psychologically fit to work, despite his chronic depression. When TVA finally contacted Dr. Teliho, he made it clear to TVA that Plaintiff was psychologically fit to perform his job and that he never felt that Plaintiff was unfit. (Teliho depo. pp. 61-62, 65-66.) Dr. Charles Adams likewise informed TVA several times between January 2014 and March 2014 that Plaintiff was emotionally and psychologically fit to perform his job. (C. Adams depo. pp. 158-59.) Dr. Glover noted that while Plaintiff was feeling humiliated and distressed over TVA's treatment, Plaintiff was objectively ready to work. (Glover depo. p. 121.) TVA's scrutiny toward Plaintiff was a significant stressor, and Dr. Glover told Dr. Leigh that Plaintiff's increased anxiety regarding his job security during this time was a significant factor influencing his MMPI test scores. (Id. at 154, 159-60.)

Finally, neither Dr. Stephen Adams nor Dr. Gary Leigh ever asked Plaintiff's supervisor about Plaintiff's behavior or work performance. Had they done so, they would have learned that Plaintiff's work had been satisfactory and there were no concerns about his behavior.

To summarize, TVA's direct threat assessment regarding Plaintiff's depression was not based upon the most current medical knowledge and/or the best available objective evidence. Rather, TVA's assessment was incomplete, contrary to the opinions of Plaintiff's treating professionals, and highly suspect.

## B. Prohibition Against Marinol as Condition of Continued Employment

Plaintiff's reasonable accommodation claim is based upon TVA's refusal to allow him to take Marinol to treat his disabilities – anxiety and insomnia. Both impairments meet the ADA's definition of disability. Plaintiff has suffered from clinically-diagnosed generalized anxiety disorder for many years. (Teliho depo. pp. 67, 69.) Plaintiff has also been diagnosed with and treated for insomnia for many years, including prescription sleep medication and anti-anxiety

medication (including Marinol). (C. Adams depo. pp. 32, 39.) Both impairments substantially limit his ability to sleep (typically only 3-4 hours of sleep per night) and negatively impact his ability to concentrate and think, as well as physically manifest themselves in panic attacks and severe fatigue. (Glover depo. pp. 31, 33, 71-72, 127; Hixon depo. pp. 111-13, 116; Hixon decl. ¶4.) While TVA does not dispute that each of these impairments constitutes a disability under the ADA, the evidence sufficiently establishes that these conditions are disabilities for purposes of the ADA. *See Williams v. AT & T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 825 (W.D. Tenn. 2016) (anxiety disorder established as disability under ADA as matter of law); 29 C.F.R. §1630.2(i)(1)(ii) (sleeping, concentrating, and thinking are all defined as major life activities).

TVA argues that Plaintiff did not request the accommodation of being allowed to continue taking Marinol. This argument is without merit. Plaintiff requested TVA's doctors and the NNFFD that he be allowed to continue taking Marinol. (Hixon depo. pp. 160-61.) Additionally, Dr. Charles Adams advocated on Plaintiff's behalf to TVA that he be allowed to continue taking Marinol. (C. Adams depo. p. 159.) Dr. Teliho's expressed opinions to TVA favorable to Marinol also constituted accommodation requests. (Doc. 19-7.) "[S]omeone other than the disabled person may request an accommodation on behalf of the disabled person." *Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, 629 (W.D. Mich. 2009) (citing *EEOC Compliance Manual,* Enforcement Guidance for Psychiatric Disabilities, at 20–21) (health professional may request a reasonable accommodation on behalf of an individual with a disability).

TVA incorrectly states that Plaintiff conceded that he never made an accommodation request. (Doc. 30, PageID#: 708.) TVA's reference to Plaintiff's previous brief (Doc. 20, PageID#: 222) is taken out of context. Plaintiff was referencing the fact that the January 6, 2014 medical examination was not triggered by a request for accommodation from Plaintiff. Prior to

18

January 6, 2014, Plaintiff was not aware that TVA was objecting to his Marinol use. However, once he became aware of TVA's objection, he and his doctors requested TVA to continue allowing him to take Marinol, i.e., reasonable accommodation request.

TVA rejected this request, claiming that Marinol use was a direct threat. But TVA cannot carry its burden on this defense. See Section III.A.1, *infra*.

## C. Disclosure of All Medications as Condition of Continued Employment

TVA does not point to any new evidence, nor does TVA raise any new arguments with respect to Plaintiff's claim that TVA violated the ADA's disability inquiries restrictions by requiring him to disclose all medications on a monthly basis as a condition of his continued employment. For Plaintiff's legal analysis, Plaintiff refers the Court to his memorandum in support of motion for partial summary judgment (Doc. 20, PageID#: 231-33) and reply brief (Doc. 28, PageID#: 553-58).

TVA implies that somehow Plaintiff's 2005 return to work agreement justifies the blanket medication disclosure requirement. There is absolutely no proof that TVA seriously considered (in 2014) that the 2005 return to work requirements were still active. TVA knew that Plaintiff's medications had changed since 2005. The 2005 return to work agreement was never mentioned in any contemporaneous TVA documents or emails during the spring of 2014.

TVA also claims that Plaintiff should have disclosed Marinol when it was first prescribed in November 2013 because doing so would have complied with his employment contract. According to his employment contract, Plaintiff was only required to disclose "medication that might interfere with [his] ability to safely perform [his] duties." (Exhibit 7.) Plaintiff obtained knowledge as to whether a medication might interfere with his ability to safely perform his duties from the prescribing doctor. (Hixon depo. p. 92.) Dr. Adams did not tell him that Marinol would

19

pose a risk of interfering with his ability to perform his job. (Id. at 195, 199.) Indeed, Marinol had no adverse effect on Plaintiff's ability to safely perform his job. (Hixon decl. ¶3.) He did not feel groggy, and he had no problems concentrating while taking Marinol. (Id.) Because Plaintiff did not experience any adverse reactions to Marinol, he did not consider Marinol to be a safety risk. (Id.) Thus, he was not required to disclose Marinol to TVA, per his employment contract.

### D. Termination Claim

Plaintiff can easily satisfy his prima facie case. A prima facie case of disability discrimination under the ADA requires a plaintiff to show that: (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

TVA contends that Plaintiff was not otherwise qualified for the job. "At the prima facie stage, a court should focus on plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field . . . ." *Id.* at 575-76. "[T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576.

At the time of his discharge, Plaintiff was qualified to perform the Chemistry Lab position. His supervisor never observed any performance problems and rated his overall job performance as "mostly good." (Cofer depo. p. 17, Doc. 19-1.) From the time that Plaintiff returned to work

20

on April 4, 2014 through his discharge on June 2, 2014, Plaintiff's supervisor had no problems with his work performance, behavior, or his ability to work safely. (Cofer depo. pp. 76-77, Doc. 19-1.) TVA claims that Plaintiff was not otherwise qualified because he was allegedly using illegal drugs. (Doc. 27, PageID# 483.) Such an argument is without merit. There is absolutely no evidence that Plaintiff was currently using illegal drugs when discharged. To the contrary, the evidence shows that Plaintiff **passed a drug screen three weeks before his discharge**. (Doc. 28-1.) Without question, Plaintiff was qualified for his job when he was discharged.

TVA claims that its enforcement of the April 4, 2014 return to work agreement constitutes a legitimate, nondiscriminatory reason for discharge. However, TVA predicates this argument upon the lawfulness of the blanket medication disclosure requirement. As previously argued, TVA's requirement that Plaintiff disclose **all** medications (regardless of whether they are job-related) violates the ADA's medical inquiry provision, 42 U.S.C. §12112(d)(4). Discharge based upon an unlawful medical inquiry cannot constitute a legitimate, nondiscriminatory reason; rather, such a discharge is based upon an illegitimate and unlawful reason. *Jackson v. Regal Beloit America, Inc.*, 2018 WL 3078760, at *12 (E.D. Ky. June 21, 2018).

With respect to pretext, TVA argues that Plaintiff must show discriminatory animus. Such argument has been rejected by the Sixth Circuit.

> Dollar General adds that the verdict cannot stand because Atkins never produced evidence of animus towards the disabled. As support, it invokes this statement by Atkins' counsel at closing argument: "We're not claiming that Dollar General dislikes people with diabetes or that it fired her to get rid of people with diabetes." R. 156 at 129. **But the Act speaks in terms of causation, not animus**. *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–17 (6th Cir. 2012) (en banc). **An employer violates the Act whenever it discharges an employee "on the basis of disability" (a necessary requirement for liability), not only when it harbors ill will (a sufficient way of establishing liability).** 42 U.S.C. § 12112(a). Imagine a company that fired a visually impaired employee to save itself the minimal expense of buying special software for her. Without more, that would constitute

termination "on the basis of disability," even if all of the evidence showed that cost-savings, not animus towards the blind, motivated the company.

*EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 436 (6th Cir. 2018) (emphasis added).

TVA now claims another reason for Plaintiff's discharge – not being truthful during the fitness for duty process. This alleged reason is pretextual for two reasons.

First, Plaintiff was truthful when he denied using marijuana. The only evidence TVA relies upon is the El Sohly Laboratories interpretation that the presence of 21 ng/mL of THCV-COOH in Plaintiff's urine sample, as conclusive proof that Plaintiff ingested marijuana (and not Marinol). (Doc. 19-9.) However, this conclusion regarding Plaintiff's re-tested urine sample was inaccurate and flawed. (Wilton decl. ¶5.) The reported ratio of THC-COOH to THCV-COOH was highly unusual and indicative of analytical error. (Id.) The normal ratio is 120:1, yet the ElShohly Laboratories data indicated a ratio of 2.4:1. (Id.) If Plaintiff had truly ingested marijuana (which he did not) in addition to Marinol, the THC-COOH to THCV-COOH ratio would have been much higher than reported. (Id.) Simply stated, the abnormally strange THC-COOH to THCV-COOH ratio should have been a red flag error to any laboratory chemist, prompting at least a review or retest. (Id.) Additionally, the theory that THCV-COOH is conclusive proof of ingestion of marijuana (but not Marinol) has been scientifically disputed for many years. (Sulak decl. ¶5 and report, pp. 2-3.) In fact, this theory was rejected by a federal district court as not meeting the *Daubert* standard for being scientifically supported. (Id.) Simply stated, the drug test results were obviously flawed and based upon a junk-science theory.

The honest belief rule will not shield TVA from liability. In addition to the flawed drug retest, TVA had ample proof that Plaintiff had not used marijuana. EAP advised TVA that Plaintiff exhibited no signs of drug abuse and did not meet the criteria for substance abuse. (Doc. 19-11.) Plaintiff's treating professionals all denied any observations or concerns that Plaintiff was using

illegal drugs. Dr. Lon Glover, who had been counseling Plaintiff since August 2009, and who had training in alcohol and drug rehabilitation, was confident that Plaintiff had not used illegal drugs. (Glover depo. pp. 151-52.) This observation was also reported to the EAP. (Doc. 19-11, PageID#: 171.) Plaintiff's psychiatrist never observed any signs that Plaintiff was using illegal drugs. (Teliho depo. pp. 66-67.) Plaintiff's primary care physician likewise never observed Plaintiff exhibiting signs of using illegal drugs. (C. Adams depo. pp. 97, 168.) Furthermore, if Plaintiff had been using illegal drugs, lab results would have revealed that fact. (Id. at 100.)

Second, Plaintiff's alleged lack of truthfulness was not initially given as a reason for termination. During the termination meeting, Cofer never mentioned Plaintiff being untruthful. (Hixon depo. p. 258.) When asked by TVA's EEO investigator why Plaintiff was fired, Clepper only gave Plaintiff's failure to report his medications to NNFFD by May 15, 2014. (Clepper stmt. p. 32, Doc. 19-22.) That was the only reason stated by Cofer when he was interviewed under oath by TVA's EEO investigator. (Doc. 19-23, Cofer stmt. p. 32.)

Shortly after Plaintiff's discharge, Clepper admitted that the attachment to Plaintiff's termination letter, styled "Failure to Cooperate with FFD Evaluation," was a mistake. **"That attachment went with a different type of FFD violation: failure to disclose information. That is not relevant to Hixon's case . . . ."** (Doc. 19-24). Clearly, the only reason for Plaintiff's discharge was his failure to follow Clepper's illegal requirement to report all medications by the 15th of each month. The newly added reason (lack of candor) is sufficient evidence of pretext. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.1996).

Finally, there is a dispute as to the identity of the actual decisionmaker. Cofer alleged that he did not "decide" to fire Plaintiff until June 2, 2014, when HR emailed Plaintiff's termination

letter to him. (Cofer depo. pp. 80, 88.) Clepper admitted that she drafted Plaintiff's termination letter. (Clepper depo. pp. 154-55.) She sent the draft termination letter to HR on May 16, 2014 – **two full weeks before** Cofer "claimed" to make the termination decision. (Clepper depo. p. 148; Doc. 19-20.) HR did not request a termination letter. (Clepper depo. p. 150.) Clepper alone initiated Plaintiff's termination process. Cofer was not the real decisionmaker; he was merely a functionary in the process. In fact, throughout Plaintiff's legal process with NNFFD, Cofer was used as a puppet by NNFD, as Cofer's boss acknowledged when she stated to Cofer: "I am not thrilled about them putting you in the middle . . . HR sure likes pulling strings behind the scenes." (Exhibit 12.) In moving forward with Plaintiff's termination process on May 28, 2014, Clepper commented "on how strong a case we have" against Plaintiff. (Doc. 19-21.)

### E. Retaliation Claim

Plaintiff has presented sufficient evidence to establish his retaliation claim. A retaliation claim under the ADA requires a showing that that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Establishing a prima facie case of retaliation is a "low hurdle." *Id.*

TVA argues that Plaintiff cannot meet the second element because Cofer was unaware of Plaintiff's EEO claim until after termination. This is wrong. Cofer and his supervisor were aware of Plaintiff's EEO claim on April 28, 2014 – one full month before Plaintiff's termination. (Cofer depo. p. 95; Exhibit 13.) Clepper was aware of Plaintiff's EEO claim at least by April 5, 2014. (Clepper depo. p. 143.) Thus, the decisionmakers' knowledge was timely.

24

TVA also argues that Plaintiff cannot show a causal connection. Close temporal proximity between the protected activity and adverse employment action can satisfy evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). The Sixth Circuit has held that three months is sufficiently close temporal proximity. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (temporal proximity of three months is significant enough to constitute sufficient evidence of a causal connection for the purpose of demonstrating a prima facie case). That is what occurred in this case. On February 26, 2014, Plaintiff initiated a disability discrimination claim with TVA's EEO department. (Hixon decl. ¶3.) He was terminated on June 2, 2014.

Plaintiff challenges TVA's argument that violation of the return to work agreement was a legitimate non-discriminatory reason. See Section III(D) above. Additionally, Plaintiff presents sufficient proof regarding pretext. See Section III(D) above. Therefore, genuine issues of material fact exist regarding Plaintiff's retaliation claim.

## IV. CONCLUSION

Based on the foregoing, Defendant's motion should be denied in full.

Respectfully submitted,

**MIKEL & HAMILL PLLC**

By: _ s/ Doug S. Hamill _____
Doug S. Hamill, BPR No. 022825
Counsel for Plaintiff
620 Lindsay Street, Suite 200
Chattanooga, TN 37403
(423) 541-5400
dhamill@mhemploymentlaw.com

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of July, 2020, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

By: ___s/ *Doug S. Hamill*___