UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

ALEX HIXON,                              )
                                         )
    *Plaintiff,*                          )
                                         )        No. 1:19-CV-120
v.                                       )
                                         )        Judge Collier
TENNESSEE VALLEY AUTHORITY               )
BOARD OF DIRECTORS,                      )
                                         )
    *Defendant.*                          )

# **M E M O R A N D U M**

Plaintiff, Alex Hixon, brings this suit against Defendant, the Board of Directors of the Tennessee Valley Authority ("TVA"), claiming TVA violated the Rehabilitation Act, 29 U.S.C. § 791(g). The Rehabilitation Act incorporates certain sections of the Americans with Disabilities Act ("ADA"). 29 U.S.C. § 791(f). Plaintiff claims Defendant violated the Rehabilitation Act by illegally examining him (42 U.S.C. § 12112(d)(4)), refusing to grant him a reasonable accommodation under the ADA (42 U.S.C. § 12112(b)(5)(A)), firing him due to his disability (42 U.S.C. §12112(a)), and retaliating against him.

Plaintiff moved for partial summary judgment (Doc. 19). Defendant responded in opposition (Doc. 27) and Plaintiff replied (Doc. 28). Defendant moved for summary judgment on all of Plaintiff's claims (Doc. 29). Plaintiff responded in opposition (Doc. 32) and Defendant replied (Doc. 33). Both motions are now ripe. For the reasons discussed below, the Court will **DENY** Plaintiff's motion for partial summary judgment. The Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment.

I.      **BACKGROUND**[1]

Defendant employed Plaintiff as a Chemistry Laboratory Technician in May 2001. Defendant classified this job as "Safety Sensitive." (Doc. 23-1 at 1–3.) Plaintiff was required to work with high temperatures, high-voltage instruments, and noxious chemicals. Plaintiff also has a history of anxiety and depression. Plaintiff has twice taken medical leave due to issues with his depression. In 2005, Plaintiff took medical leave due to a psychiatric hospitalization, and he was required to pass a fitness-for-duty examination upon returning to work. Upon his return, Plaintiff signed a contract which, among other provisions, required him to disclose if he was "placed on a medication that might interfere with [his] ability to safely perform [his] duties." (*Id.* at 19.) In 2012, Plaintiff took another medical leave so he could receive psychiatric and alcohol-abuse treatment. Upon returning to work, he was once again required to pass a fitness-for-duty examination

A.      **Plaintiff's Use of Marinol**

In November 2013, Plaintiff was prescribed Marinol by Doctor Charles Adams ("Dr. Charles Adams"), who believed the drug would treat Plaintiff's anxiety.[2] Marinol is a synthetic

---

[1] Both parties have moved for summary judgment. While generally the facts would be presented in the light most favorable for the nonmovant, the Court will note when there are disputes of facts in this case. When there is a dispute, the Court is bound "to evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

[2] Plaintiff alleges he mistakenly believed the Marinol prescription was meant to treat his insomnia, and he told TVA the drug was being used to treat his insomnia during the first medical examination at issue in this case.

2

version of delta-9-tetrahydrocannabinol ("THC"). THC is also the naturally occurring active ingredient in Marijuana. The Department of Health and Human Services recognizes Marinol can have psychoactive effects which can present a safety issue in the workplace. The Food and Drug Administration ("FDA") has approved the use of Marinol to stimulate appetite in patients with AIDS and cancer; it has also been approved to reduce chemotherapy-induced nausea and vomiting. Marinol has not been approved by the FDA to treat anxiety. However, some research indicates Marinol may help individuals who struggle with anxiety.

Due to the nature of Plaintiff's job, he underwent occasional random drug tests. On December 23, 2013, Plaintiff underwent one of those random drug tests. After taking the drug test, Plaintiff informed his employer he had been lawfully prescribed Marinol; he had not, however, previously disclosed his Marinol prescription to his supervisor. TVA's Medical Review Officer indicated Plaintiff tested positive for THC with a safety concern.

Defendant submitted Plaintiff's positive drug sample to a second lab. On January 22, 2014, the second lab concluded Plaintiff's positive drug test "could not be [from] Marinol alone" and concluded Plaintiff must have engaged in illegal drug use. (Doc. 23-1 at 4.) Plaintiff disputes the accuracy of the second drug test and maintains he has not used marijuana since college.

Defendant claims Plaintiff violated the contract he signed in 2005 by not disclosing he was taking Marinol. Plaintiff claims the 2005 contract required him to disclose only those medicines which affected his ability to work safely. Plaintiff, however, did admit he was initially taking Marinol three times a day, which made him drowsy, so he reduced his dosage to one time at night.

3

The prescribing doctor, Dr. Charles Adams, did not warn Plaintiff it would affect his ability to work safely, and Plaintiff never believed Marinol affected his ability to work safely.

### B. Plaintiff's January 6, 2014 Examination

Candice Clepper, the head of the Non-Nuclear Fitness for Duty Program ("the Fitness Program"), referred Plaintiff to receive a fitness-for-work examination. The only stated reason for this examination was Plaintiff's use of Marinol. Plaintiff's direct supervisor did not report Plaintiff was acting differently at work. Indeed, his supervisor did not complain to TVA about Plaintiff's job performance. Plaintiff's supervisor found Plaintiff's work was mostly good, and he opined Plaintiff was not a threat to himself or his coworkers.

On January 6, 2014, Plaintiff was examined by Doctor Stephen Adams ("Dr. Stephen Adams"). Dr. Stephen Adams already knew Plaintiff suffered from depression and anxiety because Plaintiff had taken medical leave from work earlier in his career. Dr. Stephen Adams also knew Plaintiff was being examined because Plaintiff admitted to taking Marinol. Dr. Stephen Adams indicated he viewed the examination as comprehensive. When asked if he was examining Plaintiff because of Plaintiff's Marinol usage, Dr. Stephen Adams replied, "[w]ell, it's more than that. It's an overall assessment. When there's a concern at TVA about an employee, they do, generally, a comprehensive assessment of whether that person is globally able to function in that job currently or not." (Doc. 32-9 at 18.) Dr. Stephen Adams also explained, "[a] fitness-for-duty examination is an overall, full examination. Is this person capable of performing their job duties in a safe manner? And it's not possible – for me to say yes or no without doing a comprehensive look at them." (Doc. 32-9 at 21.)

4

Dr. Stephen Adams started the examination by asking Plaintiff why he was required to get an examination. Plaintiff responded he had tested positive for THC because he was taking Marinol to treat his insomnia. Dr. Stephen Adams, however, stated that he understood Marinol was part of a general experiment to improve Plaintiff's mood and asserted Plaintiff volunteered his use of Marinol was related to his depression and anxiety. Dr. Stephen Adams then took a comprehensive medical history. He asked Plaintiff about physical ailments, such as a shoulder dislocation, lumbar disk pain, and a stomach ulcer. He also asked Plaintiff about his relationship with his girlfriend and his finances.

Dr. Stephen Adams concluded Plaintiff's depression was not well controlled based on Plaintiff's answers and demeanor during the examination, and he believed it was possible Plaintiff posed a safety risk in his current position. Plaintiff, however, told Dr. Stephen Adams he believed his depression was well controlled. Dr. Stephen Adams recommended TVA require Plaintiff to be examined by a psychologist, Dr. G. Gary Leigh, before deciding if Plaintiff was safe to return to work.

### C.     Plaintiff's January 14, 2014 Examination

On January 14, 2014, Dr. Leigh examined Plaintiff to determine if his depression would prevent him from working safely in his position. Dr. Leigh noted Plaintiff stated, among other things, people "had it in for him" and his "future seemed hopeless." (Doc. 25-1 at 3.) Dr. Leigh also noted that Plaintiff stated it was difficult to concentrate on his work. (*Id.*) Dr. Leigh found, "the degree of psychopathology that he demonstrated on MMPI-2 [a standardized psychological test], is seldom seen on fitness for duty evaluations." (*Id.* at 10.) Dr. Leigh concluded Plaintiff should not be allowed to work until he was more psychologically stable.

5

After being suspended, Plaintiff filed a complaint with TVA's Equal Opportunity Compliance Office ("EOCO") on February 26, 2014.   Plaintiff's supervisor knew Plaintiff filed a complaint with the EOCO before he terminated Plaintiff.

### D.   Plaintiff's March 2014 Examinations and Return to Work

On March 5, 2014, Plaintiff was cleared by the Employee Assistance Program to return to work.   It concluded Plaintiff was fit for duty and there were no signs that Plaintiff abused drugs. On March 17, 2014, Dr. Stephen Adams reexamined Plaintiff to determine his fitness for work. On this occasion, Dr. Stephen Adams viewed his examination as a "global assessment," and he claimed such an assessment was necessary to "determine whether, in my opinion, he is safe to go back to work or not."   (Doc. 19-2 at 13.)   Dr. Stephen Adams concluded Plaintiff could return to work, but he barred Plaintiff from taking Marinol while he was employed.   Dr. Leigh also reexamined the Plaintiff.   Dr. Leigh, like Dr. Stephen Adams, concluded Plaintiff was fit to return to work.

Plaintiff returned to work on April 6, 2014.   When Plaintiff returned he was required to sign a contract ("the Last Chance Agreement") which provided three conditions: (1) Plaintiff had to disclose all of his medications to the Fitness Program in writing on the fifteenth of every month; (2) Plaintiff could not take Marinol; and (3) Plaintiff had to continue to pass random drug and alcohol screenings.   Unlike Plaintiff's 2005 contract, the disclosure of any drug taken was not conditioned on whether the drug affected Plaintiff's work performance.

At no time after returning to work did Plaintiff ask Defendant to let him take Marinol. Plaintiff stated he asked his doctors to request from TVA that he be allowed to continue to take Marinol, but his doctors did not make this request to TVA.   Additionally, at the time of signing

6

the Last Chance Agreement, Plaintiff did not object to the fact that it prohibited him from taking Marinol.

### E. Plaintiff's Termination

On May 15, 2014, Plaintiff failed to disclose the medicines he was taking as required on that day under the Last Chance Agreement. An employee from the Fitness Program told Plaintiff's supervisor Plaintiff had not disclosed his medicines. Plaintiff's supervisor then informed Plaintiff, who called employees from the Fitness Program. The people Plaintiff attempted to reach were busy at the time, and Plaintiff went home after finishing his work week. When he returned to work on June 2, 2014, he was terminated.

When originally questioned, Plaintiff's supervisor claimed Plaintiff was terminated because he did not provide a written declaration of the drugs he was taking. While Plaintiff's supervisor knew Plaintiff attempted to call the Fitness Program, he felt Plaintiff should be discharged because he did not follow the Last Chance Agreement, which required the list of Plaintiff's medications be supplied in writing on the fifteenth of each month. The termination letter given to Plaintiff also stated, "[y]our behavior brings into question your trustworthiness and reliability." (Doc. 26-1, 11.)[3] Later, the supervisor stated he terminated Plaintiff because he learned the second lab to analyze Plaintiff's December 2013 urine sample found the presence of THC could not be explained by Marinol alone.

---

[3] There was an attachment to the termination letter titled "Notice of Termination – Failure to Cooperate with FFD Evaluation," but the parties agree this addition was attached in error. (Doc. 26-1, 12.)

7

Plaintiff brought this action after exhausting administrative review. He claims: (1) all the examinations of him violated the ADA; (2) the requirement he disclose all his medications violated the ADA; (3) Defendant denied him a reasonable accommodation by banning the use of Marinol; (4) Defendant unlawfully terminated him due to a disability; and (5) Defendant unlawfully retaliated against him based on his claim to the EOCO.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail

to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. <u>DISCUSSION</u>

Plaintiff brings his claims under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* The Rehabilitation Act makes it unlawful for federal agencies to discriminate against individuals with disabilities. 29 U.S.C. § 791.[4] The Rehabilitation Act expressly incorporates the standards used in Title I of the ADA, 42 U.S.C. §§ 12111 *et seq.*, and "provisions of sections 501 through 504, and 510," of the ADA, 42 U.S.C. §§ 12201–12204, 12210. 29 U.S.C. § 791(f).

Plaintiff has moved for summary judgment on his claims for unlawful examinations and wrongful termination. Defendant has moved for summary judgement on all counts. The Court will begin with Plaintiff's unlawful examinations claims, which are comprised of claims as to four

---

[4] While TVA is not a prototypical federal agency, it is subject to the Rehabilitation Act. *See Hale v. Johnson*, No. 1:15-cv-14, 2016 WL 8673579, at *3 (E.D. Tenn. Feb. 2, 2016).

9

examinations by TVA doctors and the requirement that he disclose all of his medications upon returning to work. The Court will then examine Plaintiff's claim that Defendant denied him a reasonable accommodation by preventing him from taking Marinol. Finally, the Court will turn to Plaintiff's claims of illegal discharge and unlawful retaliation.

### A.      Plaintiff's Claims for Unlawful Examinations

The ADA prevents employers from "requir[ing] a medical examination . . . unless such an examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4). Under § 12112(d)(4):

> The employer bears the burden of proving that a medical examination is job related and consistent with business necessity by demonstrating that: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.

*Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (quoting *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007)) (quotation marks omitted). In this case, Plaintiff did not request an accommodation before he was examined, so the only permissible grounds for an examination are whether Plaintiff's ability to perform the essential functions of his job was impaired and whether he posed a direct threat to himself or others. *Id.*

When an employer orders an examination on the belief the employee cannot perform the essential functions of her job, the employer "must have a reasonable belief that the behavior threatens a vital function of the business." *Id.* This inquiry is an objective inquiry. *Id.* "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999).

10

For a direct threat, the employer has the burden of proving the employee creates "a significant risk to the health and safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). "To determine whether an individual poses a direct threat, an employer must undertake 'an individualized assessment of the individual's present ability to safely perform the essential functions of the job.'" *Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 572 (6th Cir. 2019) (quoting 29 C.F.R. § 1630.2(r)). When determining if a direct threat exists, the Court should consider: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r). The regulation further states, the determination of whether an individual is a direct threat "shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Id.*

Additionally, the examination must be "limited to determining an employee's ability to perform essential job functions." *Id.* The examination cannot be "an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." *Id.* In short, when it comes to examinations, an individual's protections are two-fold: she is protected from unnecessary examinations and from a necessary examination that is too intrusive.

The Court will consider the first two examinations—the one on January 6, 2014, and the one on January 14, 2014—separately, and will then consider the March 2014 examinations collectively. Plaintiff argues Defendant lacked sufficient cause to require any examination. Plaintiff further argues that only those examinations carried out by Dr. Stephen Adams were over-

11

intrusive. Defendant argues it had sufficient cause for all examinations. After considering the examinations themselves, the Court will turn to the Last Chance Agreement and its requirement that Plaintiff disclose all of his medications. Plaintiff argues the requirement is invalid because the Last Chance Agreement is void under the ADA. Defendant argues last chance agreements are valid under the ADA, and as Plaintiff signed the contract, he cannot now claim the disclosure requirement violated the ADA.

### 1. January 6, 2014 Examination

Plaintiff argues TVA could not refer him to a medical examination after his positive drug test in December 2013, and even if it could, Dr. Stephen Adams's examination on January 6, 2014, was over-intrusive. Defendant argues it was reasonable to require an examination, the examination was not over-intrusive, and even if it was unlawful, there was no real harm because Dr. Stephen Adams already knew of Plaintiff's disability.

#### a. Ability to Perform Essential Functions of the Job as a Reason for January 6, 2014 Examination

Starting with the reason for the January 6, 2014 examination, Defendant concedes the only available evidence was Plaintiff's positive drug test. (Doc. 27 at 15.) There was no testimony from Plaintiff's supervisor or anyone who worked with Plaintiff that he was acting in an unsafe manner or his behavior was disruptive. Instead, Plaintiff's supervisor testified he had no issues with Plaintiff's work leading up to the random drug test.

Thus, the issue before the Court is whether the evidence of Plaintiff's lawfully prescribed Marinol is sufficient, on its own, to require an examination. In *McGee v. City of Greenville*, No. 6:05-2261, 2007 WL 465531, at *3–4 (D.S.C. Feb. 7, 2007), the district court answered this in the

12

affirmative. Yet, there are sufficient factual distinctions which limit the applicability of *McGee*. First, the exam in *McGee* was a pre-entrance exam, and pre-entrance exams are governed by different, more lenient standards, than exams conducted during employment. *See* EEOC Guidance, *Questions and Answers: Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans Disabilities Act* (ADA), 2000 WL 33407183 (July 26, 2000). Second, because the plaintiff in *McGee* had not begun work, there was no evidence he was able to do his job while taking Marinol. 2007 WL 465531, at *1. Third, the plaintiff in *McGee* was invited to rebut the findings of the defendant's doctor, who concluded that the plaintiff's Marinol usage posed a danger, but the plaintiff declined to file any documentation demonstrating his use of Marinol would not compromise his ability to work safely. *Id.* at *3.

In this case, the examination is governed by stricter standards under the ADA because it was not a pre-entry exam. *See* EEOC Guidance, *Questions and Answers*. Second, there is evidence Plaintiff could perform his job safely while using Marinol because all available evidence supports the conclusion Plaintiff was, in fact, performing his job safely. Furthermore, Plaintiff's doctors have stated he could work safely while using Marinol. (Doc. 19-7 at 61, 63.)

Additionally, the Court of Appeals for the Sixth Circuit has been clear, there must be substantial evidence that an individual is unable to perform the essential attributes of her job to warrant an examination. For example, in *Kroll*, the Court of Appeals found the plaintiff's supervisor knew of two incidents where the plaintiff put others at risk during her job as an ambulance driver: talking on her cell phone while driving and refusing to administer oxygen to a patient. 763 F.3d at 625. Furthermore, there were numerous examples of the plaintiff's erratic emotional state, such as starting arguments with a coworker and calling coworkers in tears. *Id.*

13

The Court of Appeals held, even with this evidence, a reasonable jury could have found ordering a medical examination was unnecessary. *Id.*

On the other hand, Marinol can pose serious and debilitating side effects. For example, it can cause "sedation, memory lapses, and worsening of mood." (Doc. 19-2 at 68.) Individuals who take Marinol are warned not to work with heavy machinery. (Doc. 24-1 at 355.) The drug may also have psychoactive effects, and, in Plaintiff's case, it could worsen his depression. (Doc. 24-1 at 347, 350.) Additionally, the risks may be further exacerbated in this case because the FDA has not approved using Marinol to treat anxiety.

Taking all inferences in favor of Defendant, Plaintiff cannot prove there is no genuine dispute of material fact as to whether his Marinol usage affected his ability to perform his work. Plaintiff was taking a drug with potentially debilitating side effects, and it is possible that taking Marinol would prevent him from working safely as a chemist.

Taking all inferences in favor of Plaintiff, Defendant cannot prove there is no dispute of material fact as to whether Plaintiff could perform the essential elements of his job. Defendant had no evidence Plaintiff was acting any differently at work or working in an unsafe manner. As there was no evidence Plaintiff's actual work was impaired, a jury could find that requiring an examination was unreasonable.

Therefore, as to whether there was sufficient evidence Plaintiff could fulfill the essential attributes of his job to support the first examination, summary judgment will be **DENIED** for both parties.

14

### b.     Direct Threat as a Reason for January 6, 2014 Examination

Defendant and Plaintiff both move for summary judgment as to whether Plaintiff's use of Marinol constituted a direct threat in the workplace.   Here, as above, Defendant has presented no evidence Plaintiff's work was disruptive or dangerous at the time of the requested examination. Defendant argues the use of Marinol alone is sufficient to warrant an examination as a direct threat. Plaintiff argues it is not.

While this analysis is similar to whether Plaintiff could fulfill the essential attributes of his job, it is not identical.   *See Kroll*, 763 F.3d at 624–27.   There are two relevant factors which do not appear in the standards for determining if an employee can fulfill an essential attribute of her job.   The opinion of whether an employee constitutes a direct threat must be based on reasonable medical judgment, and there must be an "individualized assessment."   29 C.F.R. § 1630.2(r).

Here, there was no individualized assessment.   The Fitness Program did not analyze any evidence from Plaintiff's supervisors or his files to conclude Plaintiff was a safety risk.   Indeed, in its briefing, Defendant relies upon the conclusion that Marinol *might* have bad side effects, but there was no evidence as to whether any of these side effects occurred.   No one at TVA inquired if Plaintiff had suffered from any side effects before ordering an examination.   *Cf. Breax v. Bollinger Shipyards, LLC*, No. 16-2331, 2018 WL 3329059, at * 13 (E.D. La. July 5, 2018) (denying summary judgment to defendant because while the plaintiff took a potentially dangerous drug, there was no evidence as to whether plaintiff actually experienced debilitating side effects); *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 517–18 (W.D. Pa. 2010) (holding an individualized inquiry was still necessary when an employee admitted to using methadone).

15

Because there was no individualized inquiry, the Court cannot grant summary judgment to Defendant.

Taking all inferences in Defendant's favor, however, the Court could conclude that Plaintiff posed a direct threat. Marinol has debilitating side effects, and the positive drug test may serve as a sufficiently individualized examination. Plaintiff, furthermore, worked a dangerous job where Marinol usage could pose "a significant risk to the health and safety of others . . .." *Kroll*, 763 F.3d at 625 (quoting 42 U.S.C. § 12111(3)). In short, it is possible that while taking Marinol, Plaintiff posed direct threat in his workplace.

Therefore, in so far as whether the first medical examination can be supported on the basis that Plaintiff posed a direct threat, summary judgment will be **DENIED** for both parties.

### c. Scope of January 6, 2014 Examination

Plaintiff argues the January 6, 2014 examination violated the ADA because it was too expansive. Plaintiff specifically argues Dr. Stephen Adams should not have inquired about subjects such as Plaintiff's depression, his love-life, or any physical injuries. Defendant argues all the questions were relevant and useful ways to examine if the Plaintiff could work his job safely.

As stated above, a fitness for work examination cannot be a "an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." *Sullivan*, 197 F.3d at 812. Defendant argues the exam was appropriately narrow because "[m]ental health and physical health are directly connected," and such questions about physical health were appropriate. (Doc. 27 at 20 (quoting *Grassel v. Dep't of Educ. of City of New York*, No. 12-CV-1016, 2017 WL 1051115, at * 9 (E.D.N.Y. Mar. 20,

16

2017)).  Defendant also argues any questions about Plaintiff's depression were appropriate because Marinol may worsen depression or anxiety.

On the other hand, Dr. Stephen Adams admitted he believed the scope of the examination was broad and completely comprehensive.  Dr. Stephen Adams did not acknowledge there could be *any* limit to *any* questions he could ask so long as the information could ultimately bear on Plaintiff's ability to go to work.  (Doc. 32-9 at 19, 21.)  That is not correct.  An employer must provide some limit on the examination to prevent examinations from being the probing examinations the ADA prohibits.  *See Sullivan*, 197 F.3d at 812; *James v. James Marine, Inc.*, 805 F. Supp. 2d 340, 350 (W.D. Ky. 2011).

As for Defendant's motion for summary judgment, Dr. Stephen Adams's understanding that his examination could be wide-ranging and not directly related to the Plaintiff's job means there is a genuine issue of fact as to whether the examination was sufficiently narrow. Furthermore, Dr. Stephen Adams asked numerous questions that may not have had any bearing on the Plaintiff's ability to work, such as questions about his love-life.  Therefore, there is a genuine dispute of material fact as to Defendant's motion.

On the other hand, it may have been reasonable to inquire into a wide range of topics due to the potentially dangerous side effects of Marinol.  Marinol has been known to worsen depression and anxiety, and doctors may need wide latitude in order to evaluate a patient's mental health.  Dr. Stephen Adams could have asked reasonable questions after observing Plaintiff and determining Marinol may have affected Plaintiff's ability to work.  In short, taking all factual inferences in favor of Defendant, Plaintiff has not met his burden for summary judgment, either.

17

Therefore, summary judgment as to the scope of the January 6, 2014 examination will be **DENIED** for both parties.

### d. Actual Harm from January 6, 2014 Examination

Defendant's final argument regarding the January 6, 2014 examination is that Plaintiff has not suffered an actionable injury. Defendant argues the ADA does not provide protection in this case because Dr. Stephen Adams and other medical providers at TVA already knew Plaintiff suffered from depression. While Defendant is correct a prospective plaintiff under the ADA must allege some harm, that requirement does not preclude a suit from someone with a known disability.

Defendant's position would upset well-settled precedent: an individual without disabilities can claim an employer performed an illegal examination under the ADA. *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 252 (6th Cir. 2011); *see also Roe v. Cheyenne Mountain Conf. Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 2011) ("It makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability.") An illegal examination does not need to uncover a hidden disability to be actionable. The plaintiff just needs to prove some actionable injury-in-fact. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) ("[C]ourts have required that a nondisabled plaintiff at least show some tangible injury-in-fact caused by the § 12112(d) violation.") Plaintiff has credibly alleged harm in this case; he alleged the first examination started a chain of causes which ended in his termination. Thus, Plaintiff has alleged sufficient damages under § 12112(d)(4) to create a genuine issue of material fact. Therefore, on this ground Defendant's motion for summary judgment will be **DENIED**.

### 2. January 14, 2014 Examination

18

Plaintiff argues Dr. Leigh's examination on January 14, 2014, violated the ADA. Plaintiff argues this examination was illegal because there was not sufficient evidence from Dr. Stephen Adams's initial examination to warrant a second examination.[5] Defendant argues there was sufficient evidence to warrant a second examination because Dr. Stephen Adams reasonably believed Plaintiff's depression was not well controlled and could have posed a danger in the workplace.

### a. Ability to Perform Essential Functions of the Job as a Reason for January 14, 2014 Examination

For Dr. Leigh's January 14, 2014 examination to be proper, "there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *See Sullivan*, 197 F.3d at 811. When questioned, Dr. Stephen Adams stated the only abnormal behavior by Plaintiff was his sad affect. (Doc. 32-9 at 27–28.) Dr. Stephen Adams opined Plaintiff was "somewhat disheveled . . . not making good eye contact . . . and speaking very softly." (*Id.* at 28.) Additionally, Dr. Stephen Adams had doubts about the safety of Marinol and its potential effect on Plaintiff's wellbeing.

---

[5] Plaintiff also argues first illegal examination tainted all subsequent examinations. Assuming *arguendo* the first examination was illegal, there would be no reason to exclude the evidence gained during the first examination in determining if a second examination was warranted. While the evidence would have been illegally obtained, the well-known doctrine of "fruit of the poisonous tree" generally does not apply outside of criminal trials. *Penn. Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 364 n.4 (1998) ("[W]e have generally held the exclusionary rule to apply only in criminal trials.") Second, even if the Court were free to expand the doctrine, or more accurately to create a new doctrine, there is no reason to do so, because an employee can recover damages for the initial illegal examination. *Id.* at 363 (stating the exclusionary rule only applies in situations where it would result in deterrence to officials who may otherwise violate one's rights).

Turning to Defendant's motion for summary judgment, there must be significant evidence an individual cannot fulfill the essential attributes of her job to make an examination proper. *Kroll*, 763 F.3d at 626–27. And, once again, there was no evidence from Plaintiff's supervisor or anyone Plaintiff worked with that he could not perform his job safely. While there is additional evidence from Dr. Stephen Adams's observations, his observations do not provide sufficient evidence to conclude there is no genuine dispute of material fact as to whether the examination was reasonable, when taking all inferences in Plaintiff's favor. Therefore, as to whether there was sufficient evidence Plaintiff could fulfill the essential attributes of his job as to the second examination, Defendant's motion for summary judgment will be **DENIED**.

Plaintiff is also left with the same evidence as above. Marinol use may, on its own, provide sufficient evidence to support an examination. Furthermore, Dr. Stephen Adam's observation that Plaintiff's depression was not well controlled provides additional evidence that an examination may have been warranted. Therefore, Plaintiff's motion for summary judgment as to his ability to perform the essential functions of his job as a reason for the January 14, 2014 examination will be **DENIED** as well.

### b. Direct Threat as a Reason for January 14, 2014 Examination

Plaintiff and Defendant both move for summary judgment as to whether the January 14, 2014 examination can be supported on the basis that Plaintiff was a direct threat. As stated above, the Court will consider: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r). Unlike the first examination, there was an individualized

assessment, the examination by Dr. Stephen Adams. However, the evidence available still allows for reasonable dispute as to whether Plaintiff posed a direct threat.

The Court will consider Defendant's motion first. On January 14, 2014, there was some evidence Plaintiff posed a direct threat. Plaintiff admitted to taking Marinol, and there was evidence from Dr. Stephen Adam's examination of Plaintiff that his depression was not well controlled. Yet, this evidence is not sufficient to grant summary judgment. A comparison to the Sixth Circuit's case of *Siewertsen v. Worthington Indus. Inc.* illuminates why this evidence is not enough to warrant granting Defendant's motion for summary judgment. 783 F. App'x at 573. In *Siewertsen*, the Sixth Circuit stated a reasonable juror could disagree on whether a deaf employee who drove a forklift posed a direct threat. *Id.* at 573. In that case there was expert testimony the plaintiff could not work safely in that environment. *Id.* Yet, the plaintiff presented his own evidence from experts that he could work safely, and most notably, he presented evidence that he had not acted unsafely in his current job. *Id.* That evidence was sufficient to create a genuine issue of fact as to whether he was a direct threat. *Id.* That result mirrors the facts of this case. There is some expert testimony, the opinion of Dr. Adams, that Plaintiff could not work safely while taking Marinol, but Plaintiff has presented evidence from his own doctors that he could. Also, there is no history of Plaintiff's Marinol usage causing any issues in the workplace. Thus, Defendant's motion for summary judgment will be **DENIED** as to whether Plaintiff posed a direct threat.[6]

---

[6] For comparison, there can be overwhelming evidence an individual poses a direct threat which warrants granting summary judgment. For example, in *Michael v. City of Troy Police,* 808 F.3d 304, 307–09 (6th Cir. 2015), the Sixth Circuit upheld a grant of summary judgment on the

However, Plaintiff's motion for summary judgment as to whether Plaintiff posed a direct threat on January 14, 2014 will also be denied. Marinol's side effects could have posed a threat in the workplace, especially because Plaintiff's work was dangerous. While there was no testimony that the risk ever materialized in Plaintiff's work, such evidence is not necessary in order for an employer to survive summary judgment. *See E.E.O.C. v. Prevo's Family Mkt. Inc.*, 135 F.3d 1089, 1095–98 (6th Cir. 1998) (stating an employer could order an examination on the basis of expert testimony that employee was a direct threat alone). Therefore, Plaintiff's motion for summary judgment will be **DENIED** as to whether the second examination was lawful.

### 3. The March 2014 Examinations

Plaintiff argues the final two examinations, conducted in March 2014 by Dr. Stephen Adams and Dr. Leigh, respectively, violated the ADA as well. Plaintiff argues these examinations were the result of the first illegal examination. That argument is denied for the same reasons stated above as to Dr. Leigh's January 14, 2014 examination. *Supra* § III(A)(2). Plaintiff provides no other specific arguments as to how the March 2014 examinations were improper but makes a general claim that the examinations were not supported by the evidence.

As of March 2014, Defendant had sufficient evidence to support a reentry to work examination. Defendant's reasonable belief Plaintiff could not work safely was supported by the

---

basis a police officer was a direct threat. In that case, experts stated the officer posed a direct threat, *and* there was evidence of extreme and aberrant behavior such as: recording his wife in marriage counseling and trying to get a prosecutor to charge her with perjury, carrying around a box of steroid vials, and trying to get the Police Chief to return those vials once they were confiscated by recording conversations with him and suing him. *Id.* at 309. The court in *Michael* found it persuasive that there were expert opinions and this behavior. Here, there is no evidence of comparable behavior.

opinion of two experts, Dr. Stephen Adams and Dr. Leigh. *See Michael v. City of Troy*, 808 F.3d 304, 307–09 (6th Cir. 2015) (noting while experts can disagree, it is reasonable for a company to rely on the well-founded opinion of an expert). Dr. Leigh produced objective evidence through the MMPI-2 test that Plaintiff's depression was not controlled in January 2014. Indeed, Dr. Leigh concluded there was a level of psychopathy rarely seen on examinations. In March 2014, it was reasonable to conclude Plaintiff could not perform an essential element of his job, the ability to work safely. Therefore, there is no genuine dispute of material fact that the March 2014 examinations did not violate the ADA.[7] Summary judgment for the Defendant will be **GRANTED**. Summary judgment for the Plaintiff will be **DENIED**. Counts III and IV of the complaint will be **DISMISSED with prejudice**.

### 4. The Requirement Plaintiff Disclose all Medications

Plaintiff's final claim for an illegal examination is that he was required to disclose all of his medications upon his return to work. Defendant argues the requirement did not violate the ADA because Plaintiff signed the Last Chance Agreement. Plaintiff argues the Last Chance Agreement is invalid as a matter of law.

---

[7] Plaintiff pleaded the second examination by Dr. Stephen Adams was too expansive. (Doc. 1 at 8.) Yet, Plaintiff has produced no testimony as to which questions, if any, were over-intrusive in Dr. Stephen Adams's second examination. *See* Fed. R. Civ. P. 56 ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.") Additionally, for the reasons stated above, Dr. Stephen Adams could have had reasonable concerns about Plaintiff's depression and anxiety given the findings of Dr. Leigh, and thus a broader examination may have been warranted. Because of this, there is no genuine dispute of material fact that the second exam by Dr. Stephen Adams was appropriately narrow under the ADA.

23

The Sixth Circuit, as well as its sister circuits, have generally accepted last chance agreements. *See Mararri v. WCI Steel, Inc.*, 130 F. 3d 1180, 1184 (6th Cir. 1997) (accepting last chance agreement as a non-discriminatory reason for discharge); *see also Longen v. Waterous Co.*, 347 F.3d 685, 689 (8th Cir. 2003) ("[C]ourts have consistently found no disability discrimination in discharges pursuant to such agreements.")

Plaintiff argues accepting the Last Chance Agreement in this case would be equivalent to a prospective waiver of rights under the ADA. *See Thompson v. Plante & Moran,* 99 F.3d 1140 (Table), 1996 WL 616675, at *3 (6th Cir. 1996) (concluding an employee cannot prospectively waive her rights under the ADA). Plaintiff asks the Court to distinguish *Mararri* because in *Mararri* the plaintiff was settling a prior dispute with the company. 130 F.3d at 1184.

Plaintiff offers no persuasive justification for distinguishing *Mararri* from this case. In *Marrari*, the last chance agreement may have also settled a prior claim, but it also prospectively bound the employee to the contract: he had to comply with new conditions and could be terminated for not conforming to these conditions. *Id.* at 1183. To hold last chance agreements could only settle already existing claims would render the terms of these agreements meaningless. *See Brock v. Lucky Stores, Inc.*, 24 F. App'x 709, 712 (9th Cir. 2001); *See also Longen*, 347 F.3d at 689 ("Moreover, [the plaintiff] has not alleged that he was coerced or was made to sign the [last chance agreement] under duress. Rather, he freely signed it. To find now that [the defendant] cannot enforce the terms of the [last chance agreement] would render all such agreements invalid.") Last chance agreements can serve as a reasonable and beneficial accommodation for a disabled employee. *Blazek v. City of Lakewood*, 576 F. App'x 512, 517–18 (6th Cir. 2014). The Court declines to take a position which would render last chance agreements useless, and existing Sixth

24

Circuit precedent supports the Court's conclusion. *See Keith v. Ashland, Inc.*, 205 F.3d 1340 (Table) 2000 WL 178389, at *4 (6th Cir. 2000) (concluding a last chance agreement provided a nondiscriminatory reason to terminate the plaintiff); *Marrari*, 130 F.3d at 1183 (same).

Plaintiff knowingly and voluntarily signed an agreement with Defendant to disclose all of his medications. In return, he was allowed to return to his employment. As such, Plaintiff cannot now claim the agreement violated the ADA. Therefore, Defendant's motion for summary judgment as to the requirement to disclose all medications will be **GRANTED**. Count V will be **DISMISSED with prejudice**.

### B. Plaintiff's Claim for a Reasonable Accommodation

To establish a prima-facie case for failure to accommodate, a plaintiff must show:

> (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) [the employer] knew or had reason to know about her disability; (4) she requested an accommodation; and (5) [the employer] failed to provide the necessary accommodation.

*Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). Plaintiff claims by refusing to allow him to take Marinol, Defendant failed to accommodate Plaintiff's disability. Defendant argues Plaintiff never requested an accommodation.

The evidence demonstrates there is no genuine issue of material fact. Plaintiff never requested an accommodation. Plaintiff claimed in a deposition that he asked to continue taking Marinol, and in an interrogatory answer he claimed his doctors requested this on his behalf. (Doc. 33-3 at 161; Doc. 33-4 at 2.) Yet, Plaintiff also contradicted himself in his own deposition. When originally asked if he requested an accommodation, Plaintiff simply responded he "requested to continue taking Marinol." (Doc. 33-3 at 160). Plaintiff said he would have

25

requested it "from the doctors," meaning Dr. Stephen Adams or Dr. Leigh, but later stated he did not request to continue taking Marinol before he was told to stop taking Marinol. (*Id.* at 162.) Yet, when asked if he requested the ability to take Marinol after he was told to stop, Plaintiff stated, "I don't think I requested after I was told to stop because it was presented to me that you cannot work here." (*Id.* at 162–63.) Therefore, Plaintiff's broad assertion that he "requested to continue taking Marinol," is contradicted by his more specific testimony that he did not request it before being told to stop taking Marinol and he did not request it after he was told to stop taking Marinol. *Cf. United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998) ("[A] party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony.")

Plaintiff alternatively relies on the assertion that Dr. Charles Adams, his physician, told TVA Marinol was not dangerous and beneficial. But Dr. Charles Adams testified to the following:

> Question: Were you ever specifically asked by Mr. Hixon to request that TVA continue letting him take Marinol.
> Dr. Charles Adams: Not that I recall.
> Q: Do you recall ever making that request?
> A: A request to Whom?
> Q: To anyone at TVA?
> A: No.

(Doc. 33-5 at 125.) Dr. Brian Teliho, Plaintiff's psychiatrist, also testified he cannot remember making a request to Defendant that Plaintiff be allowed to continue using Marinol. (Doc. 33-1 at 47.)

Plaintiff's assertion that he requested an accommodation is not supported by the evidence. Therefore, Plaintiff's assertion does not create a genuine issue of material fact. Summary

26

judgment will be **GRANTED** to Defendant on Plaintiff's failure-to-accommodate claim.   Count VI will be **DISMISSED with prejudice**.

### C.       Wrongful Termination

A wrongful termination claim is evaluated using the familiar burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981).   Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination.   *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002).   To establish a prima facie case under the ADA, a plaintiff must demonstrate "(1) she has a disability, (2) she is 'otherwise qualified for the position, with or without reasonable accommodation,' (3) she 'suffered an adverse employment decision,' (4) her employer 'knew or had reason to know' of her disability, and (5) she was replaced or her position remained open."   *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). An individual is "otherwise qualified" under the ADA if she can perform the essential functions of her work.   42 U.S.C. § 12111(8).   "The inquiry as to whether a function is essential is highly fact specific."   *Hoskins v. Oakland*, 227 F.3d 719, 726 (6th Cir. 2000).

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory explanation for its actions.   *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003) (citing *Burdine*, 450 U.S. at 253).   If the employer does so, the burden shifts back to the plaintiff to demonstrate the employer's explanation is a pretext for discrimination.   *McDonnell Douglas*, 411 U.S. at 802–04, 807.   Pretext can be proven by showing:  "(1) the stated reasons for the defendant's action had no basis in fact; (2) the stated

27

reasons for defendant's action were not the actual reasons; or (3) the stated reasons for the defendant's action were insufficient to explain the [adverse action taken]." *Perryman v. Postmaster General*, 475 F. App'x 585, 587 (6th Cir. 2012); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1390 (6th Cir. 1993).

### 1. Prima Facie Case of Disability Discrimination

Defendant argues Plaintiff is unable to meet his burden of production on the prima facie case. More specifically, Defendant argues Plaintiff was not otherwise qualified for his position as he did not comply with his return to work agreement and "TVA's policy requiring cooperation with [Fitness Program] evaluations, which demonstrated untrustworthiness." (Doc. 30 at 23.) Defendant does not dispute any other element of the prima facie case.

For Plaintiff to be not otherwise qualified, the requirements Defendant identifies would have to be "essential functions" of Plaintiff's work as a chemist at TVA. 42 U.S.C. § 12111(8). "Essential" means "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. 1630.2(n)(1); see *Hoskins*, 227 F.3d at 726 (using C.F.R. for interpretive guidance). The regulations provide:

> a job function may be considered essential for any of several reasons including . . . : the reason the position exists is to perform that function; . . . the function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Id.* at § 1630.2(n)(1)(2)(i)–(iii).[8]

_____

[8] The regulations further provide a list of relevant evidence such as "the amount of time spent on the job performing the function;" "the work experience of past incumbents;" and "the current work experience of incumbents in similar jobs." 29 C.F.R. § (n)(3)(i)–(vii).

Defendant's arguments are unpersuasive, as abiding by the specific aspects of the Last Chance Agreement is not an "essential function" of Plaintiff's work. First, Plaintiff's failure to abide by the Last Chance Agreement does not demonstrate he cannot perform the essential functions of his work. When tasked with determining if a certain requirement is an essential function of a job, the Court is required to analyze the job as a whole, not individualized aspects of the employment. For example, the Court should consider "the work experience of past incumbents," 29 C.F.R. § 1630.2(n)(3)(vii), and in this case no other workers were required to disclose all of their medications to TVA. Even Plaintiff was originally required to report only those medications that would affect his work performance. Furthermore, an individualized employment condition would not be in a "written job description prepared before advertising or interviewing applicants for the job." 29 C.F.R. § (n)(3)(ii). Here, the requirements of the Last Chance Agreement could not have been advertised because once again, Plaintiff was the only employee with these requirements. The evidence shows Plaintiff was the only employee required to disclose all of his medications. If all the other workers could perform their jobs without disclosing their medications, the requirement to do so is certainly not essential.

Defendant's second argument in support of its assertion Plaintiff cannot perform the essential attributes of his job is that Plaintiff did not follow the Fitness Program's policy. Once again this misreads what it means to be essential. The Fitness Program's policy is collateral to the ability of Plaintiff to perform his job. *See Anderson v. Gen. Motors, LLC*, 45 F. Supp. 3d. 662, 675 (E.D. Mich. 2014) (analyzing whether an individual could perform his job in manufacturing with his physical limitations). Plaintiff's fundamental duties were to perform experiments and examinations. They were not to comply with human resources policy. It does

29

not mean a failure to conform to human resources policies is not relevant, but it does mean it is not considered at this stage in the *McDonnell-Douglas* framework.

Plaintiff has produced enough unrebutted evidence to prove the prima facie case. Defendant's one dispute is, as a matter of law, insufficient. Following an individualized human resources policy is not an essential function of Plaintiff's job. Thus, Plaintiff met his burden on the prima facie case.

### 2. Legitimate Non-Discriminatory Reason for Termination

The burden now shifts to Defendant. Defendant must prove there was a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant argues Plaintiff was discharged because he violated the Last Chance Agreement and because the second drug test showed he lied about using marijuana. Plaintiff argues the Last Chance agreement was illegal, any reliance on the drug test was unreasonable, and the test itself was false.

As stated above, violation of a last chance agreement is a valid reason to discharge an individual. To discharge an individual based on a last chance agreement does not mean the individual was discharged because of her disability. *See Mararri*, 130 F.3d at 1185 ("[T]he district court correctly upheld [the plaintiff's] discharge for violating the terms of a valid L.C.A. [last chance agreement].") Because a last chance agreement can serve as a legitimate non-discriminatory reason for termination, Plaintiff's claim can only proceed to trial if that reason was pretextual.[9] *McDonnell Douglas*, 411 U.S. at 802–04, 807.

---

[9] The Court does not need to examine the other reasons provided by Defendant because the Last Chance Agreement is sufficient to carry Defendant's burden at this stage in the *McDonell-Douglas* balancing framework.

30

### 3.    Pretext

In order to proceed to trial, Plaintiff must demonstrate the stated reasons for his termination were pretextual.  At this stage, "an employee may not rely upon his *prima facie* evidence, but must, instead, introduce additional evidence of discrimination."  *Brahmbhatt v. Gen. Prods. Corp.*, No.1:12-cv-919, 2014 WL 2711839, at * 14 (S.D. Ohio June 16, 2014) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  Here, Plaintiff has introduced three more pieces of evidence: (1) Plaintiff's supervisors have not been consistent when explaining their reasons for firing Plaintiff; (2) the letter for Plaintiff's termination was drafted two weeks before his termination; and (3) reliance on the drug test was objectively unreasonable.

The Court will begin with the reasons given by Plaintiff's supervisors.  On January 7, 2015, while testifying under oath, Clepper, the head of the Fitness Program, testified Plaintiff was terminated because he violated the Last Chance Agreement.  She gave no other reasons for Plaintiff's termination.  (Doc. 19-22 at 32.)   Similarly, in response to the question "[w]hat are the circumstances that led to Mr. Hixon's termination of employment," Plaintiff's supervisor responded, "[h]e did not report medications he was on by the 15th."  (Doc. 19-23, 15.)   Yet in an affidavit prepared six months later, Plaintiff's supervisor claimed Plaintiff's positive drug test for marijuana and his dishonesty were additional reasons supporting his discharge. (Doc. 26-1 at 5–6.)  In yet a different deposition, Plaintiff's supervisor stated one of the reasons for Plaintiff's discharge was his dishonesty. (Doc. 27-78.)

Shifting rationales can provide evidence of pretext.   *Ward v. Sevier Cnty.*, 440 F. Supp. 3d 899, 911 (E.D. Tenn. 2020).   In *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), the Sixth Circuit held that when an employer added a reason for failing to hire an

31

employee later in the litigation, the addition to its rationale was evidence of pretext. Thus, while the failure to report medicine has remained as a reason for termination, the added position of Plaintiff's dishonesty about marijuana usage may provide doubt that Plaintiff's termination was legitimate.

If there was a contemporaneous statement that Plaintiff's termination was due, at least in part, to his dishonesty involving drug usage, then the reasons behind Plaintiff's termination would be consistent and there would be no evidence of pretext. The only contemporaneous statement that may include Plaintiff's alleged marijuana usage is the termination letter. The termination letter states, "[y]our behavior brings into question your trustworthiness and reliability," but the only specific reason supporting the discharge included in the letter is failing to disclose medications pursuant to the Last Chance Agreement. (Doc. 26-1 at 11.)[10] It is plausible TVA could have thought failing to disclose medicines brings one's "trustworthiness and reliability" into evidence. That sentence alone is ambiguous. Viewing the evidence in the light most favorable to Plaintiff, it does not unambiguously support that Defendant has always relied on both of its rationales. Defendant is therefore not entitled to summary judgment on Plaintiff's termination.

However, Plaintiff's evidence of discrimination is also not enough to warrant a grant of summary judgment to him. While Plaintiff has met his burden of production, there is a genuine dispute of material fact as to the reason behind Defendant's decision, because he could legally have been terminated for violating the Last Chance Agreement. Furthermore, viewing the

---

[10] The attachment also mentions a failure to disclose information, but the attachment letter was attached inadvertently. (Doc. 19-24.)

evidence in the light most favorable to Defendant, the termination letter referenced Plaintiff's failed drug test, which would negate Plaintiff's evidence of pretext.[11]   Summary judgment as to whether Plaintiff's termination was the result of unlawful discrimination will be **DENIED** for both parties.

### D.   Retaliation

Plaintiff's final claim is Defendant retaliated against him for filing a claim with TVA's EOCO.   Only Defendant moves for summary judgment on this claim.   Like a termination claim, a claim for retaliation follows the *McDonnell-Douglas* balancing framework.   *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

To establish a prima facie case for unlawful retaliation under the ADA, a plaintiff must show "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action."   *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).   The Sixth Circuit has cautioned this is not a high burden.   *Id.*

Defendant contends Plaintiff has not met the fourth element, causation.[12]   Plaintiff argues his termination was temporally close enough to the protected activity to meet this element without

---

[11] The Court, at this point, does not need to consider Plaintiff's additional reasons as to why the reason was pretextual because Plaintiff has already presented an issue that can survive summary judgment.   *See Griffin v. Finkbeiner*, 689 F.3d 584, 596 (6th Cir. 2012) ("Evidence that the employer's proffered reason for the termination was not the actual reason thus does not mandate a finding for the employee, but it is enough to survive summary judgment.") (citations omitted).

[12] Defendant initially argued Plaintiff's supervisor lacked knowledge.   However, Defendant withdrew this argument.   (Doc. 33 at 24 n.12.)

33

any additional evidence.   The Sixth Circuit has recently identified when temporal proximity alone will be sufficient for a plaintiff to meet her burden of production.   *See Mickey*, 516 F.3d at 524–25.   The Court stated most of the time, temporal proximity alone will be insufficient, but in cases "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* at 524.   If there is a delay, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."   *Id.*

Here, the termination occurred about three months after Plaintiff's supervisor discovered a claim was filed with TVA's EOCO.   The Sixth Circuit has held in a number of cases that three months is sufficiently close to satisfy the element of causation.   *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004); *Dye v. Office of Racing Comm'n.*, 702 F.3d 286, 306 (6th Cir. 2012) (collecting cases where the court found that the plaintiff's burden of production was met when the adverse employment action was taken two to three months after the plaintiff engaged in the protected activity under the ADA).   Additionally, in this case, Plaintiff had only been back to work for about two months, and he was fired after his first misstep under the Last Chance Agreement.   This may have been the first time any pretextual reason to fire Plaintiff presented itself.   Thus, taking all inferences in favor of Plaintiff, he has met the relatively slight burden of proving causation.

The burden then shifts back to the defense. The analysis here is the same as the analysis above as to whether Defendant discharged Plaintiff for a non-discriminatory reason.   *See Supra* § III(C)(2).   The same analysis of pretext also applies.   *See Supra* § III(C)(3).   Because the same

analysis applies, there is a genuine issue of material fact as to whether Defendant unlawfully retaliated against Plaintiff. Therefore, Defendant's motion for summary judgment as to Plaintiff's unlawful retaliation claim will be **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff's motion for partial summary judgment (Doc. 19). The Court will **GRANT IN PART** summary judgment for Defendant (Doc. 29) as to (1) the examinations Plaintiff received when he returned to TVA, (2) the requirement Plaintiff disclose all his medications, and (3) Plaintiff's claim for reasonable accommodation. As to all other issues, Defendant's motion for summary judgment will be **DENIED IN PART**. Counts III, IV, V, and VI will be **DISMISSED with prejudice**.

**An appropriate Order will enter.**

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**